# EXHIBIT M

Hearing - May 25, 2018

```
 1        UNITED STATES INTERNATIONAL TRADE COMMISSION

 2                   WASHINGTON, D.C.

 3    _____

 4    IN THE MATTER OF:            )   Investigation No.

 5    CERTAIN ACCESS CONTROL SYSTEMS )   337-TA-1016

 6    AND COMPONENTS THEREOF,       )

 7    _____)

 8

 9           Report of proceedings heard at the hearing

10    in the above-entitled matter held at the

11    Intellectual Property Rights Branch, 90 K Street,

12    Northeast, Washington, D.C. on the 25th day of May,

13    2018 at 10:00 a.m.

14

15    BEFORE:

16         Charles Stewart

17         Christopher Bullard

18         Collin Colt

19         Jessica Wu

20         Alaina Van Horn

21

22    REPORTED BY:  Tina Alfaro, RPR, CRR, RMR
```

Hearing - May 25, 2018

Page 2

```
 1        A P P E A R A N C E S:

 2        ON BEHALF OF THE COMPLAINANT:

 3        FISH & RICHARDSON

 4        BY: JOSEPH COLAIANNI, JR, ESQ.

 5             THOMAS FUSCO, ESQ.

 6             1000 Maine Avenue, SW, Suite 1000

 7             Washington, D.C. 20024

 8             (202) 626-6434

 9

10        ON BEHALF OF THE RESPONDENT:

11        MORGAN LEWIS & BOCKIUS

12        BY: JASON WHITE, ESQ.

13             ERIC NAMROW, ESQ.

14             1111 Pennsylvania Avenue, NW

15             Washington, D.C. 20004

16             (202) 739-5296

17

18

19

20

21

22
```

Hearing - May 25, 2018

```
 1           MR. COLT:  Today the Intellectual Property

 2    Rights Branch of the Regulations and Ruling

 3    Directorate of the Office of Trade of U.S. Custom

 4    and Border Protection will hear oral arguments

 5    related to the request for administrative ruling

 6    submitted under 19 C.F.R Part 177 relating to the

 7    limited exclusion order issued in U.S.

 8    International Trade Commission Investigation

 9    No. 337-TA-106.  Today's arguments will be heard by

10    Mr. Stewart, Mr. Bullard, Ms. Wu, Ms. Van Horn, and

11    Mr. Colt of the Intellectual Property Rights

12    Branch.

13           This administrative ruling is being

14    conducted on an inter partes basis with TTI from

15    the underlying ITC investigation and Chamberlain

16    from the underlying ITC investigation identified as

17    the two parties with a direct and demonstrable

18    interest in the question presented by the ruling

19    request submitted by TTI.  The parties have agreed

20    to provide for transcription of today's hearing at

21    their expense.

22           The Intellectual Property Rights Branch
```

Hearing — May 25, 2018

1    thanks the parties for their submissions to date

2    and also for their participation in today's

3    participation.

4           Who will be representing TTI at today's

5    proceeding?

6           MR. WHITE:  It will be me, Jason White.

7           MR. COLT:  Who will be representing

8    Chamberlain in today's proceeding?

9           MR. COLAIANNI:  Good morning.  Joseph

10    Colaianni from Fish & Richardson on behalf of

11    Chamberlain, and with me is Thomas Fusco also of

12    Fish & Richardson.

13           MR. COLT:  Thank you.

14           We'll hear from counsel for TTI for one

15    hour, followed by a ten-minute break.  Counsel for

16    Chamberlain will then be given one hour, followed

17    by a ten-minute break.  Finally, counsel for TTI

18    will have 20 minutes for rebuttal.

19           Does either party have any questions about

20    the format of today's proceeding?

21           MR. WHITE:  Nothing from TTI.

22           MR. COLAIANNI:  No.

Hearing - May 25, 2018

1           MR. COLT:  Counsel for TTI, please

2     proceed.

3           MR. WHITE:  Thank you.

4           Good morning, everyone.  As you heard, my

5     name's Jason White, I'm from Morgan Lewis, and I'm

6     here on behalf of TTI.  Also with me is Eric Namrow

7     also from Morgan Lewis.  We appreciate you all

8     hearing from us on a Friday before the holiday, and

9     we'll try to be as brief as we can to get us out of

10    here as quickly as possible.  We have some slides

11    and we've given you hard copies, but most of them

12    will be projected on the screen.

13          So here's a brief summary of the issues.

14    TTI is requesting a ruling of its redesigned garage

15    door openers, which we've abbreviated as GDO's, do

16    not infringe Chamberlain's '319 Patent.  The ITC

17    found a violation of the '319 Patent based on a

18    wired connection between a keypad that is mounted

19    on a wall and a head unit which is the unit that's

20    mounted in the ceiling of your garage.

21          MR. BULLARD:  Mr. White, can we talk a

22    little bit about that article that was found to be

Hearing - May 25, 2018

1      violative in the ITC investigation?

2                MR. WHITE:  Sure.

3                MR. BULLARD:  In the underlying

4      investigation my understanding is that TTI took the

5      position that the motor control unit, MCU, was the

6      claimed "Set motor drive having a microcontroller,"

7      that microcontroller; is that correct?

8                MR. WHITE:  That is correct, yes.

9                MR. BULLARD:  And it was the position of

10     TTI that all of the limitations of claim 1 were not

11     met because if that is identified as the noted

12     microcontroller, that microcontroller is not

13     connected to the identified microcontroller of the

14     wall console by means of a digital data bus; is

15     that correct?

16               MR. WHITE:  Correct.  It was not connected

17     by a wire, there was no hard wire connection to

18     that.

19               MR. BULLARD:  Yes.  And so in any

20     underlying investigation isn't it so that the ALJ

21     found that, in fact, the WiFi MCU was identifiable

22     as the "Microcontroller of said motor drive unit

Hearing - May 25, 2018

1    having a microcontroller"?

2           MR. WHITE:  That's also correct, yes.

3           MR. BULLARD:  And that the connection from

4    that microcontroller to the microcontroller in the

5    wall unit was sufficient to meet the claim

6    language?

7           MR. WHITE:  Correct, because it was a

8    wired connection.

9           MR. BULLARD:  Yes.  So the nature of that

10   wire connection, what has changed with your

11   redesign?

12          MR. WHITE:  Sure.  So with respect to the

13   one that was found to infringe, from the wall

14   console there was a wire that you may see in

15   garages that ran along the wall, up across the

16   ceiling, you kind of put staples in it to hold it

17   there, it ran directly from the wall console up to

18   the head unit and connected directly to the WiFi

19   microcontroller board.

20          MR. BULLARD:  How did it connect directly

21   to the WiFi --

22          MR. WHITE:  It had wires that ran all the

Hearing — May 25, 2018

1    way, from the wall console all the way up to the

2    head unit to that controller.

3         MR. BULLARD:  Now, physically speaking, in

4    the redesign there are wires that extend out of the

5    head unit into a receiver; is that correct?

6         MR. WHITE:  Correct.  The receiver mounted

7    at the head unit.  There was no wires that extend

8    to the wall console.

9         MR. BULLARD:  I understood that from the

10   receiver to the wall unit there's no wires that

11   extend, but from the receiver itself to the head

12   unit -- so those wires go out of the receiver, they

13   exit the receiver at some portion, they enter

14   another portion of the head unit.  The place where

15   those wires enter the head unit, is that different

16   in any way than the place where the wires prior to

17   the redesign enter the head unit?

18        MR. WHITE:  The place where they enter is

19   not different.

20        MR. BULLARD:  So if you take, for example,

21   a 6-inch stretch of wire, so the place where the

22   hires now enter the head unit and the wires extend

Hearing — May 25, 2018

1    out, you would cut that, and if we look at -- prior

2    to your redesign if we looked at that whole article

3    with that cut in the wire, would it be identical?

4    Would it include wires extending 6 inches out, for

5    example, to the same place as in the redesign?  Not

6    looking past those wires, whether it's a continuous

7    wire connection to the wall console or in the

8    redesign extends to a receiver, would that be

9    identical?

10         MR. WHITE:  I'm not sure I follow that

11    question.  So you're taking the old design and

12    you're cutting --

13         MR. BULLARD:  We'll take the old design

14    and we'll simply extend 6 inches out from where

15    the -- or we can even say 2 inches out, 3 inches

16    out.  The point is that it's sufficiently proximal

17    of where you now have an receiver, a radio

18    receiver, wireless receiver, and in the old unit

19    you cut the wires.

20         MR. WHITE:  Okay.

21         MR. BULLARD:  Now, in the new unit you do

22    the same exercise.  At that point from where the

Hearing - May 25, 2018

1   wires extend out you cut the wires before it

2   reaches the wireless receiver.  Is there any

3   difference physically between those two articles,

4   the one that we started with before the redesign

5   with the cut wires or the redesign with the cut

6   wires?

7         MR. WHITE:  I think the answer is no.  The

8   head unit itself did not change, it's only the wall

9   counsel that changed.

10        MR. BULLARD:  Okay.  Thank you.

11        MR. COLT:  Mr. White, would that apply to

12  the '201 as well as the '126?

13        MR. WHITE:  Correct.  Yes.

14        MR. COLT:  Thank you.  Please proceed.

15        MS. WU:  Mr. White, I have one more

16  follow-up question.  Is the receiver part of the

17  head unit or is it separate?

18        MR. WHITE:  So we believe if you look at

19  the definition as the ITC interpreted it, that

20  wireless receiver is part of the head unit.  It's

21  much the same as the antenna that have a wire,

22  there's a wire that extends out through the head

Hearing — May 25, 2018

1     unit through the antenna and it's attached to it.

2     We make it the same.  I don't think that matters

3     honestly when we get to the issues, but in response

4     to your question the answer is yes, it is.

5           MS. WU:  Thank you.

6           MR. WHITE:  So as we just talked about,

7     TTI redesigned the GBO that was accused of

8     infringement to include a wireless keypad that

9     communicates wirelessly with the head unit.

10    Chamberlain now alleges that claims 1 and 9 cover

11    what they phrased a part wired/part wireless

12    connection, and that's what we take issue with

13    because this part wired/part wireless connection

14    was something that was never raised.  In fact, it

15    was disclaimed by them when you see the statements

16    that they took before the ITC and before the IPR

17    folks.  In trying to distinguish their patent from

18    the prior art they took the position that it did

19    not cover wireless transmission.  So that's why we

20    say the new infringement theory is contrary to

21    prior positions they took.  it reads on the prior

22    art, in fact.

Hearing — May 25, 2018

1              MR. BULLARD:  What specific statements do

2       they make in either of those proceedings that

3       disclaimed a —— that make a disclaimer that you're

4       now arguing?

5              MR. WHITE:  Sure.  I'll get to it, but I

6       could jump ahead if you'd like just to see some of

7       the quotes.  So bear with me one second.  I'm going

8       to go ahead to the slides in the early 40s.  I

9       think it's 40, 41 if you want to look at your paper

10      copy.

11             So here was the argument.  This is just a

12      little bit of a setup.  This was the position that

13      they took for infringement before the ITC.  Their

14      opinion was that the digital data bus requirement

15      was satisfied because the WiFi (indecipherable) was

16      connected by a two-wire serial connection to the

17      head unit.  So that was the position that they

18      took.  There was a wireless connection in the prior

19      unit, it had an antenna going to a wall console.

20             MR. BULLARD:  Did that wall console that

21      it went to have a microcontroller?

22             MR. WHITE:  It does, yes, and it was not

Hearing - May 25, 2018

```
1     accused.  Here was their statement.  This is
2     Chamberlain's words in the briefing they submitted
3     to the ITC.  They said "All '319 Patent claims
4     related to wired digital communications between a
5     garage door opener's wall console and head unit."
6     They didn't say it relates to part wired/part
7     wireless, they didn't equivocate.  They said that
8     the connection from those two had to be wired.
9           MR. COLT:  Mr. White, which prior art is
10    this distinguishing?  Is it Doppelt?
11          MR. WHITE:  Doppelt is the prior art that
12    we think is closest, yes.
13          This was another statement here on slide
14    42 from their prehearing brief.  Again, this was
15    important because this was talking about prior art.
16    The statement we looked at before on slide 41, this
17    was them talking about why the claims are
18    infringed.
19          MR. BULLARD:  Mr. White, can you go back a
20    slide.
21          MR. WHITE:  Sure.
22          MR. BULLARD:  Just to be clear, this
```

Hearing — May 25, 2018

```
1     statement "All '319 Patent claims relate to wired

2     digital communications between a garage door

3     opener's wall console and head unit," is that a

4     statement that is made to distinguish over the

5     prior art?

6               MR. WHITE:  This one is not.  The next one

7     is.

8               MR. BULLARD:  So please direct our

9     attention.

10              MR. WHITE:  Here's later in their brief.

11    You see this one is early.  This one is on page 4

12    and 5 of two different briefs and we've got the

13    cites there at the bottom.  We've cited the

14    exhibits are Exhibit J and Exhibit K.  Those are

15    the exhibits to our briefing.  So if you're going

16    to look for these, that's where you'll find them.

17    We try to have that on every slide.  This is from

18    later in their brief where they're talking about

19    distinguishing their claims from the Doppelt prior

20    art reference.

21              Now, we did not argue before the ALJ that

22    a wireless communication would meet the claim
```

Hearing - May 25, 2018

1    limitations.  The reason was that the agreed

2    construction between the parties was that there had

3    to be a conductor that connected the wall console

4    to the head unit.  So we did not take the position

5    that a wireless connection from the prior art wall

6    console to the prior art (indecipherable) meet the

7    claim requirement.  But even though we didn't take

8    that position Chamberlain said to the extent that

9    we would try to argue that, they say it's an

10   attempt at misdirection.  Why?  Because they said

11   the wireless remote transmitters are irrelevant to

12   their claim requirements.  They are by their nature

13   not wall consoles, nor are they wired to the head

14   unit which claims 1 and 9 also require of the wall

15   console.

16           MR. COLT:  Mr. White, is it your position

17   that the outdoor keypad in Doppelt is a wall

18   console?

19           MR. WHITE:  Absolutely.  If you look at

20   the Commission interpretation of that -- and that

21   is -- you've got that on slide 6 in your

22   presentation materials.  This was something that

Hearing — May 25, 2018

1    went all the way up to Commission on appeal from

2    Chamberlain because of the judge's ruling that a

3    wall console had to include a passive infrared

4    detector.  So the original construction from the

5    ITC judge was that the wall console had to include

6    a passive infrared detector.

7          Chamberlain appealed that up to the

8    Commission, the Commission reversed the ALJ and

9    said no, it doesn't have to include a passive

10   infrared detector, here's what a wall console is.

11   A wall console is "A wall-mounted control unit."

12   Chamberlain never argued it had to be indoor or

13   outdoor or anything like that.  The construction

14   from the Commission is a wall mounted control unit.

