## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ONE WORLD TECHNOLOGIES, INC., | Case No.: 18-cv-200 |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| THE UNITED STATES OF AMERICA; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CUSTOMS AND BORDER PROTECTION; and KEVIN K. MCALEENAN, in his official capacity as Commissioner of U.S. Customs and Border Protection, | **NON-CONFIDENTIAL** |
| Defendants. | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF ONE WORLD TECHNOLOGIES, INC.'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION & SUMMARY OF THE ARGUMENT ............................................. 1

II.  STATEMENT OF FACTS .................................................................................. 3

    A.  The Parties ............................................................................................. 3

        1.  Plaintiff One World Technologies, Inc ................................................. 3

        2.  Defendants ................................................................................... 3

        3.  Description of the Products ............................................................. 3

    B.  The Proceedings ..................................................................................... 4

        1.  The International Trade Commission Investigation ................................. 4

            a.  Proceedings before the Commission ............................................. 4

            b.  The Federal Circuit Appeal ....................................................... 5

        2.  The Patent Trial and Appeal Board's Inter Partes Review of the Asserted Claims of the '319 Patent ..................................................... 5

        3.  Respondents Developed Redesigned GDOs, and Seek Orders Confirming that these Products May Be Imported Lawfully .................... 6

            a.  IPRB Ruling, HQ H295697 (July 20, 2018) ................................. 7

            b.  IPRB Protest Ruling, HQ H300129 ............................................. 8

            c.  The ITC Modification Proceedings ............................................. 9

III.  JURISDICTION .......................................................................................... 9

IV.  APPLICABLE LAW ...................................................................................... 9

    A.  Standard of Review .................................................................................. 9

    B.  Injunctive Relief .................................................................................... 10

V.  ARGUMENT ............................................................................................... 11

    A.  One World Has A Strong Likelihood of Prevailing on the Merits ...................... 11

        1.  The Redesigned GDOs Do Not Infringe the '319 Patent and Are Not Covered by the LEO .......................................................... 11

            a.  Chamberlain Has Admitted That '319 Patent Claims Do Not Cover Wireless Communications Between The Head Unit And Wall Console ............................................................... 12

            b.  Chamberlain Is Estopped From Arguing the Redesigned GDOs Infringe Because the '319 Patent Claims Extend to Wireless Communications Between The Head Unit And Wall Console ......................................................................... 15

## TABLE OF CONTENTS
(continued)

Page

c.    Under the Plain Language of the Claims, the Redesigned
GDOs Cannot Infringe the '319 Patent ........................................ 17

d.    The IPRB's Decision Relied On an Erroneous Construction
of the Term "Connected ............................................................. 20

e.    Under the IPRB's Construction, the Prior Art Would
Render the '319 Patent Invalid ................................................... 24

B.    One World Will Be Irreparably Harmed Without Injunctive Relief ................... 29

C.    The Balance of Hardships Tips in One World's Favor ........................................ 32

D.    The Public Interest Favors One World's Requested Relief ................................ 32

VI.    CONCLUSION ............................................................................................................. 34

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*American Signature, Inc. v. United States*,
   598 F.3d 816 (Fed. Cir. 2010)...........................................................................................10

*Belgium v. United States*,
   452 F.3d 1289 (Fed. Cir. 2006)........................................................................................10

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
   489 U.S. 141 (1989)..........................................................................................................33

*CBB Group, Inc. v. U.S.*,
   783 F. Supp. 2d 1248 (C.I.T. 2011) ...............................................................................9, 11

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
   664 F.3d 922 (Fed. Cir. 2012)...............................................................................30, 31, 32

*The Chamberlain Group, Inc. v. Int'l Trade Comm'n*
   (Case No. 18-2002) ...........................................................................................................5

*Chimie v. PPG Indus., Inc.*,
   402 F.3d 1371 (Fed. Cir. 2005)........................................................................................13

*Contracting Consulting Eng'g LLC v. United States*,
   103 Fed. Cl. 706 (2012) ...................................................................................................10

*Data Gen. Corp. v. Johnson*,
   78 F.3d 1556 (Fed. Cir. 1996)..........................................................................................15

*Harmoni Int'l Spice, Inc. v. United States*,
   211 F. Supp. 3d 1298, 1307 (Ct. Int'l Trade 2017) .........................................................30

*Hockerson-Halberstadt v. Avia Group Intern.*,
   222 F.3d 951 (Fed. Cir. 2000)......................................................................................13, 33

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
   381 F.3d 1111 (Fed. Cir. 2004)....................................................................................12, 16

*Jazz Photo Corp. v. U.S.*,
   353 F. Supp. 2d 1327 (C.I.T. 2004) ..................................................................................9

*Markman v. Westview Instruments, Inc.*,
   517 U.S. 370 (1996)..........................................................................................................11

*Nat'l Juice Prods. V. United States,*
    10 Ct. Int'l Trade 48, 628 F. Supp. 978 (1984) ................................................30

*Omega Eng'g, Inc. v. Raytek Corp.,*
    334 F.3d 1314 (Fed. Cir. 2003) ........................................................................29

*One World Techs., Inc. v. The Chamberlain Group, Inc.,*
    IPR2017-00126, Paper 1 (PTAB Oct. 25, 2016) ............................................5, 6

*Orenshteyn v. Citrix Sys., Inc.,*
    691 F.3d 1356 (Fed. Cir. 2012) ........................................................................22

*Organic Seed Growers & Trade Ass'n v. Monsanto Co.,*
    718 F.3d 1350 (Fed. Cir. 2013) ........................................................................15

*Princo Corp. v. Int'l Trade Com'n,*
    616 F.3d 1318 (Fed. Cir. 2010) ........................................................................33

*Regents of the Univ. of Minn. v. AGA Med. Corp.,*
    717 F.3d 929 (Fed. Cir. 2013) ..........................................................................29

*Robert Bosch LLC v. Pylon Mfg. Corp.,*
    659 F.3d 1142 (Fed. Cir. 2011) ........................................................................31

*Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC,*
    824 F.3d 999 (Fed. Cir. 2016) ...............................................................24, 28, 29

*SAS Institute Inc. v. Iancu,*
    138 S. Ct. 1348 (2018) ........................................................................................6

*Silfab Solar, Inc. v. United States,*
    Slip Op. 18-15, 2018 WL 1176619 ....................................................................10

*State Indus. Inc. v. A.O. Smith Corp.,*
    751 F.2d 1226 (Fed. Cir. 1985) ........................................................................33

*Techtronic Industries Co., Ltd. v. Int'l Trade Comm'n*
    (Case No. 18-2191) ..............................................................................................5

*Thomson, S.A. v. Quixote Corp.,*
    166 F.3d 1172 (Fed. Cir. 1999) ........................................................................22

*Titan Tire Corp. v. Case New Holland, Inc.,*
    566 F.3d 1372 (Fed. Cir. 2009) ........................................................................11

*TiVo Inc. v. EchoStar Corp.,*
    646 F.3d 869 (Fed. Cir. 2011) (en banc) ......................................................19, 33

*Universal Elecs., Inc. v. U.S.*,
112 F.3d 488 (Fed. Cir. 1997)............................................................................9

*W.L. Gore Assocs., Inc. v. Garlock, Inc.*,
842 F.2d 1275 (Fed. Cir. 1988).........................................................................16

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) (2008).............................................................................10, 32

*Zenith Radio Corp. v. United States*,
710 F.2d 806 (Fed. Cir. 1983)...........................................................................29

**Statutes**

28 U.S.C. § 1581(a) ...........................................................................................9, 11

**Other Authorities**

Fed. Reg. 13517 (Mar. 29, 2018)..............................................................................5

Fed. R. Civ. P. 65(b) ................................................................................................10

In accordance with Rules 7 and 65 of the Rules of the United States Court of International Trade, plaintiff One World Technologies, Inc. d/b/a Techtronic Industries Power Equipment ("One World"), by counsel, submits this Memorandum of Points and Authorities in Support of its accompanying Motion for Temporary Restraining Order and Preliminary Injunction ("Motion").