15   So that's why the outdoor keypad number 34 in

16   Doppelt qualifies.

17         MR. COLT:  On page 160 of the initial

18   determination the ALJ characterizes your position

19   as not accusing Doppelt of having a microcontroller

20   in the wall console.

21         MR. WHITE:  Correct, because we were

22   arguing that the wired console -- so there's two in

Hearing - May 25, 2018

1    Doppelt.  Let me see if I can find this slide from

2    Doppelt for you.  I have to go back a few.

3         There's two different wall consoles in

4    Doppelt, there's a wired one and there's a wireless

5    one.  The wired one did not have a microcontroller

6    in it, the wireless one did.  Here's Doppelt.  On

7    the screen we've highlighted the blue which is the

8    keypad 34 that has the controller in it.  That's on

9    the left.  I know it's hard to see on the screen

10   you're looking at.  There's also a wall console by

11   the door.  In Doppelt -- again, the parties had

12   agreed that the connection from the wall console to

13   the head unit had to be conductors, it had to be

14   wired.  So we were arguing that the Doppelt wall

15   console there that's connected via wire is what

16   rendered the claims invalid.  That console did not

17   have a controller in it.

18        MR. BULLARD:  Mr. White, how do we

19   reconcile your position with the statements in the

20   initial determination regarding your

21   noninfringement position?  Specifically I am

22   referring to on page 135 of the initial

Hearing - May 25, 2018

1    determination where the Administrative Law Judge

2    addressed your noninfringement position that, in

3    fact, it was the motor control MCU that was the

4    correct microcontroller and that was not connected

5    to the controller in the wall unit because there

6    was a break in the conductors of optoisolators.

7         Specifically the ALJ notes that "Even

8    under Respondent's interpretation of 'motor drive

9    unit' the limitation is still met.  The presence of

10   optoisolators does not negate the presence of

11   conductors also in the communication, which is all

12   the claim requires."

13        So is it your position that the claim

14   requires an entire end-to-end connection between

15   the controllers of a conductor and, if so, how do

16   we reconcile that with this statement by the ALJ?

17        MR. WHITE:  Yeah, I believe it does.  The

18   ALJ did not have the benefit of considering the

19   Doppelt reference's wireless connection in the

20   context of evaluating these issues, and that's

21   important.

22        MR. BULLARD:  How is that relevant to his

Hearing - May 25, 2018

1     consideration of the construction of the claim?

2          MR. WHITE:  It's very relevant because you

3     cannot interpret the claims to read on the prior

4     art.

5          MR. BULLARD:  Is that a per se rule that

6     any time that there's prior art you cannot have the

7     claims read on the prior art?

8          MR. WHITE:  If you -- yeah, that's always

9     the rule, you want to try to preserve literally the

10    claims.

11         MR. BULLARD:  You cite three cases to that

12    proposition and I find that that's a very fast and

13    loose representation of when that rule is applied.

14    We can take it on a case-by-case basis if it's

15    helpful, but if you're encouraging us to apply a

16    narrowing -- almost an introduction of a negative

17    limitation on that basis, I think that we would

18    have to have more comfort than we currently do that

19    the cases that you're presenting are relevant to

20    the facts that we have here.  So can we go on a

21    case-by-case basis?

22         MR. WHITE:  Sure, if you'd like.

Hearing - May 25, 2018

1              MR. BULLARD:  For example, you cite Ruckus

2      Wireless v. Innovative Wireless Solutions and here

3      you say "The cannons of claim constructions provide

4      additional reasons to limit the scope of the claims

5      to wired communication.  If after applying all

6      other available tools of claim construction the

7      claim is ambiguous, it should be construed to

8      preserve its validity."

9              In that case the very title of the patent

10     referenced telephone lines.  In fact, the Federal

11     Circuit opinion noted that the specification, the

12     intrinsic evidence in that case militated against

13     applying it to a wireless connection.  I don't see

14     anything in the record before us that is similar in

15     nature that militates against an application of

16     wireless.

17             In addition, the judge's position is not

18     one that -- of that connection, that the data bus

19     itself needs to be wireless.  It appears to be that

20     the position is that the inclusion of conductors

21     along that sequence is all the claim requires.

22             MR. WHITE:  I agree.  I think he did say

Hearing - May 25, 2018

1    that I would say in dicta because he did not rely

2    upon that in forming his opinions, but, again, in

3    the context he did not get to consider the Doppelt

4    reference and its wireless connection.

5         So let me go back and answer a couple

6    questions there.  The '319 Patent does not disclose

7    any wireless communications between a wall console

8    and a head unit.

9         MR. BULLARD:  Is the patent required to

10   disclose every embodiment?

11        MR. WHITE:  It's not required to disclose

12   every embodiment, but when that's the only

13   embodiment, the claims can be limited to the scope

14   when they've only disclosed one embodiment.

15        MR. BULLARD:  Would a person having

16   ordinary skill in the art at the time of the

17   invention understand a wireless connection to be a

18   conventional signal channel?

19        MR. WHITE:  A conventional signal channel?

20   Wireless was known at the time, it predates.  In

21   fact, that's why I say Doppelt discloses that years

22   before.

Hearing — May 25, 2018

1        MR. BULLARD:  So it was a convenional

2    signal channel?

3        MR. WHITE:  I don't know exactly what you

4    mean by conventional.  I'd say it was something

5    that was known in the prior art.

6        MR. BULLARD:  So to the extent that the

7    intrinsic evidence references the type of

8    communication channels of Doppelt, I would draw

9    your attention to column 2 starting at line 64.

10   "It's a principal aspect of the present invention

11   to provide a quick and easily retrofitted passive

12   infrared detector for controlling the elimination

13   of a garage door operator through conventional

14   signaling channels."  I mean, the very nature of

15   what is proposed in the '319 Patent is not so

16   different than the type of retrofit you're

17   proposing by simply replacing a wall console and

18   making it compatible with an existing system.

19       MR. WHITE:  I would say it definitely is.

20   The whole point of Doppelt was you could use the

21   existing wired connection to move an infrared

22   detector from a head unit down to a wall console.

Hearing - May 25, 2018

1     So if you read the '319 Patent, it talks about the

2     fact that passive infrared detectors were known to

3     exist and be located at the head unit.  They said

4     there's some advantages to having it located at the

5     wall console instead of in the head unit, and what

6     we can do is we can introduce a wall console that

7     has a passive infrared detector and retrofit it to

8     an existing unit by using those wires.  So that is

9     exactly what they were talking about it,

10    retrofitting it using the wires.  They were not

11    saying you can add a wall console that's wireless.

12    There's no mention of wireless anywhere in there.

13         MR. BULLARD:  So I still don't understand

14    how you can account for the fact that the ALJ said

15    even the interruption of the connection by the

16    optoconnectors, the optical -- the nonconductive

17    communication link, how that distinguishes.  Are

18    you saying that the claims as properly construed

19    require a continuous conductor connection between

20    one microcontroller and another and anything else

21    is outside of the scope of the claims?

22         MR. WHITE:  I think to avoid the prior

Hearing — May 25, 2018

1    art, yes, they do, and let me show you why.  So

2    here's what we've got.  This is the Doppelt

3    reference.  This is the prior art that predates it

4    by six, seven years.

5        MR. BULLARD:  But, again, what triggers us

6    looking at the prior art?  We're not talking about

7    Doctrine of Equivalents, we're not talking about

8    limiting the scope of the claims so that they don't

9    encompass the prior art.  We're talking about

10   literal infringement.

11       There are many, many cases where you can

12   properly construe the scope of the claims, but

13   nevertheless that claim is found to be invalid

14   because it encompasses the scope of the prior art.

15   This is not an exercise in discussing the Doctrine

16   of Equivalents.  It's applying the scope of the

17   claims as presented with the guidance that we have

18   from the ALJ in the underlying investigation.

19       You are now asking us to go against that

20   guidance that was given to us by the ALJ.  You've

21   indicated that the conductors that extend outside

22   of the head unit are the same, that those

Hearing - May 25, 2018

1    conductors that are used to communicate with the

2    wall console are interrupted by a wireless

3    communication, and you're saying that despite what

4    the ALJ has said in the underlying investigation we

5    should now take a narrower interpretation of the

6    claims because of the prior art.

7           At this moment I remain unconvinced that

8    there are facts in this case that would cause us to

9    deviate from that guidance given to us by the ALJ.

10          MR. WHITE:  I appreciate that.  Give me a

11   chance to convince you.

12          So remember too, this was dicta.  The

13   judge relied upon a wired connection from the wall

14   console to the WiFi microcontroller board to find

15   infringement.  He did go on to say, you know, even

16   if there was a different construction, if I was

17   looking at something else it might still also need

18   it, but he relied upon a wired connection from the

19   wall console to the WiFi board.

20          MR. COLT:  The ALJ said that the motor

21   control MCU was one of two microcontrollers in the

22   head unit.  Was that also dicta?

Hearing — May 25, 2018

1          MR. WHITE:  No.  I think that's just a

2    statement of fact.  I mean, there was no ruling on

3    that.  He said what was sufficient -- just so we're

4    clear, the claim limitation is motor control unit.

5    We said there's a board in the head unit that

6    actually controls the motor, that's the one we

7    think it should be.  Chamberlain said no, no, the

8    motor control unit is anything in the head unit and

9    we can show a wired connection from the wall

10   console to a WiFi board, we can show a wired

11   connection to one microcontroller in the head unit

12   and that's good enough even though that controller

13   doesn't the control the motor, and that's what the

14   judge agreed on.  So just by a little bit of

15   context.

16          If you look at the Doppelt reference --

17   now, again, these arguments are not made before the

18   judge because --

19          MR. BULLARD:  Why are we looking at the

20   Doppelt reference for the scope of the claims?

21          MR. WHITE:  Because they are trying to now

22   interpret the claims broader than the ALJ

Hearing - May 25, 2018

1      interpreted them.  They are trying to read into --

2           MR. BULLARD:  Let's take a step back.

3      Let's be even more fundamental than this.  We're

4      performing an exercise in claim construction.  So

5      we're looking at the intrinsic evidence and then we

6      start to look at the extrinsic evidence.

7           MR. WHITE:  Right.

8           MR. BULLARD:  And there are certain

9      triggers that cause us to look to the extrinsic

10     evidence to limit the scope of the claims.  You're

11     saying that in this case the prior art should be

12     considered in understanding the scope of the

13     claims.  What is the trigger in this case that

14     causes us to do that so that we would have

15     confidence saying, oh, we must look at the Doppelt

16     reference because that instructs the true scope of

17     the claims?  Before we dive into what the Doppelt

18     reference says, is there something in the intrinsic

19     record, prosecution history estoppel, arguments

20     made to preserve patentability, the disclosure in

21     the specification?  I haven't heard anything yet

22     that puts us there.

Hearing - May 25, 2018

1       MR. WHITE:  So it's all of that.  The

2   disclosure in the specification is limited to a

3   wired connection.  There is no mention of a

4   wireless connection anywhere.

5       MR. BULLARD:  Well, simply stating in one

6   embodiment -- we would have an exhaustive

7   disclosure in every patent application if we had to

8   enumerate every possible application of technology

9   to the underlying supporting elements in the

10  innovation.  So is there anything in there that

11  specifically -- as in the case that you cited that

12  militates against a broken connection?

13      MR. WHITE:  Absolutely.  We have, again, a

14  disclosure of wireless not used for a wall console,

15  and then you've got a limited disclosure for a wall

16  console connection of being wireless.  So wireless

17  was a prior art thing, it was shown in Doppelt, it

18  existed for years, and they had an opportunity if

19  they wanted to say this related to wireless to say

20  it in the patent itself.

21      MR. BULLARD:  So your position is that we

22  should consider the prior art merely because

Hearing — May 25, 2018

1    there's no discussion of the bus 62 being wireless?

2         MR. WHITE:  No.  We get there because of

3    the ambiguity with the entire record.

4         MR. BULLARD:  Where is that ambiguity

5    created?

6         MR. WHITE:  I'm working on getting there.

7    So we've got the record below where they took the

8    position that the wire was what infringes and

9    that's what the judge relied upon.  We've got all

10   their statements in the underlying case.  So I went

11   to slide 41.  We talked about the statements from

12   the prehearing brief saying that all the claims

13   relate to wired connections.  We then have this

14   slide 42 that we talked about before where they say

15   the claims require a wired connection to the head

16   unit.  It's a wired connection from the wall

17   console to the head unit.  They claimed it required

18   a wired connection.

19        We asked their expert —— this is slide 43.

20   This is the expert that was testifying before the

21   judge in the ITC matter.  We asked him "You'll

22   agree with me that the '319 Patent does not claim a

Hearing — May 25, 2018

1   wirelessly connected wall console," and he said

2   "That's correct."

3           MR. BULLARD:  This is before the ALJ in

4   the underlying investigation?

5           MR. WHITE:  Correct.

6           MR. BULLARD:  The same ALJ who said that

7   this is all the claims require?

8           MR. WHITE:  Yes.

9           MR. BULLARD:  Okay.  Thank you.

10          MR. WHITE:  This is his answer, "That's

11  correct."  And we went on and said "In fact,

12  they're limited to a wired connection between the

13  microcontroller in the wall console and the

14  microcontroller in the motor drive unit."  He said

15  "Yes."  So these are statements from Chamberlain.

16          We also have a statement from the

17  deposition in the IPR, and this is, again,

18  important because they were trying to preserve the

19  validity of their patents here.  We wanted to be

20  clear as to whether we were talking about wired

21  connections or wireless connections, what do those

22  claims cover, because that affects how you could

Hearing — May 25, 2018

1    argue the case in terms of invalidity.

2        We asked him "Within the confines of the

3    '319 Patent would sending signals, digital signals

4    using radio frequency or other wireless means be

5    conveying digital signals over a digital data bus?"

6    So in their opinion if you sent wireless signals,

7    would that be conveying digital data over digital

8    data bus, he said no.  So you've got conflicting

9    positions.  Before the ITC they said all patent

10   claims related to wired digital communications.

11   Here they're telling you the '319 Patent claims do

12   not recite a wired connection.

13       They cannot have it both ways for several

14   reasons.  First of all, you can't --

15       MR. BULLARD:  Is relating to a particular

16   type of connection the same as solely limited to a

17   certain type of connection?