## I.      INTRODUCTION & SUMMARY OF THE ARGUMENT

One World respectfully requests a temporary restraining order and a preliminary injunction enjoining defendants the United States of America, the U.S. Department of Homeland Security, U.S. Customs and Border Protection, and Kevin K. McAleenan, in his official capacity as Commissioner of U.S. Customs and Border Protection (collectively, "Defendants"), from denying entry of certain garage door opener products.  Defendants have excluded One World's products based on a plainly erroneous interpretation of a Limited Exclusion Order ("LEO") issued by the U.S. International Trade Commission ("Commission" or "ITC") in Investigation 337-TA-1016 ("the 1016 Investigation").

The 1016 Investigation concerned garage door products ("GDOs") that The Chamberlain Group, Inc. ("Chamberlain") accused of infringing certain claims of U.S. Patent No. 7,161,319 (the "'319 patent").  Based on the evidence presented in the 1016 Investigation and Chamberlain's numerous admissions about the scope of its claims, One World redesigned its GDO products to avoid the '319 patent.  Specifically, Chamberlain admitted the claim language requires a *wired connection* between the head unit and the wall console of the garage door opener—a requirement Chamberlain relied upon to distinguish the '319 patent claims over the prior art.  The head unit and wall console of the redesigned GDOs communicate *wirelessly* and therefore cannot infringe.

Despite this clear and critical difference between the '319 patent's claims and the redesigned products, Defendants have barred their importation, and erroneously determined that

they are covered by the LEO entered in the 1016 Investigation.  To find that the LEO covered the redesigned GDOs, U.S. Customs and Border Protection's ("CBP's") Intellectual Property Rights Branch ("IPRB") adopted a new infringement theory advanced by Chamberlain for the first time in the Customs proceedings.  But the IPRB failed to recognize Chamberlain's prior contradictory admissions and arguments, or that Chamberlain is estopped from advancing its new position.  The IPRB also erroneously declined to consider whether the '319 patent would read on the prior art and thus be invalid over the prior art under Chamberlain's new theory.  If interpreted to cover One World's the redesigned GDOs, the '319 patent is invalid, and cannot therefore be a proper basis for excluding One World's products.  Under the proper interpretation of the '319 patent claims, the redesigned GDOs do not infringe and are outside the scope of the LEO.  The IPRB's decision adopting Chamberlain's new infringement theory and denying One World's protest was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.

The IPRB's rulings are causing One World irreparable harm and interim injunctive relief is necessary to prevent further harm until this Court resolves the dispute on the merits.  The redesigned GDOs are One World's *only* GDOs offered in the marketplace.  Defendants' wrongful detention the Redesigned GDOs thus would drive One World out of the GDO market.  If injunctive relief is not granted, One World's reputation and goodwill with customers loyal to the Ryobi® brand will be irreparably damaged, as will One World's business relationship with The Home Depot, the exclusive North American retailer of Ryobi® branded power tools.  In contrast, issuing injunctive relief will not harm Defendants.  Moreover, the public interest in encouraging legitimate redesigns and having non-infringing competitive choices available in in the market strongly favors One World's requested relief.

II. **STATEMENT OF FACTS**

A. **The Parties**

1. **Plaintiff One World Technologies, Inc.**

One World is a Delaware corporation with its principal place of business in Anderson, South Carolina. One World designs, markets, and sells power tools and outdoor products under the Ryobi® brand, which is exclusively sold at The Home Depot. One World's Ryobi®-branded products include the garage door openers at issue in this case, as well as their related accessories.

2. **Defendants**

Defendants the United States of America, the U.S. Department of Homeland Security, U.S. Customs and Border Protection, and Kevin K. McAleenan, in his official capacity as Commissioner of U.S. Customs and Border Protection, are responsible for determining the admissibility of goods sought to be entered into the United States, for making determinations regarding the exclusion of goods, and for deciding protests opposing those determinations.

3. **Description of the Products**

The products at issue are the Ryobi® Ultra-Quiet Garage Door Opener, Model Nos. GD126 and GD201 (collectively, "Redesigned GDOs"). As discussed below, these products were specifically designed to—and do—avoid infringing any claim of the '319 patent.

On or about May 12, 2018, One World exported the Redesigned GDOs from a port in or near Shanghai, China. On June 12, 2018, CBP detained a shipment of Redesigned GDOs at the port of Charleston, South Carolina. CBP's actions were based on the incorrect understanding that the Redesigned GDOs are subject to a LEO in the 1016 Investigation.

B.      **The Proceedings**

1.      **The International Trade Commission Investigation**

a.      **Proceedings before the Commission**

On July 5, 2016, Chamberlain filed a complaint with the ITC naming Techtronic Industries Co., Ltd., Techtronic Industries North America, Inc., One World Technologies, Inc., OWT Industries, Inc., Ryobi Technologies, Inc.,[1] and ET Technology (Wuxi) Co., Ltd. respondences (collectively, the "Respondents").   The Complaint alleged that that Ryobi® Ultra-Quiet Garage Door Opener, Model No. GD200 infringed the '319 patent, the only patent at issue here.   On August 9, 2016, the Commission instituted the 1016 Investigation, which was later expanded to include Model Nos. GD200A and GD125 in addition to the GDO200 (collectively, the "Original GDOs").

The ALJ issued an Initial Determination finding a violation of section 337 as to the '319 patent on October 23, 2017.   *Certain Access Control Systems and Components Thereof*, Inv. No. 337-TA-1016 ("*Access Control Systems*"), Initial Determination ("ID") (Oct. 23, 2017) (attached as Exhibit B).   The ID adopted the following constructions:

| Term / Phrase | ITC Construction |
|---|---|
| "wall console" | "a wall-mounted control unit" |
| "digital data bus" | "a conductor or group of conductors which conveys digital data" |
| "controller" | "any type of control device" |
| "motor drive unit" | "unit where a driven motor resides" |

Exhibit B, Initial Determination, at 120-28; *see also Access Control Systems*, Comm'n Op. at 1-2 (May 5, 2018) (attached as Exhibit C).   The ALJ also recommended that the Commission issue a

---

[1] Ryobi Technologies, Inc. was terminated as a Respondent from the Investigation on November 7, 2016.

LEO prohibiting the importation of One World's Original GDOs, which were found to infringe the asserted claims of the '319 patent.  Exhibit B, Initial Determination, at 2.

On March 23, 2018, the Commission issued a Notice of its Final Determination, finding a violation of section 337 and adopting the recommended LEO barring importation of certain access control systems and components thereof covered by one or more of claims 1-4, 7-12, 15, and 16 of the '319 patent, and issuing CDOs as to all Respondents except ET Door (collectively, the "Remedial Orders").  *Access Control Systems*, Notice of the Comm'n Final Determination (Mar. 23, 2018) (copies of the Remedial Orders are attached hereto as Exhibit O).  The Notice published in the Federal Register on March 29, 2018.  *Fed. Reg.* 13517 (Mar. 29, 2018).  On the same day, the Commission issued its Opinion in the Investigation.  *Access Control Systems*, Comm'n Op. (Mar. 29, 2018) (attached as Exhibit D).