18       MR. WHITE:  I think that's the only way

19   you can read it in context, absolutely.  It's the

20   only way.  And you've got case law that says you

21   cannot interpret the claims differently for

22   infringement and validity.  We know that.  There's

```
1      also claims that say you are estopped if you,

2      Chamberlain take a position on the scope of your

3      claims --

4              MR. BULLARD:  Wasn't that what the ALJ was

5      doing?  He was saying even under Respondent's

6      interpretation the limitation is still met?

7              MR. WHITE:  Yeah, and I understand that.

8              MR. BULLARD:  That was the interpretation

9      for the purposes of infringement?

10             MR. WHITE:  It was not.  It was not.  I

11     told you, he found infringement based upon -- if

12     you read his decision, he found infringement based

13     on the wired connection from the wall console to

14     the WiFi board, there was a wired connection there,

15     and he said that's all that was required.  He went

16     on, I agree, in dicta to mention some other things,

17     but that was without this informed position as to

18     how the position they're taking now would conflict

19     with their prior statements and also read on the

20     prior art.  We can see it here.  They said before

21     the ITC patent claims related to wired, now they're

22     saying they don't require a wired connection.
```

Hearing - May 25, 2018

```
1              MR. BULLARD:  At any time before the
2    proceeding before the IPR did they distinguish over
3    prior art that had the type of connection that you
4    have by saying that is not within the scope of our
5    claims, specifically saying this claim element
6    where you have a connection between point A and
7    point B that is interrupted by a wireless
8    connection, an optoisolator, that is not within the
9    scope, it does not meet this claim element?  Do
10   they have a clear disclaimer of that nature?
11             MR. WHITE:  In the IPR, no, because we did
12   not argue a wireless connection was added.
13             MR. BULLARD:  Was there any clear
14   disclaimer in the prosecution history of such a
15   connection.
16             MR. WHITE:  I think in the prosecution
17   history, no, again, because no one applied a
18   wireless prior art reference.  It was understood
19   and I think accepted by everybody that it required
20   a wired connection.  Now, before the ITC judge they
21   did --
22             MR. BULLARD:  We're looking for something
```

Hearing - May 25, 2018

Page 34

1      more than understood and accepted.  We're looking

2      for a clear disclaimer.

3              MR. WHITE:  Sure.  I think this is as good

4      as we've got here on slide 42, which is from page

5      67 of their brief, where they were talking about --

6      this is, again, distinguishing -- this is the only

7      time when they attempted to distinguish a prior art

8      reference that had wireless.  Again, we didn't make

9      the argument, no one argued that wireless covered

10     it, but they went ahead and took a chance anyway

11     and said, here, if you're going to look at the

12     wireless connection in Doppelt, here's why it's not

13     good enough.

14             They say the wireless keypad in Doppelt is

15     not wired to the head unit which claims 1 and 9

16     require of the wall console.  They said that the

17     wall console had to be wired to the head unit.

18     They didn't say it could be a partially wired/

19     partially wireless.  You can look through the

20     entire record -- and I think this is important.

21     They have said that they've always taken the

22     position that this covers a part wired/part

Hearing - May 25, 2018

1    wireless.  They said it twice in their papers.

2    They say "Chamberlain has always maintained that

3    the claims indeed cover such a connection and it

4    appears in Respondent's brief."  They have no cite

5    for that, nothing.  They said it again.

6    "Chamberlain has always maintained the '319 Patent

7    covers a part wired/part wireless wall console

8    connection."  No citation because they never took

9    that position.

10         You can look at the entire record.  It

11   never talks about a part wired/part wireless

12   connection.  Never made that argument.  It's new

13   here and it directly conflicts with the position

14   they took and the argument that they made to

15   distinguish prior art.

16         MR. COLT:  Mr. White, let's say I agree

17   with you that under Chamberlain's construction

18   Doppelt is an anticipatory reference.  Was it ever

19   distinguished in the '968 parent patent application

20   or the '605 Patent over which double patenting

21   rejection had been traversed?

22         MR. WHITE:  Distinguished in what sense?

Hearing - May 25, 2018

```
1           MR. COLT:  Distinguished from the '319
2    Patent disclosure or claims.
3           MR. WHITE:  Was the Doppelt reference
4    distinguished?
5           MR. COLT:  Yes.
6           MR. WHITE:  I don't know if it was
7    discussed in the parent references, in the parent
8    applications.
9           MR. BULLARD:  Would you understand the
10   connection from the receiver to -- we'll just say
11   for argument sake the remainder of the head unit in
12   the redesign articles, would that meet your
13   construction of the limitation "a digital data
14   bus," that wired connection between the receiver
15   and the remainder of the unit?
16          MR. WHITE:  If it connected to the wall
17   console, yes.
18          MR. BULLARD:  So it's not by means of a
19   digital data bus.  So a digital data bus in and of
20   itself, are you saying that from the receiver to
21   the rest of the unit, that wired connection is not
22   a digital data bus?
```

Hearing — May 25, 2018

1           MR. WHITE:  No.  I think we have to say

2      that that is.

3           MR. BULLARD:  Okay.  So that is a digital

4      data bus?

5           MR. WHITE:  Yeah.  I think just like the

6      connections internal to Doppelt and other

7      references would qualify as well.

8           MR. BULLARD:  So let's look at it on a

9      limitation-by-limitation basis to fully understand

10     what limitation you would have to say is not met.

11     So here in your redesign articles you have a motor

12     drive unit including a motor for opening and

13     closing a garage door, correct?

14          MR. WHITE:  We do, yes.

15          MR. BULLARD:  You have a microcontroller,

16     "said motor drive unit having a microcontroller."

17     So you have a microcontroller?

18          MR. WHITE:  Yes.  As the ALJ has

19     interpreted, we do have a microcontroller in the

20     head unit.

21          MR. BULLARD:  Very good.  And you have a

22     wall console in your redesigned articles?

Hearing — May 25, 2018

1       MR. WHITE:  We do have a wall console,

2    yes.

3       MR. BULLARD:  And the wall console has a

4    microcontroller?

5       MR. WHITE:  It does, yes.

6       MR. BULLARD:  We're going to come back to

7    the next limitation.  It has a digital data bus

8    that extends from that controller in the motor

9    drive unit to a receiver?

10       MR. WHITE:  Correct.

11       MR. BULLARD:  And so the next limitation

12    we want to revisit is "Said microcontroller of said

13    motor drive unit being connected to the

14    microcontroller of the wall console."

15       MR. WHITE:  Correct.

16       MR. BULLARD:  It's your position that it

17    is not connected to that by means of a digital data

18    bus, that digital data bus being that connection

19    there to the wireless receiver, it's not connected

20    to the wall console by means of that?

21       MR. WHITE:  That's right.  You cannot

22    extend the scope of that limitation to cover what

Hearing - May 25, 2018

1    they're now saying is this part wired/part wireless

2    configuration, that's correct.

3         MR. BULLARD:  So you require being

4    connected to -- the microcontroller in the drive

5    unit being connected to the microcontroller in the

6    wall console by means of a digital data bus to

7    require a continuous conductor connection from one

8    microcontroller to the other?

9         MR. WHITE:  I think it has to be in order

10   to avoid the prior art.

11        MR. COLT:  And it's your position that the

12   intrinsic evidence is ambiguous?

13        MR. WHITE:  Correct.  When you look at

14   everything that we have here, including the

15   intrinsic evidence and the evidence before the ALJ,

16   when you look at their statements about what the

17   claims cover, I think it's crystal clear that

18   they've excluded wireless communications.  When you

19   consider all of that and then consider their

20   construction now that it covers a part wired/part

21   wireless, how can that be based upon their

22   statements?  I think their statements before the

Hearing — May 25, 2018

Page 40

```
1      ITC judge at least make it ambiguous.  We think

2      it's determinative that it doesn't cover wireless,

3      but their statements at least before the ALJ and

4      the IPR judges make it at least ambiguous as to

5      whether these claims can cover a part wired/part

6      wireless.

7              MR. BULLARD:  What is the purpose of that

8      digital data bus that extends from the RF receiver

9      to the rest of the head unit?

10             MR. WHITE:  Just to connect the two

11     components.

12             MR. BULLARD:  So it's to connect the

13     components for the exchange of digital data?

14             MR. WHITE:  It's to connect the receiver,

15     right.  Again, this is no different than what's in

16     the prior art.

17             I've got up on the screen now slide 78.  I

18     want to make sure that we're all clear as to how

19     the Doppelt reference works.  The Doppelt reference

20     has up at the top of 32, which is that upside down

21     triangle, that's an antenna.  That's connected by a

22     wire to the receiver 80 which is then connected by
```

Hearing — May 25, 2018

1    another wire 82 to the microcontroller 84.

2         What do they describe?  They describe

3    wireless communicatins from the keypad 34 to the

4    antenna 32 and then there's a wired connection that

5    goes from that antenna to the microcontroller, and

6    they even say in the middle quote there that it

7    carries digital signals.

8         MR. BULLARD:  So has Chamberlain anywhere

9    in the record here, at the ITC, before the Patent

10   Trial and Appeal Board, in the original prosecution

11   put the public on notice that their claim language

12   is distinguishable from this configuration with

13   reference to this prior art that you're citing to

14   us today specifically saying our configuration --

15   our claim language is not met by this configuration

16   in the prior art.

17        MR. WHITE:  Yes.  They had done it here.

18   They've done it in these proceedings.

19        MR. BULLARD:  They specifically linked it

20   to the figures that you're showing us now?

21        MR. WHITE:  They have.  They said this is

22   a solely wireless system.  They describe this as

Hearing - May 25, 2018

1    solely wireless.

2            MR. BULLARD:  And they say that's the

3    reason why it's not?

4            MR. WHITE:  Absolutely.  They tried to

5    distinguish this prior art.  I'll get the slide for

6    you, but they have taken that position before this

7    body.

8            MR. COLT:  Mr. White, whatever they said

9    in litigation, that's extrinsic evidence.  So first

10   we have to find an intrinsic ambiguity before we

11   get to that, don't we?

12           MR. WHITE:  I think no.  I mean, when you

13   look at the statements that they've made, the

14   Federal Circuit language is clear that statements

15   made in the context of litigation to distinguish

16   your claims are binding on you.  You don't have to

17   put aside -- I mean, they don't get a pass to say

18   everything we said in litigation you throw that

19   out, let's just look at what the patent says and

20   what the file history says, absolutely not.

21   Statements made in litigation and before the PTAB

22   are binding on the scope of the claim.  That's

Hearing - May 25, 2018

1    clearly established.

2         It's on slide 23 if you want to look at

3    your paper document.  Your question was where have

4    they said the Doppelt reference is different from

5    their claims, that their claims don't cover that

6    configuration.  So here it is.  So in their brief,

7    in their sur reply, the last brief that they filed

8    they say the Doppelt prior art does disclose solely

9    wireless connections, solely wireless, that's how

10   they describe it, that relied upon a receiver

11   formed in the head unit.  That's why they say

12   Doppelt is not a problem for them.  That's

13   different from their claims.  Their claims don't

14   encompass what's disclosed in Doppelt.

15        MR. BULLARD:  Isn't that an argument that

16   Doppelt does not include what you and I have

17   discussed as being a digital data bus, it doesn't

18   include that wired connection from the receiver to

19   other --

20        MR. WHITE:  I don't know what they're

21   saying, but let me go back to the figure.  Slide 23

22   is where they say Doppelt is solely wireless,

Hearing - May 25, 2018

```
1     remember solely wireless.  I assume they say that

2     because they're saying their claims don't cover it,

3     but let's look at what Doppelt says.  I want to go

4     back to slide 72.  Sorry, let's start with 71.

5             So here's Doppelt that they say is solely

6     wireless.  You have a wired connection from the

7     receiver to the microcontroller that it

8     specifically says carries digital signals.  You

9     have another wired connection from that receiver up

10    to the antenna which sits outside of the head unit

11    32 just like the receiver does in our context.

12    There's a wire that runs up through the antenna

13    outside of the head unit enclosure that receives

14    wireless signals that then passes them to the

15    receiver that then passes them to the controller

16    over a wired connection.

17            Why is that important?  Here's what they

18    said in their original response.  They've taken the

19    position that this "part wired/part wireless

20    requires only that there be a portion of the

21    connection somewhere between the controllers, only

22    a portion has to be hard wired.  Those are their
```

Hearing - May 25, 2018

Page 45

1    words.  You have it right there in Doppelt.  You've

2    got wireless coming in from the console to the

3    antenna, and you've got wired from the antenna to

4    the receiver and wired from the receiver to the

5    controller.

6             MR. BULLARD:  So if we do not consider the

7    prior art to change the scope of the claims but we

8    instead look at what the ALJ said on page 135 and

9    we take that to be the scope of the claims, would

10   we be able to find in your favor and still be --

11            MR. WHITE:  I have to think about what he

12   said.  I mean, again, I think what you're referring

13   to is dicta from his statement in there because --

14   I've said it a couple times, but he relied upon the

15   wired connection from the WiFi board to the wall

16   console as being what met the claim limitation.

17   Let me think about that and come back and answer

18   that when I get a chance to stand up.

19            MR. BULLARD:  Okay.

20            MR. WHITE:  So here, this is where I think

21   it's clear.  When you look at this, they describe

22   this as a solely wireless connection.  Now, they

Hearing - May 25, 2018

1   can't have it both ways.  If this is solely

2   wireless and avoids the claims, the new

3   configuration is the same.  It's got a receiver

4   like the antenna 32 that has a wired connection at

5   the head unit to the controller.  So it either --

6   if it meets the claims it's invalid and you can't

7   interpret it that way to read on the prior art, or

8   it's simply I think as they've taken the position

9   it's not covered by the claims.

10        So this is where -- we got on this sort of

11   line of answers because you asked me where have

12   they taken the position specifically with respect

13   to Doppelt to say for these figures that it's not

14   covered by the claims.  They did so in these

15   proceedings in their papers, and this is why it's

16   wrong and inconsistent.

17        I want to go through this again just to

18   make it clear as to why we think this is such a

19   problem.

20        MR. BULLARD:  Is an antenna a conductor

21   that conveys digital signals?

22        MR. WHITE:  Absolutely, yes.  It's a

Hearing - May 25, 2018

1    wired -- it's wired and you can see right in here

2    that they even said it conveys.

3         So you've got the digital signals are

4    coming in from the keypad 34 to the receiver and

5    then the receiver even says, the second quote here,

6    "The controller receives super regenerative

7    receiver coupled to a line to supply demodulated

8    digital signals." So the signals come in modulated

9    through the antenna, the digital signals, the

10   receiver demodulates them.

11        MR. BULLARD:  So your device includes such

12   an antenna that's a conductor that conveys digital

13   signals?

14        MR. WHITE:  Correct, it does.  It has an

15   antenna, and we had an antenna too -- again, this

16   is another point that I made before is we had an

17   antenna before the redesign but, again, was not

18   accused below.  So this same configuration that

19   they're accusing now was available to them below,

20   they made no such allegations.

21        MR. BULLARD:  And your wall module also

22   has an antenna that's a conductor that conveys

Hearing - May 25, 2018

Page 48

1     digital signals to communicate with the receiver?
2              MR. WHITE:  I honestly don't know what's
3     on the transmit side of things.
4              MR. BULLARD:  Okay.
5              MR. WHITE:  I assume there's got to be
6     something there that transmits out.  I don't know
7     if it's an antenna or what the actual word is.  I
8     just don't know.  Sorry.
9              MR. BULLARD:  Great.  Thank you.
10             MR. WHITE:  So let me back up on this
11    point.  I'm going to go back to slide 27.  Sorry to
12    be jumping around.
13             So you asked whether we have an antenna on
14    the receive side of things, and I told you that we
15    did and, in fact, it's been there before the
16    redesign.  So we have a wireless receiver that now
17    connects to and sits at the head unit.  Prior to
18    adding that there was an antenna there that
19    receives digital data and is connected to the
20    controller via a wired connection.  You can see
21    that when you open it up.  Here's the antenna,
22    here's the wireless receiver.  It's interesting too

Hearing - May 25, 2018

1    to see, again, how they describe the two in these

2    proceedings.  They describe the antenna version as

3    being solely wireless.