### b.    The Federal Circuit Appeal

On July 23, 2018, certain Respondents in the 1016 Investigation filed a Petition for Review of the Commission's Final Determination at the U.S. Court of Appeals for the Federal Circuit, styled *Techtronic Industries Co., Ltd. v. Int'l Trade Comm'n* (Case No. 18-2191), which was consolidated with Chamberlain's appeal from the same Final Determination, styled *The Chamberlain Group, Inc. v. Int'l Trade Comm'n* (Case No. 18-2002).  Those Respondents are seeking a stay of the Remedial Orders in the consolidated appeal.  No hearing date has been set in the consolidated appeals.

### 2.    The Patent Trial and Appeal Board's *Inter Partes* Review of the Asserted Claims of the '319 Patent

On October 25, 2016, One World and Techtronic Industries North America, Inc. filed a petition for *inter partes* review ("IPR") of the claims of the '319 patent that Chamberlain asserted in the 1016 Investigation.  *One World Techs., Inc. v. The Chamberlain Group, Inc.*, IPR2017-

00126, Paper 1 (PTAB Oct. 25, 2016).  The U.S. Patent Office's Patent Trial and Appeal Board ("PTAB") instituted review of all asserted claims on May 4, 2017, and held oral argument on February 1, 2018.  *Id.*, Papers 8 & 36.  The PTAB subsequently decided to consider an additional ground of unpatentability in light of the Supreme Court's decision in *SAS Institute Inc. v. Iancu*, 138 S. Ct. 1348 (2018).  *Id.*, Paper 41.  The PTAB held a second oral argument on August 7, 2018, *id.*, Paper 53, and the statutory deadline for the PTAB to issue a final written decision is November 4, 2018.

### 3.    Respondents Developed Redesigned GDOs, and Seek Orders Confirming that these Products May Be Imported Lawfully

After the July 2017 ITC hearing, certain of the Respondents redesigned the Original GDOs in view of evidence presented to the ALJ, and Chamberlain's numerous judicial admissions about the scope of the '319 patent.  As discussed below, both independent claims of the '319 patent require a "microcontroller [or controller] of said motor drive unit being connected to the microcontroller [or controller] of the wall console by means of a digital data bus."  The ITC found that the wired connection between the head unit and wall console of the Original GDOs met this limitation, and Chamberlain has repeatedly stated that this limitation requires a wired connection. Certain of the Respondents redesigned the Original GDOs by replacing the wired wall console with one that transmits ***wirelessly*** to a receiver at the head unit.  Applying the claim constructions adopted by the ITC, Chamberlain's admissions, and the plain and ordinary meaning of terms like "connected to" and "by means of" that the ITC did not construe, the Redesigned GDOs do not meet this limitation and therefore do not infringe the '319 patent.

### a.      IPRB Ruling, HQ H295697 (July 20, 2018)

On March 30, 2018, after the ITC's Final Determination issued, Respondents submitted a letter to the IPRB of CBP requesting a ruling that the Redesigned GDOs are not covered by the LEO.  The IPRB conducted a hearing on May 25, 2018.

During the hearing, Respondents demonstrated that the Redesigned GDOs do not include a wired connection between the controller in the head unit and the controller in the wall unit. Respondents also identified numerous admissions by Chamberlain in various *fora* that the '319 patent does not cover wireless transmissions between the controllers and is limited to a wired connection between the controllers.  *See* Section V.A.1.a, *infra* at 12.  Chamberlain, however, flip-flopped and argued for the first time that the '319 patent claims cover wireless communications in what Chamberlain christened a "part-wired, part-wireless" configuration.  *Id*.

The IPRB issued Ruling HQ H295697 (the "Request Ruling") on July 20, 2018.  Exhibit E.  The IPRB acknowledged that "[t]he GDOs at issue replace the pair of wires and the wired, wall-mounted keypad of the [previous design] with a wireless, wall-mounted keypad and a wireless receiver."  *Id*. at 26.  Nevertheless, the IPRB concluded that all that is required to meet the "microcontroller [or controller] of said motor drive unit being connected to the microcontroller [or controller] of the wall console by means of a digital data bus" limitation is the presence of some conductor—***any*** conductor—at some point between the microcontroller in the wall unit and the microcontroller in the head unit.  The IPRB focused on the "pair of wires" that connected the head unit to a wireless receiver located at the head unit (but not to wall console) as satisfying the disputed limitation:

> Indeed, given that: (i) the head unit of the GDOs at issue remains unchanged from the '319 Accused Products, and (ii) a pair of wires connects the head unit of the GDOs at issue to the wireless receiver in the same manner as a pair of wires connected the head unit to the wired, wall-mounted keypad of the GDOs before the ITC, it follows that the microcontroller (or controller) of the motor drive unit of the

GDOs at issue is connected to wireless receiver by means of a digital data bus (i.e., a conductor or group of conductors which conveys digital data).

*Id*. at 27.

The IPRB erroneously relied on Chamberlain's new position regarding the '319 patent's scope, while failing to properly apply judicial estoppel and declining to consider whether Chamberlain's reading renders the asserted claims invalid in light of the prior art already considered in the 1016 Investigation. *See id.* at 32-34.

### b.    IPRB Protest Ruling, HQ H300129

On or about June 29, 2018, Defendants excluded a shipment of Redesigned GDOs from importation into the U.S. at the Port of Charleston, South Carolina. *See* Exhibit P.  On August 10, 2018, One World filed protest number 160118100231 regarding the Redesigned GDOs that were wrongly denied entry into the United States.

On September 7, 2018, the IPRB issued Ruling HQ H300129 (the "Protest Ruling") erroneously denying One World's protest challenging CBP's enforcement of the LEO.  Exhibit F. In its Protest Ruling, the IRPB incorrectly found that the Redesigned GDOs infringe the '319 patent based on the same misreading of the claim requirements found in the Request Ruling.  *Id.* at 34-36.  In particular, the IRPB again found that "the pair of wires connecting the head unit to the wireless receiver in the redesigned GDOs is a digital data bus that connects the wireless receiver to the controller in the head unit." *Id.* at 35.  The IPRB did not find—and could not have found—that there is any wired connection between the controller in the head unit and the controller in the wall console of the Redesigned GDOs, nor that the wireless receiver connected to the head unit is the claimed "wall console."   The IPRB again failed to apply judicial estoppel to Chamberlain's prior statements, and declined to consider its new reading of the '319 patent

rendered the asserted claims invalid in light of the prior art already made of record in the 1016 Investigation. *Id.* at 38.

### c.      The ITC Modification Proceedings

On August 2, 2018, Respondents requested institution of a Commission Rule 210.76(a)(1) modification proceeding, and a determination that the Redesigned GDOs are not covered by the LEO because they do not infringe any valid claim of the '319 patent.  The Commission instituted modification proceedings on September 4, 2018.  Exhibit G.  The Commission has ordered the presiding Administrative Law Judge to issue a recommended determination within six months after publication of the Order's notice in the Federal Register.  *Id.* at 3.

## III.   <u>JURISDICTION</u>

One World seeks judicial review of CPB's decision to exclude the Redesigned GDOs and deny One World's protest pursuant to 28 U.S.C. § 1581(a).

## IV.   <u>APPLICABLE LAW</u>

### A.      <u>Standard of Review</u>

The Court of International Trade may reverse a Customs ruling if that agency's "action, findings, and conclusions . . . [are] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Holford USA v. United States*, 19 Ct. Int'l Trde 55, 1488 (1995). The Court "makes its determinations on the basis of the record before it" in actions under Section 1581(a). 28 U.S.C. § 2640(a)(1). The Court reviews *de novo* the protested CBP decision to exclude the subject merchandise.  *Universal Elecs., Inc. v. U.S.*, 112 F.3d 488, 493 (Fed. Cir. 1997); *Jazz Photo Corp. v. U.S.*, 353 F. Supp. 2d 1327, 1333 (C.I.T. 2004).  Thus, "any [] findings of fact are required under § 2640(a)(1) to be made *de novo* by the Court of International Trade, not Customs, and all conclusions of law are, of course, also the *de novo* responsibility of this Court." *CBB Group, Inc. v. U.S.*, 783 F. Supp. 2d 1248, 1254 (C.I.T. 2011).