4             MR. BULLARD:  What communicates with that?

5             MR. WHITE:  There's an outdoor keypad that

6    communicates digitally wirelessly.

7             MR. BULLARD:  And physically what's in

8    that outdoor keypad?

9             MR. WHITE:  So there's a microcontroller

10   and everything else that you need that -- you know,

11   when you approach a garage sometimes there's an

12   external one that you punch in a key code, hit

13   enter, you can do other things to control your

14   door, and it's wireless because it's outside the

15   garage.

16            MR. BULLARD:  And that conveys digital

17   data between the two?

18            MR. WHITE:  Correct, and it connects to

19   that antenna.  So you've got the wireless receiver

20   here that connects to the indoor keypad and we have

21   the pre-existing antenna that's a conductor that

22   extends outside of the head unit via wire, that

1    communicates with the external keypad which

2    predated the redesign.  If you look, they describe

3    that connection as being solely wireless.

4           In this proceeding -- this is their

5    reply -- they said our pre-existing situation we

6    had a wireless keypad that communicated wirelessly

7    to a conductor, an antenna at the head unit that is

8    then hard wired into the controller, they said that

9    is solely wireless.  Again, I assume that means it

10   doesn't infringe their claims, it doesn't meet

11   their claims.  But you look at them, here they are,

12   they're both right there.  Here's the internal

13   connection.  It's a little bit hard to see, but the

14   antenna's -- we tried to blow it up at the bottom.

15   The antenna's got that black wire that comes in and

16   is wired to the board right next to the controller

17   that you can see it.  The indoor keypad comes in

18   with a wire, two wires that go right to the same

19   board a few inches over and are wired directly to

20   the head unit.  Yet they've called one a solely

21   wireless configuration that doesn't infringe and

22   that they didn't accuse of infringement below and

Case 1:18-cv-00200-JCG   Document 4-13   Filed 09/13/18   Page 52 of 127


Hearing - May 25, 2018

Page 51


1    they've called the other one an infringing part

2    wired/part wireless connection.

3        This is just another example of where

4    they're taking both sides of the issue when it

5    suits them to try to distinguish prior art, they've

6    said this part wired/part wireless configuration,

7    oh no, that's not what the claims cover.  Yet when

8    they want to try to capture this new design that

9    relies upon the same configuration in the prior art

10   that pre-existed, they say no, it infringes.

11   Again, we've never seen that before.  There was

12   never a position below where they took -- they said

13   a part wired/part wireless connection infringes.

14   In fact, as we showed you, they took the exact

15   opposition position.

16       MR. COLT:  I have a hypothetical that's

17   the inverse of Mr. Bullard's.  Let's say we took

18   the original design and we follow that wire as it

19   goes from the head unit to the wall console and

20   then midway down the wall, you know, a couple feet,

21   wherever, then we cut it and then we put a

22   transceiver there.  Would that infringe?

GregoryEdwards, LLC |  Worldwide Court Reporting
GregoryEdwards.com |  866-4Team GE

Hearing - May 25, 2018

1              MR. WHITE:  I'd have to think about that.

2      Let me see.  Depends on where you put it I think

3      potentially.  I'm not sure.  I'm not sure.  Let me

4      put that on my notes to think about too and get

5      back to you.  I haven't thought about it in that

6      context.

7              If we get back to -- again, this is the

8      old versus new, this is the one that pre-existed

9      the redesign and the one after the redesign.  The

10     one they say, the part wired/part wireless

11     configuration is covered by the claims and yet they

12     say the other one, which is a part wired/part

13     wireless apparently is solely wireless and I would

14     assume not covered by the claims.  That's on slide

15     34.

16             So, again, if you look at all this in

17     context, you have to take what said in the

18     litigation and before the PTAB judges.  You can't

19     throw that out, you can't ignore that and say,

20     well, the patent is clear, it doesn't say it's

21     limited.  Therefore they can have the broad scope

22     of the claims.  You can't do that, you're bound by

Hearing - May 25, 2018

1    the statement that you make, and they have been

2    crystal clear about saying it requires a wired

3    connection.

4         We looked at this before.  They tried to

5    say that they've always taken this position, not

6    true.  They have never taken that position.  You

7    can look through all the papers, I'm telling you,

8    their post-hearing briefs, their prehearing briefs,

9    they never took the position that the claims cover

10   a part wired/part wireless connection because it

11   simply isn't there.

12        MR. BULLARD:  And just so I confirm my

13   understanding, it's the wireless receiver in the

14   redesigned unit that connects to the

15   microcontroller in the wall unit in your redesign?

16   So you have a wireless receiver.

17        MR. WHITE:  We do, yes.

18        MR. BULLARD:  And that is what is directly

19   connected to -- or conveys digital data -- let's be

20   clear about what they said.  So it's the wireless

21   receiver that conveys digital data to the wall

22   console in your redesign?

Hearing - May 25, 2018

1             MR. WHITE:  That's true, yeah.  The only

2     connection -- there is absolutely no wire that

3     leads from the wall console to anywhere.  The only

4     connection is wireless from the wall console up to

5     the wired receiver in the head unit.

6             MR. BULLARD:  So it's a microcontroller in

7     the wall console to the wireless receiver conveying

8     this digital data in the redesign?

9             MR. WHITE:  That's the wireless, correct.

10            MR. BULLARD:  Thank you.

11            MR. WHITE:  The only connection to the

12    wall console is wireless.  There is no wired

13    connection to the wall console at all.

14            And, again, you have to limit them to the

15    statements that they've made, and I don't think

16    they could have been any clearer, especially when

17    distinguishing the prior art in the brief, to say

18    that the transmitters that were wireless in Doppelt

19    are irrelevant.  That's what they said, they're

20    irrelevant because they're not wired to the head

21    unit.

22            Remember there is a public notice function

Hearing - May 25, 2018

1    to this, right.  Folks like you who have to make

2    these decisions, folks like us who are accused of

3    infringement and have to consider redesigns, we are

4    entitled to rely upon the statements that they

5    make.  We're entitled to rely upon those to try to

6    design them out.

7           We've cited the case law to you in the

8    briefs, but we've also got it in the slides.  You

9    cannot do what Chamberlain is doing, to try to

10   take -- when it suits their purposes to say no, no,

11   no, this has got nothing to do with wireless;

12   And if you look at the testimony, there's no

13   equivocation here.

14          Now they're trying to say, well, we didn't

15   expressly say it doesn't cover this situation.  We

16   didn't need to, there was no suggestion that it

17   did.  They said we don't have a question from our

18   experts saying a specific part combination wired/

19   wireless like you're using here.  He doesn't say

20   that's not covered.  Of course not, we didn't even

21   need to ask.  The questions were much broader.

22          You'll agree with me that the '319 Patent

Hearing - May 25, 2018

1     does not claim wirelessly connected wall console,

2     that's correct.  He didn't say no, no, no, if it's

3     partially wireless that's fine or if it's part

4     wired it only requires -- he didn't say that.  He

5     didn't equivocate, just like in the IPR process.

6     It was a broad question.  Would conveying digital

7     data over wireless means be over a digital data

8     bus?  No.  No equivocation, no hesitation.  Nowhere

9     did they say no, no, no, wait a minute, you're not

10    understanding, I think a part wired/part wireless

11    could infringe.  They didn't take that position and

12    their expert didn't take that position.  They have

13    to be bound by those statements and we're entitled

14    to rely upon them as are you.

15            So when you look at everything that

16    they've said, again, we think it's crystal clear

17    that the claims cannot cover a part wired/part

18    wireless system, one, because of the statements

19    that they made and, two, because it reads on the

20    prior art.  How do you get to the prior art?

21    Again, you don't even need to get to the prior art

22    because we think their statements are clear on

Hearing - May 25, 2018

Page 57

1    their face and, if you agree with us, that's the

2    end of the story because they are bound by their

3    statements.

4            At a minimum those statements in the

5    description of the spec at least create ambiguity.

6    It's not crystal clear by any means that this could

7    be covered, that this part wireless switch is not

8    disclosed.  I don't think there's any way that you

9    can say without any doubt it's crystal clear that a

10   part wired/part wireless system is covered by these

11   claims.  I don't know how you can make that.  So at

12   a minimum there's at least ambiguity as to what

13   these claims cover.

14           That then leads you to the prior art which

15   says you're not to read the claims that cover the

16   prior art, but the way they're interpreting that

17   part wireless/part wired it absolutely does.  So I

18   just want to make that point one more time and then

19   I'll stop and pass the time.  This is where we

20   think they really run into problems.

21           I'm going to go back to slide 71, 72.

22   Remember, 72 says they've taken the position that

Hearing - May 25, 2018

1     at least a portion of the connection must be hard

2     wired.  That's their new position, only a portion

3     has to be hard wired.  We're talking about the

4     connection between the controllers.  If you look at

5     Doppelt which comes into play because I say at

6     least it's ambiguous, you cannot say definitively

7     it covers this part wired/part wireless.  When you

8     look at this you've got undisputed wireless

9     communications coming in being relayed over a wired

10    connection to that controller.  The case law says

11    their statements aren't enough for you to limit

12    those claims, when you look at the prior art this

13    resolves it.  They cannot read these claims, expand

14    them now to read on this type of configuration.

15          Unless you have any questions, I'll stop

16    there.

17          MR. COLT:  Mr. White, if you had to

18    address DOE, would you say it doesn't apply to the

19    prior art?

20          MR. WHITE:  I think a number of reasons.

21    I mean, they have cited nothing to say that it's an

22    equivalent, that wireless is an equivalent to

Hearing - May 25, 2018

```
 1    wired.  I mean, it's certainly not.  No way do they

 2    work the same.  If you look at some of the

 3    dependent claims they talk about carrying power

 4    over the wires, you know, it's different.  I mean,

 5    wired versus wireless, I think everyone understands

 6    that's different.  They don't cite anything to

 7    state anything to say that they are the same.  They

 8    have attorney argument in one basically long

 9    paragraph that says, oh, sure, these are all the

10    same.  I think that there is no proof to that.

11    Everybody knows wired is different than wireless.

12    Again, if you look at the prior art, they clearly

13    can't interpret the claims.

14          MR. COLT:  And do I understand you'll be

15    making a written description argument as well as a

16    prior art argument for limiting the claims?

17          MR. WHITE:  I don't think we've expressly

18    made that, but I think you probably could make

19    that.  If you consider if they try to expand the

20    claims so far as to cover a wireless connection, as

21    I said, the only thing shown describing the patent

22    is a wired connection and we know that wireless
```

Hearing - May 25, 2018

1    predates it.  It's in the Doppelt reference.

2           Sorry.  One last slide I wanted to show

3    you.  It's curious -- and I don't know the

4    explanation for you, but I think it's curious when

5    you compare the Doppelt reference which predates

6    the '319 by seven years -- six, seven years and you

7    see the fact that they knew about wireless, that

8    wireless could be used, but they chose not to

9    describe it or include it anywhere in the

10   '319 Patent, I mean, that's telling as well.

11          So this is Doppelt on the left here --

12   this is slide 14.  So you've got Figure 1 of

13   Doppelt on the left and Figure 1 of the '319 Patent

14   on the right.  Pretty similar.  Yet the one on the

15   left it's sort of the opposite which you'd expect.

16   The one on the left predates the one on the right

17   by seven years.  The one on the left shows a wall-

18   mounted keypad that communicates wirelessly with

19   the head gear.

20          Yet seven years later when they apply for

21   the '319 Patent claiming digital data buses and

22   everything else they didn't mention wireless.  They

Hearing - May 25, 2018

Page 61

1    didn't say it was there, they contemplate it there,

2    they didn't describe it, they didn't even put it

3    in.  Why is that?  We don't know exactly.  I would

4    suspect that because their whole point of putting a

5    passive infrared detector in the wall console, you

6    couldn't communicate at that time wirelessly with

7    the head unit.  You had to use the wires to have

8    all that functionality in it.  So I don't think

9    they contemplated it.  They certainly didn't

10   disclose it.

11          I just find it curious that a patent that

12   was filed seven years later when wireless was

13   something in the prior art they didn't claim it,

14   they didn't describe it, they didn't in any way try

15   to capture it in their claims.  So for all those

16   reasons we don't think the claims here could be

17   extended to cover the redesigns we describe.

18          MR. COLT:  Thank you, Counsel.

19          We'll take a ten-minute break and then

20   hear from counsel for Chamberlain.

21                 (A short break was had.)

22          MR. COLT:  Counsel for Chamberlain,

Hearing - May 25, 2018

Page 62

```
1      whenever you're ready.

2              MR. COLAIANNI:  I'm ready.

3              Good morning.   Joseph Colaianni on behalf

4      of Chamberlain.  Thank you again for your time in

5      reading through our briefing materials and we

6      appreciate your time this morning in entertaining

7      oral argument in this matter.  This is a very

8      important matter for Chamberlain, you have a very

9      important decision to make.  I think the issue here

10     is rather straightforward and I think it can be

11     efficiently presented.  You have generously given

12     me an hour to present.  I hope to take less than an

13     hour.  I'd like to highlight some of Chamberlain's

14     key positions and then turn the floor over to you

15     to ask any questions you have.  The oral argument

16     is for your benefit, not mine.  I'd encourage you,

17     please to jump in and ask any questions that you

18     have as I go through this.

19             MR. BULLARD:  Mr. Colaianni, to that line,

20     let's directly address some items that were brought

21     up by Mr. White in his presentation.  Particularly

22     he noted that there were characterizations in the
```

1    underlying ITC investigation of the Doppelt

2    reference.  He drew our attention to CGI's

3    prehearing brief at page 67 and noted that

4    "Chamberlain previously argued that the wireless

5    remote transmitters are irrelevant to these

6    requirements.  They are by their very nature not

7    wall consoles."  And he emphasized that you stated

8    "Nor are they wired to the head unit which claims 1

9    and 9 also require in the wall console."

10          So how can we reconcile your statement

11   that claims 1 and 9 require the wall console to be

12   wired to the head unit with an argument that a

13   wireless connection meets the claims?

14          MR. COLAIANNI:  That's a very good

15   question.  Let me take a shot at answering this.

16          Doppelt is a Chamberlain patent, it's a

17   Chamberlain UK patent.  One of the inventors is

18   common to the '319 Patent.

19          THE REPORTER:  I'm sorry, Counsel, I am

20   having a really hard time hearing you.