### B. <u>Injunctive Relief</u>

Rule 65 of the Rules of this Court allows for the issuance of a preliminary injunction or temporary restraining order in an action.  USCIT R. 65(a)-(b).  A temporary restraining order or preliminary injunction may issue where:

1.  the movant is likely to ultimately succeed on the merits of its claims;

2.  the movant will be irreparably harmed without injunctive relief;

3.  the balance of hardships tilts in the movant's favor; and

4.  the public interest favors the grant of injunctive relief.

*American Signature, Inc. v. United States*, 598 F.3d 816, 823 (Fed. Cir. 2010) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 19 (2008) (2008)); *Silfab Solar, Inc. v. United States*, Slip Op. 18-15, 2018 WL 1176619, at *3 (CIT Mar. 5, 2018) (the standard for evaluating a motion for a temporary restraining order and a motion for preliminary injunction are the same).  "No single factor is determinative, and 'the weakness of the showing regarding one factor may be overborne by the strength of the others." *Contracting Consulting Eng'g LLC v. United States*, 103 Fed. Cl. 706, 709 (2012) (quoting *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993)).  The four factors should be weighed according to a "sliding scale," which means that, for example, a greater showing of likelihood of success on the merits lessens One World's burden to show irreparable harm, and vice versa.  *See Belgium v. United States*, 452 F.3d 1289, 1292–93 (Fed. Cir. 2006).  The party seeking to obtain a temporary restraining order or preliminary injunction bears the burden of showing that it is likely to succeed on the merits of its claims.  *See Winter*, 555 U.S. at 20.  In addition, a temporary restraining order requires the movant to demonstrate that "immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition."  Fed. R. Civ. P. 65(b).

## V.     ARGUMENT

### A.     One World Has A Strong Likelihood of Prevailing on the Merits

One World asserts causes of action seeking: (1) judicial review of the IPRB's denial of its protest under 19 U.S.C. § 1581(a); and (2) declaratory judgement that the Redesigned GDOs are admissible into the United States.  At the heart of both these actions is One World's claim that the Redesigned GDOs do not infringe the claims at issue in the LEO, *i.e.*, claims 1–4, 7–12, 15, and 16 of the '319 patent.  Accordingly, to establish a likelihood of success on the merits, One World must show it is likely that the Redesigned GDOs do not infringe any valid claim of the '319 patent. *See Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009).  One World is likely to prevail because the asserted claims do ***not*** cover products like the Redesigned GDOs that use wireless communications, which Chamberlain has repeatedly admitted—and if the claims ***do*** cover wireless communications, they are invalid.

### 1.     *The Redesigned GDOs Do Not Infringe the '319 Patent and Are Not Covered by the LEO.*

A patent infringement analysis is a two-step process.  First, the scope of the claims must be determined.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).  Second, the properly construed claims must be compared with the accused device to determine whether all of the claim limitations are present in the accused product. *Id.*  If even one limitation is missing there can be no infringement.  *Id.*  As applied here, claim construction is a question of law that this Court reviews *de novo*.  *See CBB Group*, 783 F. Supp. at 1254.

Chamberlain has repeatedly admitted that the '319 patent does not cover wireless transmission from a keypad, and is limited to a wired connection between the controllers in wall keypad and the head unit.  Through its judicial admissions and attempts to distinguish prior art wireless systems, Chamberlain unequivocally disavowed any claim scope covering wireless

communications from a keypad.  The IPRB abused its discretion by ignoring these judicial admissions, and this alone provides sufficient grounds for granting One World's requests for declaratory and injunctive relief.

Further, under the plain language of the claims, the Redesigned GDOs do not infringe the '319 patent because the controllers in the head unit and keypad are not "connected . . . by means of a digital data bus," as required by all claims of the '319 patent.  In particular, the Redesigned GDOs use a wireless keypad that communicates wirelessly with a receiver located on the head unit.  No "digital data bus" connects the respective controllers in the head unit and wall console. The IPRB erred by ignoring Chamberlain's judicial admissions and construing this claim limitation to cover wireless systems so long as there is a "digital data bus" anywhere in the communication path between the controllers in the head unit and wall console.  This construction was arbitrary, capricious, an abuse of discretion, and not in accordance with the law.  The Court should reverse the protest decision because the IPRB erred by adopting a claim construction that was conflicts with Chamberlain's repeated judicial admissions

The IPRB also abused its discretion by refusing to consider whether the '319 patent would read on the prior art and be invalid under its broad construction.  The IPRB should not have adopted a construction that would read the '319 patent directly on the prior art.

a.   **Chamberlain Has Admitted That '319 Patent Claims Do Not Cover Wireless Communications Between The Head Unit And Wall Console.**

"Because the inquiry into the meaning of claim terms is an objective one, a patentee who notifies the public that claim terms are to be limited beyond their ordinary meaning to one of skill in the art will be bound by that notification, even where it may have been unintended." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004). A patentee's representations impact the scope of its claims because it "ensures that claims are not

construed one way in order to obtain their allowance and in a different way against accused infringers." *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005).  Accordingly, "competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct, such as designing around the claimed invention." *Hockerson-Halberstadt v. Avia Group Intern.*, 222 F.3d 951, 957 (Fed. Cir. 2000).

Chamberlain has repeatedly admitted that wireless communications between the head unit and the wall console are outside the scope of the claims.  During the ITC proceedings, the parties agreed that a connection "by means of a digital data bus" required a wired connection.  Indeed, Chamberlain repeatedly argued that only a fully wired connection between the wall-mounted control unit and the head unit would infringe the '319 patent, and made clear that wireless communications would *not* infringe.  For example, in both its pre- and post-hearing ITC briefs, Chamberlain argued that ███████████████████████████████████████████ ████████████████████████████████████████  *See* Exhibit H at 5 and Exhibit I at 4–5 (emphasis added).

The reason that Chamberlain agreed the claims require a wired connection was simple:  Chamberlain's own prior art reference (discussed further below) plainly disclosed a wireless communications between the same elements as recited in the '319 patent claims.  Accordingly, to distinguish the prior art's wireless communication, Chamberlain argued that ██████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ Exhibit H at 67 (emphasis added).

At the ITC's evidentiary hearing, Chamberlain's expert again unequivocally acknowledged that the claims of the '319 patent do not cover wireless communication and are limited to a wired connection:

> Q.     You'll agree with me that the '319 patent does not claim a wirelessy connected wall console; correct?
> A.     That's correct.
> Q.     And, in fact, the '319 patent claims are **limited** to a wired connection between the microcontroller of the motor drive unit, correct?
> A.     Yes.

Exhibit J, Hr'g Tr. (July 13, 2017) at 1079:13–20 (emphasis added).

Chamberlain made the same admission in other forums when attempting to avoid the prior art. After One World filed IPRs with the PTAB challenging the validity of the '319 patent, Chamberlain's expert again attempted to distinguish the prior art by arguing that wireless communication was outside the scope of the patent's claims:

> Q.     So within the confines of the '319 patent, would sending signals, digital signals using radio frequency or other wireless means, be conveying digital signals over a digital data bus?
>
> A.     In my opinion, no.

Exhibit K, Dep. Tr. of Dr. Nathaniel Davis, at 65:3-8 (objection omitted).