21          MR. COLAIANNI:  One of the inventors of

22   the Doppelt patent is common to the '319 Patent.

Hearing — May 25, 2018

Page 64

1       The Doppelt patent was part of the prosecution.   It

2       was considered by the patent team during issuance

3       of the '319 Patent by the U.S. Patent Office.   Not

4       the Doppelt UK patent, but the corresponding U.S.

5       Doppelt patent which contains the same disclosure

6       was considered by the examiner, and that patent

7       appears on the front page of the '319 Patent.   So

8       the Patent Office was familiar with Doppelt.   You

9       heard a lot of what I would consider to be

10      invalidity argument this morning.   This reference

11      was considered by the Patent Office and the '319

12      Patent claimed to allow the Doppelt reference.

13              The statements that were made during the

14      briefing that were referred to during TTI's

15      arguments this morning were directed to the fact

16      that a wire is necessary.   Chamberlain does not

17      dispute that there needs to be a wired connection,

18      there needs to be a wire involved in the connection

19      of the digital data bus between the wall console

20      and the head unit.   It doesn't need to be solely

21      wired.   That's the issue.   There's no disclaimer

22      anywhere in the record, anywhere in the intrinsic

Hearing - May 25, 2018

1    record, in the specification, in the prosecution

2    history, there's no disclaimer where Chamberlain

3    made a statement that the claims do not cover

4    something that includes a part wired/wireless

5    connection.

6          MR. BULLARD:  Let me be more specific.

7    What was this sentence intended to mean to the ITC

8    when you say "The wireless remote transmitters are

9    irrelevant to these requirements.  They by their

10    very nature are not wall consoles, nor are they

11    wired to the head unit which claims 1 and 9 also

12    require of the wall console"?  What specific claim

13    limitations are not met by Doppelt in the context

14    of that argument?  Explain to me what that is

15    intending to convey to the ITC in the record.

16          MR. COLAIANNI:  Yes.  Just for the record,

17    you were referring to the quote on page 42 of the

18    TTI slides, correct?

19          MR. BULLARD:  That's correct.

20          MR. COLAIANNI:  It looks like what is

21    being extracted from the record here is a statement

22    about the wireless remote transmitters in the

Hearing - May 25, 2018

Page 66

1     Doppelt reference which I believe were referring to

2     the car remotes that are shown, the handheld

3     remotes that are used to trigger a garage door

4     opener, the wireless remote transmitters.  They're

5     not wall consoles.  That's I believe what was

6     supposedly being referred to here.

7            And may I also say Doppelt was -- does

8     disclose a truly wireless system.  The reason for

9     that is that in Doppelt there is a disclosure --

10           MR. BULLARD:  But, Mr. Colaianni, I'm not

11    referring to the portion of the phrase where it

12    says "By the very nature they are not wall

13    consoles."  I think on page 42 of the slide, the

14    portion that's underscored is "Nor are they wired

15    to the head unit which claims 1 and 9 also require

16    of the wall console."  That's a statement intended

17    to distinguish prior art relative to the patent

18    claims, and I need to understand what you're saying

19    is not present in that structure that is required

20    in the patent claims.

21           MR. COLAIANNI:  I understand.  I was

22    getting to that part of the statement.  The first

Hearing - May 25, 2018

1    underlined statement was the one I was just

2    addressing, the one that says the wireless remote

3    transmitters are irrelevant.  I was explaining that

4    I believe that statement looks like it's referring

5    to the handheld car remotes that are not wall

6    consoles.

7          The second part of the statement that

8    you're referring to now, "Nor are they wired to the

9    head unit," there's no wired connection there.

10   There's no wire at all.  These are truly wireless

11   in the sense as I was just stating.  In Doppelt the

12   head unit that's mounted at the top of the garage

13   contains a receiver, it's formed within the head

14   unit, it's part of the head unit.  It's not an

15   accessory that plugs in via a wire.  It's a

16   component inside the box, right.  So the wireless

17   connection with the car remote is completely

18   wireless, there's no wired connection.

19         MR. BULLARD:  To that point, then, there

20   was a slide that was presented by Mr. White that

21   showed a schematic of Doppelt and it included a

22   connection that was identified as being wired on

Hearing — May 25, 2018

1    page 71.

2            MR. COLAIANNI:  Yes.

3            MR. BULLARD:  So element 82 refers to a

4    line 82.  That's not a wired connection?

5            MR. COLAIANNI:  I'm not sure it's

6    perfectly clear from the reference whether that's

7    wired or wireless.  It's a connection.  The

8    receiver --

9            MR. BULLARD:  It indicates that "The

10   controller 70 includes a super regenerative

11   receiver 80 coupled via a line 82 to supply

12   demodulated signals to a microcontroller 84."  So

13   my reading of that is that "a line 82," is that an

14   accurate characterization of Doppelt?  Is that an

15   inaccurate?

16           MR. COLAIANNI:  You've read the portion of

17   the reference correctly.  It says "The super

18   regenerative receiver 80 is coupled via a line 82."

19           MR. BULLARD:  And what do the claims

20   require?  What is the ALJ's interpretation of the

21   limitation "digital data bus"?

22           MR. COLAIANNI:  "Digital data bus" is a

Hearing - May 25, 2018

1      conductor for conveying -- capable of conveying

2      digital data signals.

3              MR. BULLARD:  Is that what the ALJ found

4      at the ITC?

5              MR. COLAIANNI:  I believe that's what he

6      found.  I need to look to get the exact quote.  I

7      believe it was --

8              MR. BULLARD:  I understood that to be the

9      agreed upon claim construction of the parties, but

10     on page 122 the ALJ noted "I'm under no obligation

11     to adopt the agreed construction simply because it

12     was agreed to.  I do not find that the agreed

13     meaning comports with the plain and ordinary

14     meaning of 'digital data bus,'" and went on to say

15     "accordingly, I give the term 'digital data bus'

16     its plain and ordinary meaning, which is a

17     conductor or group of conductors which convey

18     digital data."

19             So I ask you now how is the line 82 not a

20     conductor which conveys digital data?

21             MR. COLAIANNI:  It appears to be conveying

22     digital data.  Whether it's a wire or not I'm not a

Hearing - May 25, 2018

1    hundred percent certain because it's referred to as

2    a line in Doppelt which may well convey digital

3    data via a wire.  This is formed within the head

4    unit in Doppelt.  So it could be a wire.  It could

5    be an optoisolator type of component that uses

6    light.  There could be multiple ways of conveying.

7    It does --

8         MR. BULLARD:  Sorry for the interruption,

9    but I think it would be helpful to be precise in

10   this instance.  We have a very short claim, we're

11   looking at the meaning of every word in front of

12   us.  You keep using the phrase wire, wired.  You

13   know, the claim itself says "digital data bus," the

14   construction from the judge says "a conductor or

15   group of conductors which conveys digital data."

16   Does the claim itself require the presence of a

17   wire?

18         MR. COLAIANNI:  Yes.

19         MR. BULLARD:  Where is that requirement

20   for a wire?  I don't see the word "wire" anywhere.

21         MR. COLAIANNI:  The claim requires a wire

22   in the sense of being a conductor.

Hearing - May 25, 2018

1          MR. BULLARD:  Okay, because I can envision

2     conductors not being wires.  I can envision

3     conductors being traces on printed circuit boards.

4     As opposing counsel had noted, conductors can take

5     the form of antennas.  "Conductor" is a broader

6     term than "wire."  Or Is that not your position, a

7     wire is required, a physical wire?

8          MR. COLAIANNI:  Chamberlain's position has

9     been consistent.  At least a portion of that

10    connection must be wired.  We have taken that

11    position consistently.

12         MR. BULLARD:  Maybe that's what I'm trying

13    to understand.  You say wired.  What is wired?

14         MR. COLAIANNI:  A hard wire, physical

15    wire.

16         MR. BULLARD:  Physically wired?

17         MR. COLAIANNI:  Physical wire, correct.

18         MR. BULLARD:  What are examples of things

19    that are physically wired?  We're an agency that

20    deals in physical articles.  So we have to know

21    when something is (inaudible), whether it possesses

22    physical things that are met by the language of the

Hearing - May 25, 2018

1    claims.  So if something is wired, give me an

2    example of structure that we would find in the

3    device that shows that a microcontroller is wired.

4           MR. COLAIANNI:  For example, a copper wire

5    for conveying electronic signals would be a hard

6    wire connection.  I would characterize it that way.

7    A circuit board, printed circuit board with

8    metallic conductor leads on it, I would consider

9    that to be a hard wired connection.  Those are a

10    few examples that come to mind.

11           MR. BULLARD:  Thank you.

12           MR. COLAIANNI:  Absolutely.

13           The Doppelt reference -- I just want to

14    round out the part about Doppelt because you had

15    some statements -- some questions about the

16    statements that were made by Chamberlain during the

17    ITC investigation.

18           MR. BULLARD:  Thank you.

19           MR. COLAIANNI:  And this reference was

20    alleged to be prior art by TTI, it was litigated,

21    and the court -- the ALJ found the claims valid of

22    Doppelt.  The ALJ considered the connections that

Hearing - May 25, 2018

1    were present between the wall console and the head

2    unit in Doppelt.  The ALJ considered all of this.

3    The argument that was made by TTI during the

4    investigation focused on the wall console inside

5    the garage which lacked a microcontroller.  It

6    supposedly lacked one of the limitations of the

7    claims, and that's what was litigated and that's

8    the reason -- that's one of the reasons that the

9    ALJ rejected TTI's invalidity challenge (inaudible)

10   Doppelt.

11            This argument now that we are somehow

12   walking into an invalidity position due to claim

13   construction, I have a couple thoughts about that,

14   one of which is that I think it's inappropriate to

15   look at the prior art in the way that TTI is

16   suggesting.  the claims have to be construed to

17   preserve validity.  I don't think the case law

18   requires that a claim construction is improper if

19   it reads on a prior art reference.  Now, I'm not

20   suggesting that our claim construction reads on

21   Doppelt at all, but I don't think it's improper --

22   I think it would be improper to construe a claim

Hearing — May 25, 2018

1    solely because of a prior art reference made

2    (inaudible).

3         MR. BULLARD:  Where is the boundary?  When

4    should we look at the prior art to instruct us as

5    to the scope of the claims?  What are the triggers?

6         MR. COLAIANNI:  Well, if a prior art

7    reference is disclosed during prosecution of a

8    patent and there's argument during prosecution by

9    the patentee and by the Patent Office and there are

10   explicit disclaimers, the patentee says this prior

11   art does not disclose my claim because my claim

12   covers X and the prior art covers Y, that's fair to

13   look at that and to limit the claim accordingly,

14   right.  That's the patentee saying I'm disclaiming

15   this scope because I need to to get around this

16   prior art.

17        We don't have that situation here at all,

18   not at all.  To pull out this Doppelt reference

19   which was considered by the Patent Office and now

20   say that the way we're reading the claim somehow

21   invalidates it in view of Doppelt is not a

22   consideration that the IPR Branch should be looking

Hearing - May 25, 2018

1    at in construing the claim.  You should be looking

2    intrinsic record of the patent and I'd like to talk

3    about that if I can.  The intrinsic record here is

4    clear and there's no limitation on the claim to

5    limit it to a completely end-to-end wired

6    connection as TTI is suggesting.

7              MR. BULLARD:  If I may just to finish up

8    with Doppelt from my view.

9              MR. COLAIANNI:  Yes, please.

10             MR. BULLARD:  Doppelt was asserted as

11   prior art at the ITC; is that correct?

12             MR. COLAIANNI:  Yes, sir.

13             MR. BULLARD:  Was it asserted as an

14   anticipatory reference?

15             MR. COLAIANNI:  I believe it was asserted

16   in an obviousness combination.  It may have been

17   also been an anticipatory argument.  I would need

18   to check the record on that.

19             MR. BULLARD:  And what was the basis for

20   the ITC not adopting those grounds for rejection,

21   the basis for invalidity?

22             MR. COLAIANNI:  One of the bases they

1   noted was a lack of microcontroller in the wall

2   console (inaudible).

3          MR. BULLARD:  Did the ITC cite a lack of a

4   wired connection between the head unit and the wall

5   console?

6          MR. COLAIANNI:  I don't believe that was

7   distinctly called out by the Commission

8   (inaudible).

9          THE REPORTER:  I'm sorry.

10          MR. COLAIANNI:  I'm sorry.  I'm facing

11   this way.

12          THE REPORTER:  I really need you to speak

13   up.  I am struggling.

14          MR. COLAIANNI:  I don't the Commission

15   called out the lack of the wired connection, but

16   I'd like to, if I may -- and I can address this in

17   our post-hearing brief -- check on that because I

18   don't have the entire record committed to memory.

19   It's a very large record, but I don't believe

20   that's the case sitting here now.

21          MR. BULLARD:  And at the Patent Trial and

22   Appeal Board I understand that the Doppelt

1    reference has been cited in the notice of

2    institution by the Patent Trial and Appeal Board.

3    Has Chamberlain filed a patent owner response in

4    that case yet?

5           MR. COLAIANNI:  I believe they have.

6    There was an issue that came up in that case

7    regarding the recent SAS decision that has delayed

8    things.  I'm not sure what the precise status is,

9    but the statements that were alluded to earlier by

10   Dr. Davis in the PTAB proceeding, as well as his

11   testimony in the ITC proceeding, he was not asked

12   directly about whether the claims covered something

13   that's partially wireless.

14           He was answering the question he was asked

15   and he never stated or testified anywhere that the

16   connection that includes a wire also includes

17   wireless components would be not covered by the

18   claims.  There's just no testimony like that.  We

19   saw the testimony that Mr. White presented.  He

20   didn't say (inaudible) I respectfully submit.

21           There's also a different standard for the

22   claim construction in PTAB and I understand that's

Hearing - May 25, 2018

1    under review and may be changing soon, but

2    currently they're still operating at the Patent

3    Office under the broadest reasonable interpretation

4    standard

5         MR. BULLARD:  That's helpful to know.  So

6    could you tell us the difference in the claim

7    construction that we should provide and the PTAB

8    should provide?  Can you give us some clarity as

9    to -- to the extent that we see the record of the

10   PTAB and they have claim construction, for example,

11   "a digital data bus," what is the difference in

12   scope between that claim limitation as the PTAB

13   interprets it and how we should interpret it?

14        MR. COLAIANNI:  That's a great question.

15   The PTAB has not interpreted it yet.  I would

16   suggest that the IPR Branch should apply the

17   Phillips standard for claim construction that was

18   also applied by the ITC, by the ALJ, and the

19   Commission at the ITC and construe the claims based

20   on the intrinsic record.  That's what Judge Pender

21   did and the IPR Branch and PTB is charged with

22   enforcing the limited exclusion order from the

Hearing - May 25, 2018

1    Commission.  I would respectfully submit that the

2    Phillips instruction standard is the appropriate

3    one to apply.