At oral argument in the IPRs, Chamberlain's counsel again attempted to distinguish the prior art by arguing that the '319 patent claims do not extend to wireless communications between the wall counsel and the head unit:

> Judge Horvath: If I were to take that remote controller and mount it on a wall, would that become a wall console?
>
> Mr. Monaldo: That's a good question, Your Honor. That's not an argument that Petitioner has raised in this proceeding, but *I don't think so*. It's a remote controller that has different functionality. *It's not attached to anything*.
>
> . . .
>
> Judge Horvath: If I were to mount it on a wall, would it have the digital data bus?

14

Mr. Monaldo: I don't think so because ***it's wirelessly transmitting and there's not necessarily a data bus that's flowing between the two components.  It's a wireless controller that is used to send wireless signals that are different than when we're talking about the wall console***.  That's connected ***directly*** through a digital data bus to the head unit.

Exhibit L, Aug. 7, 2018 PTAB Hr'g Tr. at 28:21–29:16 (emphasis added).

As discussed below, One World's request for injunctive relief should be granted because Chamberlain's judicial admissions preclude any argument that the '319 patent covers the Redesigned GDOs.

>      **b.      Chamberlain Is Estopped From Arguing the Redesigned GDOs Infringe Because the '319 Patent Claims Extend to Wireless Communications Between The Head Unit And Wall Console.**

The Federal Circuit has long held that "a party who successfully argues one position is estopped from later adopting a contrary position in a case involving the same patent." *Organic Seed Growers & Trade Ass'n v. Monsanto Co.*, 718 F.3d 1350, 1358 (Fed. Cir. 2013). Chamberlain's numerous admissions estop it from arguing a different claim interpretation that would cover wireless transmissions. *See Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1564 (Fed. Cir. 1996) ("[W]here a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed.").

Nonetheless, during the Customs proceedings, Chamberlain did just that.  It advanced for the first time a new (and contradictory) position that "the claims do not cover a ***solely wireless*** connection," but do cover a "***part-wired/part-wireless connection***"—*i.e.*, a system that has a digital data bus or conductor at some point in the communication pathway. *See* Exhibit M, IPRB Hr'g Tr. at 83:9–84:22 (emphasis added).   The IPRB wrongly adopted and relied upon Chamberlain's newly crafted infringement theory.

15

In the Protest Ruling, the IPRB dismissed Chamberlain's prior admissions because it gave credit to Chamberlain's argument that none of its prior judicial admissions "stat[ed] that the '319 patent does not cover a ***part-wired/part-wireless connection***."   Exhibit F at 37 (quoting Chamberlain's Reply) (emphasis in original).   The IPRB's decision to dismiss the prior judicial admissions based on this distinction was arbitrary, capricious, an abuse of discretion, and not in accordance with the law for two reasons.

First, judicial estoppel exists to prevent precisely the gamesmanship Chamberlain is displaying.  *See Innova/Pure*, 381 F.3d at 1117 ("a patentee who notifies the public that claim terms are to be limited . . . will be bound by that notification" and may not, like a "nose of wax," twist the meaning of patent claims one way to avoid a finding of unpatentability and in another way so as to avoid infringement).  The IPRB should not have allowed Chamberlain to twist the meaning of the claims depending on whether it was addressing infringement or invalidity.  The Federal Circuit has long held that it is "axiomatic" that claims must be interpreted the same way for both invalidity and infringement.  *See W.L. Gore Assocs., Inc. v. Garlock, Inc.*, 842 F.2d 1275, 1279 (Fed. Cir. 1988).

Second, nowhere in Chamberlain's prior statements did it ever distinguish between a "solely wireless" connection and a so-called "part-wired/part-wireless connection."   To the contrary, Chamberlain argued, without qualification, that the claims do not cover wireless systems. For example, Chamberlain's testified that the claims do not cover wireless communications between the head unit and wall console, and were ***limited*** to a wired connection:

Q.   You'll agree with me that the '319 patent does not claim a wirelessy connected wall console; correct:
A.   That's correct.
Q.   And, in fact, the '319 patent claims are limited to a wired connection between the microcontroller of the motor drive unit, correct?
A.   Yes.

Exhibit J, Hr'g Tr. (July 14, 2017) at 1079:13–20.

Furthermore, all wireless systems are "part-wired," as the IPRB has applied that term, inasmuch a conductor or wire exists at some point in the wireless communication pathway (*e.g.*, an antenna). Thus, the so-called "part-wired/part-wireless" distinction is nonsense. In the end, Chamberlain cannot be allowed to escape its prior judicial admissions based on a superficial "part-wired/part-wireless" distinction that contradicts its prior statements and was plainly crafted as an attempt to read the claims on the Redesigned GDOs.

Accordingly, the IPRB's decision, which failed to give credit to Chamberlain's prior admissions and argument and adopted a new interpretation of the claims contradicts those admissions, was arbitrary, capricious, an abuse of discretion, and not in accordance with the law.

### c.   Under the Plain Language of the Claims, the Redesigned GDOs Cannot Infringe the '319 Patent.

The intrinsic evidence also compels Chamberlain's prior admissions about the scope of its claims. The '319 patent has two independent claims, claims 1 and 9. Representative claim 1 is reproduced below with the disputed language emphasized:

> 1.   An improved garage door opener comprising
>
> a motor drive unit for opening and closing a garage door, said motor drive unit having a microcontroller and
>
> a wall console, said wall console having a microcontroller,
>
> ***said microcontroller of said motor drive unit being connected to the microcontroller of the wall console by means of a digital data bus.***

Exhibit A at claim 1 (emphasis added). Claim 9 is identical except the term "microcontroller" in claim 1 is replaced with "controller."

The bolded language above requires that the microcontroller of the head unit[2] and the microcontroller of the wall console be "connected . . . by means of a digital data bus." During the 1016 Investigation, the ALJ construed the term phrase "digital data bus" as a "conductor or group of conductors which conveys digital data." Exhibit B at 121-22. The familiar terms "connected to" and "by means of" were not construed during the 1016 Investigation, and are therefore given their plain and ordinary meaning. *See id.* at 120-28. Applying the ALJ's constructions and the plain meaning of the construed language, an electrical conductor must connect the controller in the head unit to a specific thing—the controller in the wall counsel.

In the Original GDOs, the wired keypad was connected to the head unit by a pair of wires (*i.e.*, a group of conductors). As shown below, these wires extended out from the wall console, up the garage's wall, and to the head unit located on the ceiling:



---

[2] The term "motor drive unit" was construed to be a "unit where a driven motor resides." Exhibit B at 124-28. The driven motor in the Redesigned GDOs resides in the head unit.

During the ITC proceeding, Chamberlain identified this wired connection as the claimed "digital data bus" connecting the wall console to the head unit, and the ALJ agreed. *See* Ex. B at 134-35. As discussed, to avoid prior art that disclosed wireless communications between wall consoles and head units, Chamberlain repeatedly asserted that a wireless connection between these two elements would ***not*** be covered by the claims.

Relying on all of Chamberlain's arguments and evidence in the 1016 Investigation and PTAB proceedings—including the testimony of Chamberlain's experts and admissions of its counsel—certain Respondents in the ITC redesigned the accused GDOs to avoid the claims of the '319 patent. Those Respondents did precisely what the patent system encourages: to rely on the public notice function of the patent system by innovating and designing around existing technology. *See TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 881–82 (Fed. Cir. 2011) (en banc) ("[L]egitimate design-around efforts should always be encouraged as a path to spur further innovation.").