4           MR. COLT:  I understand it's your

5    position, Mr. Colaianni, that the Doppelt reference

6    does not disclose a microcontroller in the wall

7    console, but could you explain why it does not

8    disclose a digital data bus connecting the

9    microcontroller in the motor drive unit to the

10   external keypad.

11          MR. COLAIANNI:  Yes.  Yes, Mr. Colt.

12          The Doppelt reference includes a wireless

13   connection between the head unit or motor drive

14   unit -- those terms have been used synonymously in

15   this case -- and the wall console.  As I noted

16   earlier, the circuitry -- the receiver, I should

17   say, which is formed inside the head unit and there

18   is a direct wireless connection between the head

19   unit and the wall console.  No part of that was

20   wired.

21          Again, this was not litigated, this

22   specific issue was not litigated because we didn't

Hearing — May 25, 2018

Page 80

1    have this type of -- what we're talking about now

2    is a new product that's raised a lot of questions

3    and a lot of new issues here today.  So some of the

4    statements that were heard during TTI's

5    presentation talking about wired connections and

6    things, these were made in the context of what was

7    at issue in the ITC investigation, which was a

8    complete end-to-end wired connection.  Not that

9    that affects Doppelt directly, but I wanted to just

10    get that out because I think there's a little bit

11    of misdirection here.

12        MR. COLT:  Does the digital data bus have

13    to extend out of the motor drive unit?

14        MR. COLAIANNI:  You know, that's a tough

15    question to answer.  I say that because part of the

16    connection -- let me back up.  We're looking at a

17    claim here that specifically says the

18    microcontroller of the head unit has to be

19    connected to the microcontroller of the wall

20    console by means of a digital data bus.  So we

21    respectfully submit that that means that part of

22    the connection -- at least part of the connection

Hearing - May 25, 2018

1    from the microcontroller of the wall console to the

2    microcontroller of the head unit has to be wired,

3    hard wired.  Whether it has to actually physically

4    protrude from the box, the head unit, probably

5    something I haven't given a lot of thought to.  I

6    do think that if there's a wired connection, hard

7    wired connection anywhere from the microcontroller

8    of the head unit to the microcontroller of the wall

9    console it would satisfy the claim.

10          MR. COLT:  So inside the head unit there

11   is a wire that connects the microcontroller to the

12   external antenna.  Is that a digital data bus?

13   There's a picture of the two on page 9 of

14   Chamberlain's reply brief.

15          MR. COLAIANNI:  Oh, yes.  You're talking

16   about a connection between the antenna and the

17   microcontroller?

18          MR. COLT:  Yes.

19          MR. COLAIANNI:  Yes, that would be the

20   wired connection.  I would agree with that, yes.

21   Did that address your question?  I'm sorry.

22          MR. COLT:  So I'm still not sure why that

Hearing - May 25, 2018

Page 82

1       limitation is not present in Doppelt?

2               MR. COLAIANNI:  Well, this was never

3       argued to be present in Doppelt, number one.  This

4       issue did not come up in Doppelt, the specific

5       issue that we're hearing about now.  There's not a

6       disclosure, I don't believe, of a wired connection.

7       I mean, we discussed earlier this line that is

8       shown in figure 2 of Doppelt.  Sitting here now

9       without the benefit of expert testimony and a full

10      record on this it's not occurred to me that's a

11      wired connection.  It may or may not be a wired

12      connection.

13              As we saw in the infringement models that

14      were in the ITC, the TTI models, there are nonwired

15      connections inside the head unit.  It was a use of

16      optoisolators which are light signals being used to

17      convey data.  So it's not a hundred percent certain

18      whether this disclosure in Doppelt is limited to

19      wired, that's what I would say, nor has there been,

20      as I say, formal mapping of the claims against the

21      Doppelt reference in this sense with this issue in

22      mind, but I'm not convinced sitting here by clear

Hearing - May 25, 2018

Page 83

1    and convincing evidence that Doppelt shows a wired

2    connection.   The Patent Office certainly didn't

3    think so because they issued the claims under the

4    Doppelt reference.

5            If there are no other questions I can move

6    on to my presentation.

7            MR. COLT:  One more question.

8            MR. COLAIANNI:  Absolutely.

9            MR. COLT:  Would it be possible to have a

10   connection between -- what would a successful

11   redesign look like?  What would one that does not

12   use a digital data bus yet nevertheless transfers

13   digital data between the two microcontrollers?

14           MR. COLAIANNI:  Boy, that's something TTI

15   probably would have to answer, but I would say

16   Chamberlain has taken the position that the claims

17   do not cover a solely wireless system.  We have a

18   completely wireless connection between the

19   microcontrollers.

20           MR. BULLARD:  So maybe that's a better way

21   to understand it, then.  What is a solely wireless

22   system?

Hearing - May 25, 2018

1          MR. COLAIANNI:  A system that communicates

2     from the wall console to the head unit without

3     wires, without using a wired connection, a hard

4     wired connection.

5          MR. BULLARD:  You mentioned earlier that

6     wires -- again, this is the use of the term "wired"

7     and "wireless."  A board that had a wireless

8     transmitter but nevertheless included conductive

9     traces, wouldn't that be wired?  How do you achieve

10    a wireless connection from one controller to

11    another without the use of some kind of -- again, I

12    turn to the judge's construction of the term

13    "digital data bus," "a conductor or group of

14    conductors which conveys digital data."  How do you

15    have that solely wireless connection but not have a

16    conductor or group of conductors which conveys

17    digital data?

18         MR. COLAIANNI:  I suppose you could have a

19    receiver -- wireless receiver mounted within the

20    head unit that's connected directly to the

21    microcontroller of the --

22         MR. BULLARD:  But that would still include

Hearing - May 25, 2018

1    conductors, wouldn't it?

2           MR. COLAIANNI:  It would need to include

3    conductors to pass the data from the receiver to

4    the microcontroller, yes.

5           MR. BULLARD:  So you would still have

6    conductors in that connection?

7           MR. COLAIANNI:  You could do it

8    wirelessly.  If you're considering a conductor to

9    be something that's not limited to a hard wire

10   connection, you could do it wirelessly.  You would

11   have a completely wireless connection.

12          MR. BULLARD:  Thank you.

13          MR. COLAIANNI:  The issue, though, that

14   you were raising, Mr. Bullard, I think is a fair

15   question, but it's something that you probably

16   don't need to address here because the redesign

17   that TTI has proposed doesn't include such a

18   configuration.  What it includes is a receiver

19   box that is -- they basically split the wall

20   console of the infringing model into two pieces,

21   one of which is mounted on the wall and one of

22   which is a separate box with a wire attached and

Hearing - May 25, 2018

1    they use the exact same head unit that was used in

2    the infringing model.  In fact, it's labeled the

3    same.  It's labeled GD200.  That was the infringing

4    model.  They take that physical wire of the

5    receiver and plug it into the head unit.

6          I don't know that we need to get into the

7    metaphysical debate about whether something

8    includes a board inside the head unit and whether

9    it travels for a micron or two over a conductor.

10   What we have here is a wired connection coming out

11   of the head unit, not part of the unit, coming out

12   of the head unit into a separate component, the

13   receiver.  It's a wired connection.

14         MR. BULLARD:  Wouldn't there be written

15   descriptions of work in the underlying patent for

16   such a wireless connection recited in the claims?

17         MR. COLAIANNI:  The written description of

18   the patent -- there is an exemplary embodiment in

19   the patent that shows a wired to wired, end-to-end

20   connection, fully hard wired.  That's in several of

21   the figures of the United Kingdom patent, I think

22   it's Figure 1 they show a physical wire.  There are

Hearing — May 25, 2018

1    other disclosures in the patent not connecting the

2    wall console and the head unit, but there are other

3    connections in the patent that show RF receivers,

4    wireless receivers.

5         Wireless communication was known at the

6    time, they disclose that.  If you look at figure 2

7    of the '319 Patent, the motor drive unit includes

8    an RF receiver for communicating wirelessly.  So

9    wireless communication was obviously known at the

10   time the patent was filed.  I don't believe that it

11   would be appropriate to limit the claims based on a

12   preferred embodiment that shows a hard wired

13   end-to-end connection.

14        MR. COLT:  In Figure 2 is the item labeled

15   54 a wire?

16        MR. COLAIANNI:  54 is the line you're

17   looking at between the RF receiver and the

18   microcontroller; is that correct?

19        MR. COLT:  Yes.

20        MR. COLAIANNI:  It's not specified I

21   believe either way.  I can check the patent

22   specification, but I don't believe it's specified.

Hearing - May 25, 2018

Page 88

```
1      It may be.  If it's specified in the specification
2      as a wire, then it is, but, again, I wouldn't view
3      this as limiting.  It's a preferred embodiment,
4      it's an exemplary embodiment, and it's labeled as
5      such in the patent.
6             MR. COLT:  In the specification where it
7      says "It is a principal aspect of the present
8      invention to provide a quickly and easily
9      retrofitted passive infrared detector."  Would that
10     defeat the utility of a purely wireless connection
11     or even a part wired/part wireless connection if it
12     can't connect to an older model?
13            MR. COLAIANNI:  No.  The wall console is
14     not limited to having or not having a passive
15     infrared detector.  This was a debate that we had
16     earlier, you heard Mr. White discuss this.  TTI had
17     initially construed the claim -- or proposed a
18     construction of the claim that would require a PID
19     in the wall console.  Judge Pender reluctantly
20     adopted that and it was reversed by the Commission.
21     So wall console was given a broad meaning.  It's
22     not limited to having or not having a PID.
```

Hearing - May 25, 2018

1          MR. COLT:  But I'm asking whether this

2    would limit the digital data bus as something which

3    is capable of being retrofitted?

4          MR. COLAIANNI:  Retrofitted to a system

5    that did not have a PID?

6          MR. COLT:  Yes, did not have a passive

7    infrared detector, would that also necessarily not

8    have the capability for wireless communication?

9          MR. COLAIANNI:  It would work with --

10   okay.  So yes, the system would work with an older

11   model that requires a fully wired connection.  We

12   don't dispute that fully wired end-to-end

13   connection would be covered by the claims and that

14   would work with an older -- you're talking about an

15   older wall console without a passive infrared

16   detector included, correct.  The system is set up

17   to work that way and the claims were construed in

18   order to allow for that possibility, using a wire

19   from end to end.

20         MR. BULLARD:  Is the ITC investigation on

21   appeal to the Federal Circuit?

22         MR. COLAIANNI:  I don't believe TTI has

Hearing — May 25, 2018

1    filed its notice of appeal yet.  It may not be due,

2    though, until next week.

3            I wanted to come back, if I could, to -- I

4    have some slides here in the beginning of the

5    presentation discussing Chamberlain and some of the

6    underlying events at the ITC investigation, but I'm

7    going to skip over those and just jump to the issue

8    we've been discussing here.

9            I think the parties agree that a fully

10   wired connection is covered by the claims.  I think

11   the parties agree that a fully wireless connection

12   is not covered by the claims.  So the issue for the

13   IPR Branch to consider is whether the claims cover

14   a part wired/part wireless connection between the

15   microcontrollers of the wall console and the head

16   unit.  Then we also have to consider whether TTI's

17   redesigned product is solely wireless or not.  They

18   allege that it is.  We strongly contest that.  What

19   TTI has done is not solely wireless.

20           We've talked about claim construction a

21   lot, I'm not going to belabor this point, but the

22   intrinsic evidence is primary here and the claims

1    clearly define the end points of the connection

2    between the microcontrollers of the wall console

3    and the head unit.  This is claim 1.  There's a

4    similar limitation in claim 9 that's identical

5    except for the use of the term "controller" as

6    opposed to "microcontroller."  That's an issue

7    that's not material to this dispute.

8         So the connection's defined here.  Judge

9    Pender construed "motor drive unit" to be "A unit

10   where the motor resides."  This was a dispute

11   during the ITC litigation where TTI took a more

12   narrow view of "motor drive unit" as only including

13   the part of the motor drive unit where the motor

14   itself is driven.  Judge Pender rejected that and

15   gave a broader interpretation and said it's

16   actually co-extensive with the head unit.  He also

17   construed "digital data bus" as we discussed

18   earlier as "a conductor or group of conductors

19   which conveys digital data."

20        Finally, there's claim language here that

21   requires the connection be "by means of a digital

22   data bus," meaning that it requires a digital data

Hearing - May 25, 2018

Page 92

1    bus, what we've looked at as a hard wire connection

2    be presented but not solely limited to a fully hard

3    wired connection.   "By means of" is a broader term.

4         MR. BULLARD:  You're asking us to

5    interpret the phrase "by means of."  Have you

6    provided any intrinsic evidence to assist what "by

7    means of" should be interpreted to mean?

8         MR. COLAIANNI:  Only what we have here

9    which is just the plain meaning dictionary

10   definition.  It wasn't provided to you, but it can

11   be.  Plain meaning of the terminology was not

12   construed by the ALJ.

13        MR. BULLARD:  Is there an interpretation

14   of this phrase "by means of" that's dispositive in

15   this case?  So if we find one way then there's

16   infringement by the redesign; if we find another

17   way there's not infringement by the redesign.

18        MR. COLAIANNI:  I don't believe so.  I

19   don't believe there would be a dispositive issue

20   based on this.  I think "by means of" means what it

21   means.  It means that the connection has to include

22   a hard wired connection.

Hearing - May 25, 2018

Page 93

1          MR. BULLARD:  If we interpret it as solely

2     based on, by means of solely based on, wouldn't

3     that be dispositive?  Solely based on a digital

4     data bus and we require that a digital data bus be

5     a conductor, a wired connection, wouldn't that be

6     dispositive?

7          MR. COLAIANNI:  If you were to construe

8     the claim as you just suggested, that would be

9     dispositive, but I would suggest that would not

10    have any relation to the term "by means of."  It

11    has no support of limiting "by means of" to a

12    solely end-to-end wired connection, but yes, if you

13    were to construe the claim that way, that would be

14    something different than what TTI's redesign has.

15         MR. BULLARD:  So to the extent that you're

16    asking us to have a construction of "by means of,"

17    we would ask that you provide a clear citation to

18    the intrinsic record or supporting evidence from

19    the extrinsic record rather than attorney argument

20    as to what the plain and ordinary meaning of the

21    term would be.

22         MR. COLAIANNI:  I will do that.

Hearing - May 25, 2018

1          MR. BULLARD:  Thank you.

2          MR. COLAIANNI:  "Connected to" was another

3     term.  This was also not construed by the Court but

4     has been addressed in other opinions and does not

5     require a direct connection.  To the extent that it

6     may be considered that a wire must be connected end

7     end, "connected to" has not been construed so

8     narrowly.  We have a couple examples of cases here,

9     there are others.  The point being that it does not

10    require a direct connection.

11         MR. BULLARD:  Are there are examples in

12    your own specification that use the term "connected

13    to" in indirect connections?