The resulting design-around is a wireless communication path between the wall console and a wireless receiver that is in turn connected to the head unit. Whereas the indoor keypad of the Original GDOs was connected to the head unit by wire, the keypads of the Redesigned GDOs communicate wirelessly with the head unit:



Thus, the Redesigned GDOs do not meet the claims' requirement that the wall console's controller and the head unit's controller be "connected . . . by means of a digital data bus."  This new wireless the Redesigned GDOs squarely outside of the scope of the claims of the '319 patent, and, the IPRB's decision to the contrary was arbitrary, capricious, an abuse of discretion, and not in accordance with the law.

> **d.   The IPRB's Decision Relied On an Erroneous Construction of the Term "Connected . . . By Means of Digital Data Bus" To Find Infringement.**

The IPRB acknowledged that "[t]he GDOs at issue replace the pair of wires and the wired, wall-mounted keypad of the [previous design] with a wireless, wall-mounted keypad and a wireless receiver." Exhibit E, Request Ruling, at 26.   Nevertheless, the IPRB ignored Chamberlain's prior admission and adopted a claim construction that all that is required to meet the requirement of "connected . . . by means of a digital data bus" is the presence of some conductor—***any*** conductor—at some point in the communication pathway between the microcontroller in the wall unit and the microcontroller in the head unit.  *See id.* at 27.  For the Redesigned GDOs, the IPRB found that a "pair of wires connects the head unit of the GDOs at issue to ***the wireless receiver***," and therefore, there was a digital data bus at some point in the

connection.  *See id.* (emphasis added).  The pair of wires to the "wireless receiver" are shown in red below:



When denying One World's protest, the IPRB again confirmed that it was erroneously relying on the connection between the wireless receiver and the head unit as meeting this claim element.  *See* Exhibit F, Protest Ruling, at 35 ("[T]he pair of wires connecting the head unit to the wireless receiver in the redesigned GDOs is a digital data bus that connects the wireless receiver to the controller in the head unit.").

The IPRB's findings were arbitrary and capricious because the wireless receiver is ***not*** a wall console.  Rather, as shown in the above figure, the wireless receiver sits at the head unit and receives wireless signals from the wireless keypad mounted on the garage wall.  ***No*** conductor or wire connects the wireless receiver and the wireless keypad.  As discussed, the '319 patent's claims require the microcontroller in the head unit and the microcontroller in the wall console to be "connected . . . by means of a digital data bus."  Exhibit A at claims 1 & 9.  Even if the IPRB were correct that a digital data bus "connects the wireless receiver to the controller in the head unit," the

21

plain language of the claims requires the digital data bus to "connect" the head unit's and the wall console's controllers, *not* a receiver to the head unit.

The IPRB attempted to justify its broad claim construction by relying upon a single passage of *dicta* from the ALJ's Initial Determination.  *See* Exhibit E, Request Ruling, at 11; Exhibit F, Protest Ruling, at 11.  But this *dicta* neither addressed the wireless configuration of the Redesigned GDOs nor adopted the IPRB's expansive claim construction.[3]

During the ITC proceeding, Respondents argued that the "motor drive unit" was a particular controller within the head unit, referred to as the "GDO controller."  Exhibit B, Initial Determination, at 134–135.  They further argued that the wall console was not connected to the GDO controller by means of a digital data bus because there was an optical connection between the GDO controller and second circuit board also located *within* the head unit.  *Id.* The ALJ rejected these arguments because he interpreted the "motor drive unit" to be coextensive with the head unit.  *Id.*  This alone was sufficient for the ALJ to find infringement because, in the Original GDOs' design, a pair of wires directly connected the wall console and head unit.

The ALJ then commented, in *dicta*, that even under Respondents' interpretation, the presence of " ███████████  does not negate the presence of 'conductors' also in the ███████████ ███ , which is all the claim requires."  *Id.* at 135.  The ALJ did not explain the rationale for his comment or adopt any claim construction based on it.  Notably, the ALJ did not even specify what " ███████████ " he was referring to.  This term is found nowhere in the claims or elsewhere

---

[3] The Federal Circuit has long held that *dicta* is not controlling on later courts.  Extending dicta to unforeseen circumstances often leads to erroneous results.  *See Orenshteyn v. Citrix Sys., Inc.*, 691 F.3d 1356, 1361 (Fed. Cir. 2012) (rejecting court's prior statement as "dicta as it was unnecessary to decide the case, and hence is not controlling over the present case"); *Thomson, S.A. v. Quixote Corp.*, 166 F.3d 1172, 1176 n.5 (Fed. Cir. 1999) (declining to follow predecessor court's statement because it "was dictum and therefore not controlling precedent").

the ALJ's infringement discussion.  Further, the ALJ was addressing the distinct situation of optical communication between two circuit boards located within the same head unit.  The ALJ did not explain or even consider a system that uses a wireless keypad to wirelessly transmit signals to a receiver at the head unit, as in the Redesigned GDOs.  The IPRB thus abused its discretion by relying on these statements to extend the scope of the claims to wireless systems, especially in light of Chamberlain's admissions that the claims exclude wireless communication.[4]

Further, the IPRB's claim construction that all this limitation requires is the presence of some conductor at some point between the microcontrollers in the head unit and wall console is erroneous because nearly all wireless systems include a conductor at some point in the wireless connection.  For example, microcontrollers have circuit boards with metal conductors in the form of traces.   Yet the ALJ and Commission never considered these types of conductors when discussing invalidity or claim scope.  Likewise, nearly all wireless systems (including the Doppelt reference discussed below) have antennas that are also "conductors."  In fact, the IPRB's Protest Ruling found that "the wireless receiver's antenna in the redesigned GDOs, is, itself 'a conductor that conveys digital signals.'"  Exhibit F, Protest Denial, at 35.  The ALJ and Commission never considered the prior art's antennas when discussing invalidity or claim scope.  Given that all systems have some form of a conductor, the IPRB's claim construction effectively reads the "connected . . . by means of a digital data bus" limitation out of the claims.  The IPRB's claim construction and infringement analysis are thus arbitrary, capricious, an abuse of discretion, and not in accordance with the law.

---

[4] The IPRB's decisions wrongly suggest it was not adopting a new claim construction, but rather applying the ALJ's construction.  *See* Exhibit F, Protest Ruling at 37. (characterizing One World's construction as a "new, narrower claim construction than was applied at the ITC in the underlying investigation").  The ALJ did ***not*** issue the "part-wired/part-wireless" claim construction that the IPRB adopted.  The IPRB's construction was in fact a new claim construction.

e.      **Under the IPRB's Construction, the Prior Art Would Render the '319 Patent Invalid.**

The IPRB's decision also should be reversed because the '319 patent cannot, as a matter of law, cover the wireless system used by the Redesigned GDOs.   To so read the claims erroneously run the asserted claims straight into Chamberlain's own prior art U.K. Patent Application GB231250 to Doppelt ("Doppelt") and render the '319 patent invalid.  *See* Exhibit N.

The Federal Circuit has held that, "[i]f, after applying all other available tools of claim construction, a claim is ambiguous, it should be construed to preserve its validity."  *Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*, 824 F.3d 999, 1004 (Fed. Cir. 2016) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1327 (Fed. Cir. 2005) (en banc)).  In *Ruckus*, the Federal Circuit relied on this cannon as support for "limit[ing] the scope of the claims to wired communication."  *Id.*

In this case, the plain language of the claims, the specification, Chamberlain's judicial admissions, and the IPR prosecution history all counsel against the IPRB's interpretation of the claims.  Even assuming the IPRB was correct to consider the ALJ's dicta statement as applying to the Redesigned GDOs (it was not), the ALJ's statement, at best, rendered the claim construction dispute ambiguous.  In these circumstances, the IPRB's refusal to consider whether its claim construction would render the claims invalid was arbitrary, capricious, an abuse of discretion, and not in accordance with the law.