14         MR. COLAIANNI:  Not that I'm aware of.  On

15    the converse, there's no -- nothing in the

16    specification that limits it to a direct

17    connection, but there's nothing also that says that

18    it would require -- that it would limit it or not

19    limit it to a direct connection since it would

20    be -- allow for breakages in the connection.  It's

21    not explicitly defined in the specification.

22         MR. BULLARD:  And a connection between the

Hearing — May 25, 2018

```
1    microcontrollers, is that a point of novelty in the

2    claims?

3              MR. COLAIANNI:  The point of novelty --

4    let me back up.  This invention really came about

5    by use of microcontrollers for allowing enhanced

6    functionality in a garage door opener system.  The

7    point of novelty here really is the improvement

8    over the prior art type of wall unit which you may

9    have had in your house growing up where there was a

10   simple on/off switch, an analog on/off switch, open

11   and close.  This provided microcontrollers

12   intelligence to the wall console and the head unit

13   so that (inaudible) could be done.  That's really

14   what we view as (inaudible).  The connection

15   between the two is not argued as a point of

16   novelty.

17             So we have the claim language here that

18   simply does not require a solely wired connection.

19   The claim does not say that.  Claims are, of

20   course, what defines the scope of the invention and

21   the first piece of intrinsic evidence must be the

22   language itself, and the claim language here simply
```

1       does not require a wired end-to-end connection.

2               We next turn to the specification of the

3       '319 Patent, which is also a very important piece

4       of intrinsic evidence, and, again, what the

5       Respondents here are trying to do is limit this

6       claim to the preferred embodiment.  They're trying

7       to limit this to figure 2 which shows a wired

8       connection end to end, and that's not appropriate.

9       They tried this with the wall console limitation

10      and they were ultimately objected by the

11      Commission.  Unless there's a specific teaching or

12      disclaimer somewhere in the intrinsic record to

13      limit the claim, the Federal Circuit's consistently

14      taught us that we cannot limit claims based on

15      (inaudible).

16              I noted earlier there's a provision in the

17      patent specification for wireless communication.

18      There are descriptions in the patent specification

19      of wireless.

20              MR. STEWART:  Could you repeat that,

21      please.

22              MR. COLAIANNI:  Yeah.  I'm sorry.  Yeah.

Hearing - May 25, 2018

1    There are descriptions in the patent specification

2    of wireless communication as well as wired.   Not

3    the same connection, but there is an RF receiver

4    shown as element 56 in figure 2.   This is something

5    that a person skilled in the art reading the

6    patent, they knew at the time this was filed that

7    wireless and wired communication were known.   These

8    were not new technologies.

9         Finally, the prosecution history is

10   something that needs to be considered.   We've

11   talked about Doppelt.   This was the main argument

12   that's being raised here by TTI today, this Doppelt

13   reference.   I think we've addressed this.   Unless

14   there are other questions on this, I don't think we

15   need to go through the Doppelt arguments again.   I

16   would like to say you can scrub the file history

17   from top to bottom.   There's no explicit disclaimer

18   in the file history that would be used to limit the

19   claims.   No statement was made, statements of prior

20   art or any other argument that could be used to

21   limit the connection recited in claim 1 the way

22   that TTI is proposing.

Hearing - May 25, 2018

1          So the intrinsic evidence here strongly

2    supports the fact that the claims are not limited

3    in the way that TTI is inviting you to limit them.

4    What TTI has pointed to is the extrinsic evidence.

5    They've relied heavily on the extrinsic evidence,

6    primarily Dr. Davis's testimony.  We've talked

7    about that.  The testimony they pointed to does not

8    cite Dr. Davis testifying that claims are limited

9    to a solely wireless connection.

10         MR. BULLARD:  To that point, doesn't

11   Dr. Davis in response to a line of questioning say

12   "Agreed" when asked "In fact, the '319 Patent

13   claims are limited to a wired connection between a

14   microcontroller of the motor drive unit, correct,"

15   and he says "Yes"?  Wouldn't that preclude a

16   wireless connection between the microcontroller of

17   the motor drive unit?

18         MR. COLAIANNI:  I think the testimony is

19   consistent with the fact that a wired connection

20   would have to be there, but not limited to an end-

21   to-end wired connection.  That's the question he

22   was asked and that's what he answered.

Hearing - May 25, 2018

1          MR. BULLARD:  Well, he's also asked
2    "You'll agree with me that the '319 Patent does not
3    claim a wirelessly connected wall console," and he
4    says "That's correct."  So he was asked whether it
5    claims wireless connection and then he was asked --
6    and he agreed that it does not claim a wireless
7    connection.  Then he was asked if the claims are
8    limited to a wired connection, and he says yes.  I
9    just -- it's difficult to reconcile that with a
10   system that includes a wireless connection.
11          MR. COLAIANNI:  I think if you read it
12   carefully, Mr. Bullard, he's not limiting the claim
13   the way TTI is suggesting.  He is absolutely saying
14   that the claims don't say wireless.  That word
15   doesn't appear in the claims.  I think you would
16   agree that a completely wireless connection would
17   not be covered, but I don't believe what he's
18   saying supports what TTI's arguing.  What he's
19   saying is consistent with the fact that a wired
20   connection must be present, but not solely wired.
21          But all this was considered by Judge
22   Pender, all the arguments about Doppelt, all the

1     arguments about Dr. Davis's testimony, and the

2     intrinsic record in which Judge Pender as you

3     pointed out earlier clearly stated that despite

4     Respondent's attempt to limit the construction to

5     motor drive unit, which is part of it, he rejected

6     that construction.  He said "Even if I adopt it,

7     the presence of these wireless elements inside the

8     head unit do not negate the presence of conductors

9     in the communication link, which is all the claim

10    requires."

11          MR. COLT:  Was the term "communication

12    link" litigated or otherwise defined in greater

13    detail?

14          MR. COLAIANNI:  So "communication link" is

15    not a claim term.  So there was no argument of a

16    construction of that term during the ITC

17    investigation.  What he's referring to is the link

18    between the microcontroller as specified in the

19    claim, and this couldn't be a clearer statement

20    that the ALJ already considered this issue.

21          TTI's right, what was ultimately decided

22    by the judge was based on the product that was in

Hearing - May 25, 2018

1     front of him at the time.  It was the models he

2     found to infringe, they included a completely wired

3     connection, there's no question about that, but

4     he's got a clear statement here.  He's already

5     considered this issue.  He looked at all the

6     evidence from all the witnesses, looked at the file

7     history, looked at all the evidence, the very

8     voluminous ITC record, and he says here all the

9     claim requires is the presence of conductors and

10    that the presence of wireless components such as

11    optoisolators does not take that product outside

12    the scope of the claims.

13          This I think is the most definitive

14    statement we could ask for.  There's no reason to

15    deviate from this.  There's no new evidence

16    introduced today, nothing we've heard that would

17    cause you to deviate from what the judge found, the

18    judge who heard the whole record and who was

19    affirmed by the Commission.

20          There's a question here of whether TTI's

21    redesign is completely wireless or not.  Again, I

22    don't want to belabor it, but this receiver box

Hearing - May 25, 2018

Page 102

1    that they've now introduced as an accessory to the

2    product is a separate product.  It's not part of

3    the head unit.  It plugs in, there's no question

4    about that.  That's been discussed and admitted.

5    It plugs into the same model GD2000 head unit that

6    was found in the infringement model.  It's the same

7    head unit.

8            This is an illustration just showing that

9    what TTI has essentially done is just shorten the

10   wire.  Instead of having the wire connecting all

11   the way, they just shortened it so that the motor

12   drive unit and the receiver are connected by a

13   wire.  That essentially is the redesign and this

14   does not escape the (inaudible) of the '319 Patent.

15           What TTI is trying to do is redefine motor

16   drive unit in the claims as we've suggested here to

17   suggest that the receiver box is actually part of

18   the motor drive unit so that now you've got some

19   sort of wireless link between the motor drive unit

20   as they define it and the wall console, but that's

21   not what the claim says.  The claim says you have a

22   connection between the microcontroller inside the

Hearing - May 25, 2018

1    motor drive unit and the wall console to the

2    microcontroller.  I mean, if you look at that

3    connection, there's clearly a wire.  You cannot

4    ignore that wire that connects the receiver to the

5    head unit.

6              So I would suggest -- respectfully suggest

7    there's literal infringement, that the redesigned

8    product literally infringes at least claims 1 and 9

9    of the '319 Patent.  There's a wall unit, there is

10   a head unit, both have microcontrollers, that point

11   is undisputed.  There is a connection between those

12   two microcontrollers that includes at least

13   partially a wire.  That's clear.  If not

14   undisputed, it's clear.  That satisfies the

15   definition of digital data bus, it satisfies the

16   definition provided by the ALJ, and literal

17   infringement is here.  These redesigned products

18   fall within the scope of the limited exclusion

19   order.

20             MR. COLT:  Are there any other claims that

21   are literally infringed that were referenced in the

22   limited exclusion order?

Hearing - May 25, 2018

1              MR. COLAIANNI:  There are.  We have,

2      Mr. Colt, in our briefing materials focused on

3      claims 1 and 9 because TTI did that.  So we wanted

4      to respond and enjoin the issues, but there are

5      other claims as well and we'd be happy to identify

6      those for you in the post-hearing briefing if

7      helpful.

8              MR. COLT:  Thank you.

9              MR. COLAIANNI:  So I would submit you

10     don't even need to get to the Doctrine of

11     Equivalents, but if for some reason you're not

12     convinced on literal infringement there's certainly

13     infringement of the Doctrine of Equivalents.  We

14     have clearly a (inaudible) that's been used by the

15     Supreme Court and by the Federal Circuit and

16     district courts for years.  I think it's very clear

17     that you have -- the connection in the redesigned

18     product performs substantially the same function as

19     that in the claims and in substantially the same

20     way providing data between the two end points to

21     achieve the same result.

22              We were criticized here for not providing

Hearing — May 25, 2018

1    evidence of this.   This is a brand new product.

2    This was not addressed in the underlying ITC

3    investigation.   The product had been minimally

4    changed and the arguments here are clear.   You can

5    call them attorney arguments, but this is

6    absolutely clear as a bell that the connection is

7    doing the same thing.   They just shortened the

8    wire.   There's no difference in functionality.   If

9    there were I suspect the product might have issues,

10   but it doesn't.   It still works the same way.   When

11   a user comes in and hits a remote or pushes a

12   button, it opens and closes the same thing as it

13   would do if it were a wired connection.

14        So I don't see how they can come here and

15   argue against what we've said.   They've offered no

16   substantive (inaudible) points.   They just

17   criticize us for not providing evidence, which,

18   again, this is a brand new product.   We haven't had

19   a chance to provide evidence.   We haven't been able

20   to -- we have shown pictures.   We did an inspection

21   of the product and those pictures are shown in our

22   briefing materials which shows the structure and

Hearing - May 25, 2018

1    there's no dispute over the operation of the

2    product.

3         So I submit to you that if you disagree

4    with us on literal infringement, infringement of

5    the Doctrine of Equivalents is present.

6         MR. COLT:  Does Doppelt have the

7    equivalent of a digital data bus?

8         MR. COLAIANNI:  I haven't thought about

9    that question.  It has means for communicating

10   signals between the head unit and the wall unit

11   wirelessly, but I haven't given that consideration

12   as to whether that would be equivalent in a

13   Doctrine of Equivalents sense which requires an

14   analysis.  I'm happy to address that in the

15   briefing if helpful.

16        MS. WU:  Mr. Colaianni, your presentation

17   and the briefing focuses on GD201.  Would you agree

18   that that's representative of GD126 as well?

19        MR. COLAIANNI:  Yes, Ms. Wu.  As I

20   understand the products, the new redesigned

21   products, the GD201, the GD126 are the same in

22   relevant respects.  I think the horsepower is

Hearing — May 25, 2018

1    different in the motor, but I believe everything

2    we've talked about today applies to both models.

3            MS. WU:  Thank you.

4            MR. COLAIANNI:  With that I will close if

5    there are no further questions.

6            MR. COLT:  Thank you, Counsel.

7            We'll take a 10-minute break and hear

8    rebuttal from TTI.

9                    (A short break was had.)

10           MR. COLT:  Counsel for TTI, please

11   proceed.

12           MR. WHITE:  Thank you.

13           I talked a couple times during my original

14   presentation about the phrase you were referring to

15   from the judge's opinion at the initial

16   determination level as being dicta and what he

17   actually relied upon to show infringement of the

18   digital data bus limitation.  I actually had a

19   slide on this and I wanted to make sure I describe

20   this.  This is slide 60.

21           So in the initial determination Judge

22   Pender said "Under the proper construction the unit

Hearing — May 25, 2018

1    where a motor drive resides" —— that being whether

2    it's required for the motor drive unit —— he said

3    "The limitation is met by the accused products

4    because it is undisputed that the indoor keypad's

5    microcontroller connects only to the WiFi board's

6    microcontroller and communicates digitally over

7    that wired connection." So when he was making his

8    determination as to what was found to infringe, he

9    relied upon the wired connection from the WiFi

10   board to the wall console.

11          I made that point a couple times. I just

12   wanted to show you that that's actually what he

13   said and it is right there in the initial

14   discrimination.

15          MS. WU: Should we disregard any dicta?

16          MR. WHITE: I think you have to —— it's

17   not controlling. Obviously it's there. I think

18   you have to consider everything else, though, and

19   if the record is clear, I think you do have to

20   ignore dicta. That would be contrary to the

21   outcome that is driven by all (inaudible) in the

22   case.

1         There was another issue that came up too

2    that, Mr. Colt, you asked about and that was

3    whether "communication link" which is referenced in

4    the paragraph of the patches that we talked about

5    had been discussed or defined, but it hasn't.  So,

6    again, not only is this dicta where the judge said,

7    you know, if there was another connection down the

8    line it may not matter if it was wired or wireless.

9    He talked about a communication link.  We don't

10   even know what he was talking about.  Was he

11   talking about between the head unit and the wall

12   console?  Was he talking about something internal

13   to the head unit?  We don't know.

14        So, again, the clear and convincing

15   evidence is everything else in the record that was

16   relied upon and presented here, not the dicta that

17   we discussed before.

18        There was some suggestion that the judge

19   considered below all the arguments that you heard

20   today about Doppelt.  That is simply not true.

21   Importantly, the judge did not consider whether the

22   wireless keypad to the antenna in Doppelt met the

Hearing — May 25, 2018

1   claim limitation or in any way rendered them

2   invalid.

3       MR. BULLARD:  So what was the basis for

4   the judge finding that the patent claims were not

5   invalid (inaudible)?

6       MR. WHITE:  You asked the question before

7   was Doppelt argued to be anticipatory or

8   obviousness.  It was an obviousness combination.

9   The reason for that -- and I talked a little bit

10  about this before.  Let me get the slide up to show

11  you Doppelt.  There's two different wall consoles

12  disclosed in Doppelt.