Doppelt is a Chamberlain prior art patent that predates the '319 patent by ten years.  *See* Exhibit N.  In the ITC investigation, Chamberlain did not dispute that Doppelt discloses every limitation of claims 1 and 9 except a "microcontroller [or controller] of said motor drive unit being connected to the microcontroller [or controller] of the wall console by means of a digital data bus."

*See* Exhibit B, Initial Determination, at 182-83.  Under the IPRB's reading of the '319 patent,

Doppelt discloses a wireless system that meets every element of independent claims 1 and 9.

Doppelt discloses a "garage door opener," as can be seen in Doppelt's Figure 1, annotated

below in blue:



Exhibit N at Fig. 1.

Doppelt also discloses "a motor drive unit for opening and closing a garage door," where

"motor drive unit" has been construed as "a unit where a driven motor resides."  Doppelt discloses

a "[h]ead unit 12" that is "mounted to the ceiling of garage 14," which includes a motor for opening

Doppelt's garage door.  *Id.* at 5:8-10.  Head unit 12 can be seen in Figure 1, annotated below in

blue:



As shown in the annotated version of Figure 2 below, Doppelt also discloses "said motor drive unit having a microcontroller [or controller]," because its "head unit has a controller 70" (*id.* at 5:29-30) (in blue below) that "includes a microcontroller 84" (*id.* at 5:34-37) (in green below).



Doppelt further teaches a "wall console"—which the Commission construed to mean "a wall-mounted control unit." Specifically, Doppelt discloses "[a]n external control pad 34 [that] is positioned on the outside of the garage." *Id.* at 5:16-18. The control pad is also referenced as a

"keypad type door frame mount transmitter 34," as depicted in the annotated version of Figure 1 below. *Id.* at 7:1–5.



FIG. I

Doppelt also teaches "said wall console having a microcontroller," as Doppelt's outdoor control pad 34, also referred to as "[t]ransmitter 34," is "controlled by a programmed microcontroller." *Id.* at 10:26–27. This can be seen below in Figure 10, which has the boundary of the "transmitter 34" annotated in blue and the microcontroller annotated in green:



FIG. 10

Finally, Doppelt teaches "said microcontroller of said motor drive unit being connected to the microcontroller of the wall counsole by means of a digital data bus," if the digital data bus can be *wireless* or if the claims cover a so-called "part-wired, part-wireless" configuration. Doppelt teaches wireless communications in that external keypad 34 "communicate[s] via radio frequency transmission with an antenna 32 of the head unit 12." *Id.* at 5:18–20. As highlighted in Figure 2 below, antenna 32 is electrically connected to receiver 80 which is in turn connected to microcontroller 84 via line 82.



**FIG. 2**

*Id.* at Fig. 2; *see also id.* at 5:29-37 ("[T]he garade door operator 10, which includes the head unit 12 has a controller 70 which includes the antenna 32 . . . . The controller 70 includes a super-regenerative reciever 80 (Fig. 5) coupled via line 82 to supply demodulated digital signals to microcontroller 84").

This configuration in Doppelt is the same as the Redesigned GDOs. The Redesigned GDOs' wireless keypad communicates wirelessly with the wireless reciever, just as "external keypad 34 of Doppelt communictes wirelessly with antenna 32." The Redesigned GDOs have a wired connection from the wireless reciever to a controller in the head unit, just as reciever 80 is

connected via "line 82" to "microcontroller 82." This is exactly the type of "part-wired/part-wireless" configuration that Chamberlain argues satisfies the claim language. Thus, Doppelt would anticipate the '319 patent's independent claims.

Defendants cannot lawfully exclude One World's Redesigned GDOs based on a reading of the '319 patent that renders it invalid.

To the extent there is any support for the IPRB's construction, it renders the meaning of the claim, at best, ambiguous. In this situation, the Federal Circuit has stated that a claim should not be interpreted to read on a prior art patent application. *Ruckus*, 824 F.3d at 1004 ("The canons of claim construction provide additional reason to limit the scope of the claims to wired communication. If, after applying all other available tools of claim construction, a claim is ambiguous, it should be construed to preserve its validity."); *Regents of the Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 936–37 (Fed. Cir. 2013) (holding that the proper construction was one that avoided the prior art successfully distinguished by the applicant); *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1335 (Fed. Cir. 2003) (holding that the district court failed to interpret the claims "to preserve their validity . . . [and] thus erred.").

Accordingly, the '319 patent simply cannot be read to cover the sort of wireless system contained in the Redesigned GDOs. The IPRB's decision did just that and as such was arbitrary, capricious, an abuse of discretion, and not in accordance with the law.

### B.     One World Will Be Irreparably Harmed Without Injunctive Relief

One World will suffer immediate and irreparable harm absent issuance of a temporary restraining order followed by entry of a preliminary injunction until this case is resolved on the merits. Irreparable harm includes "a viable threat of serious harm which cannot be undone." *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983) (internal citations omitted). This

Court considers "immediacy" of harm and the "inadequacy of future corrective relief" as important factors in the irreparable harm inquiry. *Nat'l Juice Prods. V. United States*, 10 Ct. Int'l Trade 48, 53, 628 F. Supp. 978, 984 (1984). Substantial loss of business constitutes irreparable harm because "loss of business renders a final judgment ineffective, depriving the movant of meaningful judicial review" and cannot be undone. *Harmoni Int'l Spice, Inc. v. United States*, 211 F. Supp. 3d 1298, 1307 (Ct. Int'l Trade 2017) (citing *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975)). "Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities" may also constitute irreparable harm. *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) (internal citations omitted).

Defendants are wrongly detaining One World's Redesigned GDOs and preventing their entry into the U.S. under their erroneous interpretation of the scope of the LEO. One World now faces a six month wait until the Commission will be able to addresses these issues during the Modification Proceedings and correct the IPRB's erroneous ruling. During this time, the IPRB's decision will wrongly preclude One World from importing any Redesigned GDOs. One World is new to the garage door opener and accessories market having entered in 2016, and is still building a reputation with GDO consumers. Exhibit Q at ¶ 5 (Declaration of M. Farrah[5]). As a new competitor, One World is suffering far more than merely lost sales as a result of the Defendants' wrongful detention of the Redesigned GDOs. As discussed below, absent immediate injunctive relief, One World will suffer immediate and irreparable harm in the form of loss of good will, damage to reputation, and loss of business opportunities.

---

[5] Mr. Farrah's declaration was styled for submission in connection with the stay the ITC Respondents are seeking in the consolidated appeal. *See supra*, Section II.B.1.b.