13       Here's Doppelt.  There's a wall console

14  next to the door which is 39, and then there's a

15  wireless keypad on the wall which is 34.  Because

16  everybody had interpreted the claims to require a

17  wired connection from the keypad to the head unit,

18  in arguing Doppelt as a prior art reference we only

19  relied upon the wall console 39.  That did not have

20  a microcontroller in it.  That was the only thing

21  that was missing because we already know we've seen

22  Doppelt has a head unit wired directly to a wall

Hearing - May 25, 2018

1   console and there's a controller in the head unit.

2   So the only thing that was missing was the

3   controller in the wall console.  It wasn't there in

4   the wired one.

5           We made no arguments about the wireless

6   keypad which absolutely has a controller in it.

7   Why?  The reason is Chamberlain never said the

8   digital data bus could be wireless.  Everybody

9   interprets this as being conductors.  You heard him

10  say it several times here wired, wired, wired.

11  That's all you heard today, that's all we heard

12  before the ITC.  Based upon that construction we

13  focused on the wired connection.  That was what the

14  judge found.  He said -- we were arguing an

15  obviousness combination saying this wall console

16  that did not have a controller in it could be

17  modified to include a controller because there's

18  other wall consoles out there that had controllers

19  in there, and he said there was a lack of

20  motivation to take a controller from a different

21  wall console and put it into the one in 39.  He did

22  not discuss or in any way address whether or not a

1    wireless keypad with a controller would meet the

2    claim limitations as Chamberlain is interpreting

3    them today.

4              That may be more than you wanted, but

5    that's the background as to why he found that there

6    was not a obviousness rejection based on Doppelt.

7    It was because we were relying upon a wired

8    connection which admittedly did not have a

9    controller.  There is a controller for sure in the

10   wireless one.

11             We also heard Mr. Colaianni say that

12   Doppelt was considered by the Patent Office.  I

13   thought that was interesting.  That makes it part

14   of the intrinsic record.  Anything that's before

15   the Patent Office in terms of the file history and

16   the prior art cited in there becomes part of the

17   intrinsic record.  So I know you were asking me how

18   do we get to the prior art, how do we consider

19   Doppelt.  I think he gave you another reason is

20   that in Doppelt -- he said it's not that exact

21   patent but the disclosure's the same.  If that's in

22   the prior art, part of the intrinsic record and you

Hearing - May 25, 2018

1     can consider it.

2           Now, when you look at the prior art in the

3     intrinsic record and file history, there's no

4     indication that the Patent Office ever considered

5     digital data bus as including wireless

6     communications.  Doppelt wasn't applied that way,

7     nothing was applied that way.  Everybody before the

8     Patent Office considered it to be a wired

9     communication just like it was discussed at the

10    ITC.

11          We also heard unequivocally and maybe for

12    the first time that Chamberlain is of the position

13    that the claims do not cover a solely wireless

14    connection.  They describe Doppelt as being solely

15    wireless and they describe the TTI prior antenna

16    connection as being solely wireless.  Today they

17    said for sure that those are not covered by the

18    claims.  That's significant because let's look at

19    what they say a wireless connection looks like.

20          Here we have it.  We have Doppelt says --

21    this is from their brief.  Doppelt discloses a

22    solely wireless connection.  It's going to take me

Hearing - May 25, 2018

1    a while to advance.  We looked at this before.

2    Their description of Doppelt as being solely

3    wireless and today saying it's not covered by the

4    claims I think is also determinative for us.  Why

5    is that?  Because it's the same configuration that

6    the TTI redesign is using.  We had this here, we

7    talked about it.  They describe this configuration

8    as being solely wireless.  It's not.  If you want

9    to hold it strictly, you've got a wireless

10   connection that goes to the antenna and then you've

11   got a wired connection from the antenna to the

12   receiver and a wired connection from the receiver

13   to the microcontroller.

14        MR. BULLARD:  Is line 82 in Doppelt a

15   conductor?

16        MR. WHITE:  Absolutely.  I don't know how

17   you could say any other way.  I mean, it says it's

18   a line and it contains digital data.  I mean, you

19   heard him say it may or may not be.  It may or may

20   not be a wired.  He says if it's a line it's

21   absolutely a conductor.  It says to supply

22   demodulated digital signals.  It has to carry the

Hearing - May 25, 2018

1    signals, right.  It's the only link between those

2    two, it has to be a conductor.

3              MR. COLT:  Could it be fiber optic?

4              MR. WHITE:  Could it be fiber optic?  I

5    don't know.  Back at this point in time, I don't

6    know the answer to that.  It's definitely a

7    conductor.

8              MR. BULLARD:  We asked Mr. Colaianni

9    Colaianni about wired and how wired relates to the

10   claim language.  What is the relationship between

11   wired and conductor?

12             MR. WHITE:  I think that they've taken the

13   position -- I think arguably -- I have to think.

14   Is wired the same thing as a conductor?  I think

15   probably a conductor is just in general terms maybe

16   a little bit harder than wired, but they have said

17   wired, wired, wired.  This is the same thing.

18   They're trying to run away from statements they

19   made below and statements they've made here.  We're

20   entitled to rely upon those statements.  They have

21   said wired consistently is what's required here,

22   wired end to end is what's required here, and we

Hearing - May 25, 2018

1      simply don't have that.

2             Actually an interesting question was

3      asked, I think Mr. Colt you may have asked this,

4      does the digital data bus have to extend outside of

5      the head unit.  Seems to me maybe they were trying

6      to draw a distinction there.  You didn't get an

7      answer to that.  He didn't say yes, didn't say no,

8      but the answer you did hear -- I wrote it down --

9      if there's a hard wired connection anywhere it

10     satisfies the claim.  That can't possibly be.  Look

11     at Doppelt, there is a hard wired connection there.

12     Again, they cannot have it both ways.  They cannot

13     say a hard wired connection anywhere satisfies the

14     claim to try to say we infringe, yet say these hard

15     wired connections in Doppelt are not relevant.

16             MR. BULLARD:  In the proceeding before the

17     Patent Trial and Appeal Board is this theory of

18     invalidity the basis for consideration at the PTAB?

19             MR. WHITE:  It is not for the same reasons

20     that we have taken them at their word that wired

21     connection is required to meet the digital data

22     bus.  So we've -- now we have basically the same

Hearing - May 25, 2018

1    combination at the PTAB that we did before Judge

2    Pender and that is that the Doppelt wired PTAB on

3    the wall can be modified to include a processor in

4    it, and the PTAB has agreed with us on that, at

5    least in the institution decision.

6         MR. BULLARD:  Just so we have a clear

7    understanding of the record at the ITC and the

8    record at the PTAB, Doppelt has been presented at

9    both the ITC and the PTAB as part of a 103

10   obviousness invalidity argument?

11        MR. WHITE:  Yes.

12        MR. BULLARD:  And here today you're

13   presenting us with aspects of Doppelt that would

14   invalidate the claims based on anticipation?

15        MR. WHITE:  Correct.  Aspects that have

16   not been argued before the ITC or the PTAB.

17        MR. BULLARD:  So at no point in either the

18   PTAB or ITC has the patent owner directly responded

19   to allegations as to these features, meaning the

20   claim limitations?

21        MR. WHITE:  I don't think that's right

22   because we already saw once in the briefs they

Hearing - May 25, 2018

1    anticipated an argument that the wireless would

2    cover and they said it's irrelevant.  That was in

3    slide 42 that we looked at before.

4         MR. BULLARD:  I understand.  There was

5    that characterization of the nature of Doppelt, but

6    I'm asking specifically about the way that on an

7    element-by-element basis Doppelt is being applied.

8    I think you clarified, for example, for the PTAB --

9    I'm looking at page 11 of the notice of institution

10   from the Patent Trial and Appeal Board, the

11   decision of institution, that Petitioner argues

12   Doppelt includes a GDO having wall-mounted switch

13   module 39, but does not disclose that switch module

14   39 includes a controller -- microcontroller, and

15   that's because you're looking at a different wall

16   module than what we see here in slide 71?

17        MR. WHITE:  Correct.

18        MR. BULLARD:  So although you've pointed

19   to Chamberlain making an argument about Doppelt in

20   general, it's not an argument in response to this

21   specific allegation?

22        MR. WHITE:  I have to be careful with that

Hearing — May 25, 2018

1    because I think the statements -- it's not a simple

2    yes or no.  If we look at slide 42, for example, we

3    did not specifically raise an anticipation argument

4    based upon the wireless console 34, but they made

5    an argument anyway about the wireless communication

6    saying that the claims require a wired combination.

7        So it's a partial yes, partial no answer

8    to your question.  They were not responding to a

9    specific combination we proposed, but they were

10   addressing the very issues we raised here.  We

11   didn't raise it below, but they anticipated it

12   anyway and raised this instead, the claims require

13   a wired combination.

14       Similarly in the depositions in the

15   testimony they weren't responding to the specific

16   combination -- I'm sorry -- the specific

17   anticipation argument we're making here, but we did

18   asking questions broad enough to cover these

19   situations and they did answer them affirmatively

20   saying the claims require wireless connections, the

21   claims don't cover wireless.  So, again, that

22   wasn't in response to a specific combination, which

Hearing - May 25, 2018

Page 120

1    is your specific question, but they were addressing

2    the exact arguments that are being raised here and

3    they made statements that are binding upon them

4    that exclude the current configuration.

5         MR. BULLARD:  Thank you.

6         MR. WHITE:  Another question that came up

7    was what is the point of novelty of the

8    '319 Patent.  You specifically asked him is it a

9    controller, is it wireless, what is it, and I think

10   you heard the response was, well, it's a controller

11   in the wall console, but that's not exactly true

12   because you see in Doppelt, Doppelt had a wall

13   console with a controller in it.  If there's any

14   novel aspect of the '319 Patent it's the

15   combination of the controller in the wall console

16   and the wired connection.  It can't just be a

17   controller in the wall console because that's in

18   the prior art in Doppelt.

19        Remember, Mr. Colt, you asked about

20   retrofitting.  Again, one of the key aspects of the

21   '319 patent was retrofitting meaning you can make

22   this wall console and attach it to the existing

1    wires and take the benefit of that.  So if there's

2    anything novel it's the combination of the

3    controller and the wired connection.

4           One additional point is we talked about

5    that there's wireless capability disclosed in the

6    '319 Patent.  That's true, there's an antenna 52,

7    but there's also a wall control 60 that hard wired.

8    If you look at the '319 Patent, this goes a little

9    bit to your written description questions before,

10   you won't see anywhere where the patent talks about

11   using the wall control 60 to communicate wirelessly

12   via the antenna 52.  It's simply not there.  Could

13   have been there, but not there.

14          Another big point in the response you

15   heard was talking about case law talking what it

16   means to be connected to and things like that.  All

17   that's fine and good, but their statements here

18   before the ITC, before the PTAB trump all that.

19   You can't throw those away and ignore their

20   statements about what the claims cover and what

21   they don't based upon case law interpreting

22   different claims in a different context.  Their

Hearing - May 25, 2018

1     statements here control and are trumping.

2          Mr. Bullard, you asked a point -- question

3     that brought out an answer that was what's a

4     configuration look like that doesn't infringe under

5     this construction, and I think it was interesting

6     that there was not any identifiable version of this

7     that wouldn't infringe as they're interpreting the

8     claims now.  Obviously there's got to be some

9     version of this that wouldn't meet the claim

10    limitations.

11         I think the one that's obvious is it's got

12    to be a wired end-to-end connection because

13    anything else you talked about with Mr. Colaianni

14    when he says as long as there's a wire somewhere in

15    the patent, under that construction, as you pointed

16    out, there's always going to be a tracer on the

17    board or something that's going to be at least a

18    partial wired connection.  So there would be no

19    configuration that would not meet these claims.

20    Again, we're talking about a digital data bus

21    covering a wireless communication.  It simply

22    doesn't make sense.

Hearing - May 25, 2018

Page 123

1          So I'll conclude with one last thing.  As

2    I said in my opening presentation, this whole

3    exercise has been a point in contradictory

4    statements and contradictory positions.  When it's

5    been to their benefit to say, like we heard today,

6    the claims don't cover solely wireless to avoid the

7    prior art they said that, but when it comes to

8    infringement to try to capture ours they then say

9    the claims cover a partially wired/partially

10   wireless.  The partially wired/partially wireless

11   system looks exactly like in Doppelt.  We can see

12   it, it's lined up, the antenna even extends outside

13   of the head unit.  So that's why you didn't get an

14   answer to the question as to whether or not the

15   digital data bus has to extend outside the head

16   unit because even in Doppelt it does.

17          You have to consider Doppelt, you do.

18   You've heard now it's part of the intrinsic record

19   and at a minimum there's got to be at least

20   ambiguity whether or not these claims cover this

21   new partially wired/partially wireless system.

22   When you consider the Doppelt reference you see

1    that it cannot read on that configuration, it

2    cannot read on the accused claims.

3         You've got legal backup for this.  You've

4    got the case law that says you should interpret the

5    claims on prior art.  You've got the case law that

6    says you can't interpret the claims one way for

7    infringement and another way for validity.  You've

8    got the case law that says you're estopped by

9    making  augments for a different body, you can't

10   change them when you come here.

11        So for all those reasons we ask that you

12   interpret the claims as they should be, excluding

13   this partial wired/partial wireless configuration

14   and find that the products here do not infringe.

15        Unless you have additional questions, I'll

16   leave it at that.

17        MR. COLT:  Thank you, Counsel.

18        The parties are thanked for their

19   participation in today's inter partes proceeding

20   and are reminded that the post-hearing briefs are

21   due a week from today, Friday, June 1, and we ask

22   that those be submitted by 6:00 p.m.  You're

1    welcome to submit them simultaneously.

2              Are there any further questions while

3    we're on the record?

4              MR. COLAIANNI:  Would it be helpful to

5    have electronic copies of the slides?  You have a

6    paper copy.  Would you like an electronic copy?

7              MR. COLT:  Yes, that would be great.

8              Thank you.  That completes this

9    inter partes proceeding.

10                        (Whereupon, at 12:28 p.m. the

11                         proceedings were adjourned.)

12

13

14

15

16

17

18

19

20

21

22

Page 126

```
 1                    CERTIFICATE OF REPORTER

 2              I, Tina M. Alfaro, Certified Realtime

 3    Reporter and Notary Public within and for the

 4    District of Columbia, the officer before whom the

 5    proceedings were taken, do hereby certify that the

 6    foregoing transcript is a true and accurate record

 7    of these proceedings; that said proceedings were

 8    taken in Stenotype note by me on the 25th day of

 9    May, commencing at 10:00 a.m. and ending at

10    12:28 p.m.

11              I further certify that I am not related

12    to, nor associated with any of the parties or their

13    attorneys, nor do I have any disqualifying

14    interest, personal or financial, in the actions

15    within.

16              IN WITNESS WHEREOF, I have hereunto set my

17    hand and affixed my notarial seal this _____ day of

18    May, 2018.

19    My Commission expires October 31, 2020.

20

21    _____

22    NOTARY PUBLIC, DISTRICT OF COLUMBIA
```