One World designs and supplies a number of power tool and outdoor products under the Ryobi® brand name.  The Home Depot has been the exclusive North American retailer of Ryobi® branded products since 2000.  *Id.* at ¶ 2.  The Redesigned GDOs are One World's *only* GDOs offered in the marketplace.  *Id.* at ¶ 8.  CBP's decision to deny entry of the Redesigned GDOs thus would drive One World out of the GDO market.  *Id.*  If injunctive relief is not granted, consumers currently loyal to the Ryobi® brand would question whether the Ryobi®-branded GDOs were pulled from the market for technological, safety, or market reasons.  *Id.*  This type of damage to Ryobi's brand and reputation is incalculable.  *Id.*

In addition, the detention of the Redesigned GDOs is causing immediate and irreparable damage to One World's business relationship with The Home Depot.  One World developed its GDO and accessories at The Home Depot's request, investing millions and spending almost a year-and-a-half developing the products.  *Id.* at ¶¶ 4-5.  The Home Depot has heavily promoted this product.  *Id.* at ¶ 9.  Having to now tell The Home Depot that its GDOs are no longer available will irreparably harm One World's reputation, credibility, and trust with The Home Depot, and seriously undermine One World's relationship with a key customer that accounts for ██% of its North American power tools business.[6]  *Id.* at ¶¶ 4, 9

Further, The Home Depot approached One World about designing and supplying a "game changing" GDO because of One World's reputation as a product innovator in the power tool market.  *See id.* at ¶¶ 4, 10.  If injunctive relief is not immediately granted, One World's reputation as a product innovator would be profoundly damaged.  *Id.* at ¶ 10.  One World has expended

---

[6] One World's other product lines do not prevent it from suffering irreparable harm absent an injunction.  *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1152 (Fed. Cir. 2011) ("[T]he fact that an infringer's harm affects only a portion of a patentee's business says nothing about whether that harm can be rectified.").

significant resources to build a reputation as a leader, not a follower, in the power tool industry and has earned The Home Depot's trust as a go-to partner for cost-effective innovation and product differentiation. *See id.* Without immediate injunctive relief, One World's reputation for rapid and lawful innovation that hundreds of One World employees have worked years to develop will be irreparably harmed. *Id.*

For all of these reasons, One World request the issuance of a temporary restraining order followed by entry of a preliminary injunction until this case is resolved on the merits.

C.      <u>The Balance of Hardships Tips in One World's Favor</u>

When evaluating a request for preliminary injunctive relief, courts must balance the potential hardship to each party. *See Winter*, 555 U.S. at 20. One World has demonstrated that it is suffering, and will continue to suffer, immediate and irreparable harm absent injunctive relief. In contrast, there can be no showing of any hardship on the part of Defendants if the requested injunction does issue. In fact, if an injunction issues, the burden on the part of Defendants in enforcing the LEO will be diminished, rather than increased.

Nor can Defendants argue they are being harmed inasmuch as they have an interest in the enforcement of any trade laws that will be compromised by One World's requested injunction. The IPRB, not the Commission, determined the Redesigned GDOs were subject to the LEO. Even assuming Defendants could show they would suffer any harm, it would be minimal and certainly would not outweigh the significant harm to One World if immediate injunctive relief is not granted. Accordingly, the balance of hardships favors One World.

D.      <u>The Public Interest Favors One World's Requested Relief</u>

Finally, a court must consider the impact of injunctive relief on the public interest. Typically, the public interest is served by enforcing valid and infringed patents. However, the

public is not served by enforcing a patent beyond its metes and bounds. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 150–151 (1989) ("The federal patent system thus embodies a carefully crafted bargain for encouraging the creation and disclosure of new, useful, and nonobvious advances in technology and design in return for the exclusive right to practice the invention for a period of years…. The attractiveness of such a bargain, and its effectiveness in inducing creative effort and disclosure of the results of that effort, depend almost entirely on ***a backdrop of free competition in the exploitation of unpatented designs and innovations***.") (emphasis added); *Princo Corp. v. Int'l Trade Com'n*, 616 F.3d 1318, 1327 (Fed. Cir. 2010) ("[T]he patentee may exploit his patent but may not 'use it to acquire a monopoly not embraced in the patent.'") (quoting *Transparent-Wrap Mach. Corp. v. Stokes & Smith Co.*, 329 U.S. 637, 6443 (1947)).  Here, the IPRB broadly construed the patent in a manner that would render it invalid. There is no public interest in enforcing patents in a way that would render them invalid.

Patent law encourages companies to design around patents to promote innovation by relying on the patentee's admissions as to the scope of his or her patent rights. *See Hockerson-Halberstadt v. Avia Group Intern.*, 222 F.3d 951, 957 (Fed. Cir. 2000) ("[C]ompetitors are entitled to rely on those representations when ascertaining the degree of lawful conduct, such as designing around the claimed invention.").  It is through this process of disclosure and design around that innovation occurs. *See, e.g., State Indus. Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985) ("One of the benefits of a patent system is the so-called 'negative incentive' to 'design around' a competitor's products").  The public is served through greater competition in the market place by spurring innovation through encouraging better quality of products.  Accordingly, "legitimate design-around efforts should always be encouraged as a path to spur further innovation." *TiVo*, 646 F.3d at 881–82.

## VI.      <u>CONCLUSION</u>

For all of the foregoing reasons, One World respectfully requests that Defendants be enjoined from enforcing the exclusion order against One World's non-infringing products.

 Dated:  September 13, 2018                              Respectfully submitted,

                                                        By: /s/ *Stephen E. Ruscus*
                                                        Stephen E. Ruscus
                                                        **Morgan, Lewis & Bockius LLP**
                                                        1111 Pennsylvania Ave, N.W.
                                                        Washington, D.C. 20004
                                                        Telephone: (202) 739-3000
                                                        Facsimile: (202) 739-3001

                                                        Of Counsel:
                                                          Jason C. White
                                                          Michael Abernathy
                                                          Nicholas A. Restauri
                                                          **Morgan, Lewis & Bockius LLP**
                                                          77 West Wacker Drive
                                                          Chicago, IL 60601
                                                          Telephone: (312) 324-1000
                                                          Facsimile: (312) 324-1001

                                                          Eric S. Namrow
                                                          Susan Baker Manning
                                                          **Morgan, Lewis & Bockius LLP**
                                                          1111 Pennsylvania Ave, N.W.
                                                          Washington, D.C. 20004
                                                          Telephone: (202) 739-3000
                                                          Facsimile: (202) 739-3001

                                                        *Attorneys for Plaintiff One World Technologies Inc.*

Case No. 1:18-cv-00200

## CERTIFICATE OF SERVICE

Pursuant to USCIT R. 5 and Paragraphs 5 and 6 of Administrative Order 02-01 of the U.S. Court of International Trade, I hereby certify that on September 13, 2018, I caused a copy of the foregoing **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF ONE WORLD TECHNOLOGIES, INC.'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** to be delivered to the following individuals:

| *The United States Court of International Trade:* | |
|---|---|
| United States Court of International Trade<br>1 Federal Plaza<br>New York, NY 10278-0001<br>Tel: 212-264-2800 | ☒ CM/ECF<br>☐ Hand-delivery<br>☐ Certified or Registered Mail<br>☐ First-class Mail<br>☐ Express Mail or Overnight Carrier |
| *The United States Of America* | |
| Amy Rubin, Assistant Director<br>International Trade Field Office<br>U.S. Department of Justice<br>26 Federal Plaza, Room 346<br>New York, NY 10278 | ☐ Hand-delivery<br>☒ Certified or Registered Mail<br>☐ First-class Mail<br>☐ Express Mail or Overnight Carrier |
| *The United States Department of Homeland Security* | |
| Office of the General Counsel<br>U.S. Department of Homeland Security<br>245 Murray Lane, SW<br>Mail Stop 0485<br>Washington, DC 20528-0485 | ☐ Hand-delivery<br>☒ Certified or Registered Mail<br>☐ First-class Mail<br>☐ Express Mail or Overnight Carrier |
| *United States Customs and Border Protection* | |
| Kevin K. McAleenan<br>Commissioner<br>U.S. Customs and Border Protection<br>1300 Pennsylvania Ave. NW<br>Washington, DC 20229 | ☐ Hand-delivery<br>☒ Certified or Registered Mail<br>☐ First-class Mail<br>☐ Express Mail or Overnight Carrier |
| Chief Counsel Scott K. Falk<br>U.S. Customs and Border Protection<br>1300 Pennsylvania Ave. NW<br>Washington, DC 20229 | ☐ Hand-delivery<br>☒ Certified or Registered Mail<br>☐ First-class Mail<br>☐ Express Mail or Overnight Carrier |

*/s/ Nina Armah*

NINA ARMAH
Paralegal
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2541