# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ONE WORLD TECHNOLOGIES, INC., | Case No.: 18-cv-200 |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| THE UNITED STATES OF AMERICA; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CUSTOMS AND BORDER PROTECTION; and KEVIN K. McALEENAN, in his official capacity as Commissioner of U.S. Customs and Border Protection, | **NON-CONFIDENTIAL** |
| Defendants. | |

## PLAINTIFF ONE WORLD TECHNOLOGIES, INC.'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND REQUEST FOR DECLARATORY JUDGMENT

# TABLE OF CONTENTS

I. INTRODUCTION & SUMMARY OF THE ARGUMENT ........................................... 1

II. STATEMENT OF FACTS ................................................................................. 3

    A. The Parties ............................................................................................ 3

        1. One World ................................................................................. 3

        2. Defendants ................................................................................ 4

        3. Description of the Products ...................................................... 4

    B. The Proceedings ................................................................................... 4

        1. The International Trade Commission Investigation ................. 4

        2. The Patent Trial and Appeal Board's Inter Partes Review of the Asserted Claims of the '319 Patent ........................................... 6

        3. One World Developed Redesigned GDOs and Seek Orders Confirming that these Products May Be Imported Lawfully .................... 7

III. JURISDICTION ............................................................................................. 10

IV. APPLICABLE LAW ....................................................................................... 11

    A. Standard of Review ............................................................................. 11

    B. Declaratory and Injunctive Relief Under Section 1581(a) ................. 11

    C. Declaratory Relief Under Section 1581(h) ......................................... 12

V. ARGUMENT .................................................................................................. 12

    A. The Redesigned GDOs Do Not Infringe the '319 Patent and Are Not Covered by the LEO ............................................................................. 12

        1. Chamberlain Is Judicially Estopped from Asserting The '319 Patent Claims Extend to Wireless Communications Between the Head Unit and Wall Console ................................................... 13

        2. Under the Plain Language of the Claims, the Redesigned GDOs Cannot Infringe the '319 Patent. ............................................. 26

        3. The IPRB's Decision Adopted an Erroneous Construction of the Term "Connected . . . By Means of Digital Data Bus" To Find Infringement ............................................................................ 32

    B. The Court Should Issue Both Injunctive Relief Under Section 1581(a) And Declaratory Relief Under Section 1581(h) ...................................... 44

        1. One World Will Be Irreparably Harmed Without Both Forms of Relief ...................................................................................... 44

        2. The Balance of Hardships Favors One World's Requested Relief .......... 51

3.    An Injunction Would Serve The Public Interest ..................................... 52

C.    Defendants' Motion To Stay Should Be Denied ................................... 54

VI.  CONCLUSION .................................................................................................. 56

Cases

*American Signature, Inc. v. United States*,
  598 F.3d 816 (Fed. Cir. 2010) .............................................................................11

*Amoco Prod. Co. v. Vill. of Gambell, AK*,
  480 U.S. 531 (1987) ...............................................................................................12

*AstraZeneca LP v. Apotex, Inc.*,
  633 F.3d 1042 (Fed. Cir. 2010) ...........................................................................49

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
  489 U.S. 141 (1989) ...............................................................................................52

*CBB Group, Inc. v. U.S.*,
  783 F. Supp. 2d 1248 (Ct. Int'l Trade 2011) ..................................................11, 13

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
  664 F.3d 922 (Fed. Cir. 2012) .............................................................................45

*Certain Access Control Systems and Components Thereof*,
  Inv. No. 337-TA-1016 ("*Access Control Systems*"), Initial Determination
  ("ID") (Oct. 23, 2017) ........................................................................................5, 36

*Certain Laser-Driven Light Sources, Subsystems Containing Laser-Driven Light
  Sources, and Products Containing Same*,
  Inv. No. 337-TA-983, Order No. 8 at 8-9 (Mar. 4, 2016) ......................................55

*Certain Network Devices, Related Software and Components Thereof
  (II)*, Inv. No. 337-TA-945, Comm'n Op. at 11-12 (Aug. 16, 2017) ........................55

*The Chamberlain Group, Inc. v. Int'l Trade Comm'n*
  (Case No. 18-2002) ..................................................................................................6

*Chimie v. PPG Indus., Inc.*,
  402 F.3d 1371 (Fed. Cir. 2005) .............................................................................14

*Data Gen. Corp. v. Johnson*,
  78 F.3d 1556 (Fed. Cir. 1996) ...............................................................................20

*GE Lighting Solutions, LLC v. AgiLight, Inc.*,
  750 F.3d 1304 (Fed. Cir. 2014) .............................................................................22

*Harmoni Int'l Spice, Inc. v. U.S.*,
   211 F. Supp. 3d 1298, 1307 (Ct. Int'l Trade 2017) ..............................................45

*Hockerson-Halberstadt v. Avia Group Intern.*,
   222 F.3d 951 (Fed. Cir. 2000).............................................14, 26, 52, 53

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
   381 F.3d 1111 (Fed. Cir. 2004)..............................................................14, 23

*Jazz Photo Corp. v. U.S.*,
   353 F. Supp. 2d 1327 (Ct. Int'l Trade 2004) ......................................11

*Manufacture De Machines Du Haut-Rhin v. Von Raab*,
   569 F. Supp. 877 (CIT 1983) ...................................................................12, 48

*Markman v. Westview Instruments, Inc.*,
   517 U.S. 370 (1996)...........................................................................12, 13

*New Hampshire v. Maine*,
   532 U.S. 742 (2001)...........................................................................21, 23

*Omega Eng'g, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003)................................................................22, 44

*One World Techs., Inc. v. The Chamberlain Group, Inc.*,
   IPR2017-00126, Paper 1 (PTAB Oct. 25, 2016) ....................................6

*Organic Seed Growers & Trade Ass'n v. Monsanto Co.*,
   718 F.3d 1350 (Fed. Cir. 2013).................................................................19

*Otter Products, LLC v. U.S.*,
   37 F. Supp. 3d 1306, 1317 (CIT 2014) .................................................12

*Princo Corp. v. Int'l Trade Com'n*,
   616 F.3d 1318 (Fed. Cir. 2010)................................................................53

*Regents of the Univ. of Minn. v. AGA Med. Corp.*,
   717 F.3d 929 (Fed. Cir. 2013)..................................................................44

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
   659 F.3d 1142 (Fed. Cir. 2011).................................................................49

*Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*,
   824 F.3d 999 (Fed. Cir. 2016)..................................................2, 35, 41, 44

*SAS Institute Inc. v. Iancu*,
   138 S. Ct. 1348 (2018).........................................................................6, 7

*State Indus. Inc. v. A.O. Smith Corp.*,
   751 F.2d 1226 (Fed. Cir. 1985)..................................................53

*Sunpreme, Inc. v. U.S.*,
   181 F. Supp. 3d 1322, 1342 (Ct. Int'l Trade 2016) ...................52

*Techtronic Industries Co., Ltd. v. Int'l Trade Comm'n*
   (Case No. 18-2191)....................................................................6

*Titan Tire Corp. v. Case New Holland, Inc.*,
   566 F.3d 1372 (Fed. Cir. 2009)................................................12

*TiVo Inc. v. EchoStar Corp.*,
   646 F.3d 869 (Fed. Cir. 2011) (en banc)............................31, 53

*Trebro Mfg., Inc. v. Firefly Equip., LLC*,
   748 F.3d 1159 (Fed. Cir. 2014)................................................51

*Universal Elecs., Inc. v. U.S.*,
   112 F.3d 488 (Fed. Cir. 1997)..................................................11

*W.L. Gore Assocs., Inc. v. Garlock, Inc.*,
   842 F.2d 1275 (Fed. Cir. 1988)................................................26

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)..............................................................12, 51

*Zenith Radio Corp. v. U.S.*,
   710 F.2d 806 (Fed. Cir. 1983)..................................................45

**STATUTES**

28 U.S.C. § 1581(h) ......................................................12, 44, 48, 55

28 U.S.C. § 1581(a) ......................................................10, 11, 44, 55

28 U.S.C. § 2640........................................................................11

28 U.S.C. § 2643(c) ................................................................11, 12

**OTHER AUTHORITIES**

19 C.F.R. § 177 ........................................................................10

2018. *Fed. Reg.* 13517 (Mar. 29, 2018)........................................6

Court of International Trade Rule 65(a)(2)......................................1

18 Moore's Federal Practice § 134.30 (3d ed. 2000)......................21

Pursuant to Court of International Trade Rule 65(a)(2) and the Court's September 27, 2018 letter (Dkt. No. 029), Plaintiff One World Technologies, Inc. d/b/a Techtronic Industries Power Equipment ("One World"), submits this Supplemental Brief in Support of its Motion for Temporary Restraining Order and Preliminary Injunction, and Request for Declaratory Judgment.

## I.     INTRODUCTION & SUMMARY OF THE ARGUMENT

One World respectfully requests an injunction requiring defendants the United States of America, the U.S. Department of Homeland Security, U.S. Customs and Border Protection, and Kevin K. McAleenan, in his official capacity as Commissioner of U.S. Customs and Border Protection (collectively, "Defendants") to release One World's currently-detained garage door openers ("GDOs"), and declaratory judgment that One World's future imports of redesigned GDOs should not be excluded.  Both forms of relief are necessary to avoid immediate and irreparable harm faced by One World if Defendants' actions are not corrected.

Defendants have excluded One World's products based on a plainly erroneous interpretation of a Limited Exclusion Order ("LEO") issued by the U.S. International Trade Commission ("Commission" or "ITC") in Investigation 337-TA-1016 ("the 1016 Investigation"). The 1016 Investigation concerned GDOs that The Chamberlain Group, Inc. ("Chamberlain") accused of infringing certain claims of U.S. Patent No. 7,161,319 (the "'319 patent").  Based on the evidence presented in the 1016 Investigation and Chamberlain's numerous admissions about the scope of its claims in various *fora*, One World redesigned its GDO products to avoid the '319 patent.  Specifically, in an effort to distinguish the prior art, Chamberlain admitted the '319 patent claims do **not** cover a wireless keypad and instead require a *wired connection* between the head unit and the wall console of the garage door opener.  One World relied upon this distinction in

redesigning its GDOs to use a *wireless* keypad that communicates with the head unit *wirelessly* and therefore cannot infringe.

Despite this clear and critical difference between the '319 patent's claims and the redesigned products, Defendants have barred their importation, and erroneously determined that they are covered by the LEO entered in the 1016 Investigation. To find that the LEO covered the redesigned GDOs, U.S. Customs and Border Protection's ("CBP" or "Customs") Intellectual Property Rights Branch ("IPRB") adopted a new infringement theory advanced by Chamberlain for the first time in the Customs proceedings. Yet in doing so, the IPRB failed to recognize that Chamberlain is judicially estopped from advancing its new position. The IPRB also erroneously declined to consider whether the '319 patent would read on the prior art and thus be invalid under Chamberlain's new theory. If interpreted to cover One World's the redesigned GDOs, the '319 patent would be invalid and could not therefore be a proper basis for excluding One World's products. Under the proper interpretation of the '319 patent claims, the redesigned GDOs do not infringe and are outside the scope of the LEO. The IPRB's decision adopting Chamberlain's new infringement theory and denying One World's protest was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.

The IPRB's rulings are causing One World irreparable harm. The redesigned GDOs are One World's *only* GDOs offered in the marketplace. Defendants' continued wrongful detention the redesigned GDOs thus would drive One World out of the GDO market in the United States. The Home Depot is the exclusive North American retailer of the redesigned GDOs. Based on current inventory levels and sell-through projections, One World will be unable to fulfill The Home Depot's orders for the redesigned GD126 by late October. If it cannot fulfill orders, One World's business relationship with The Home Depot would be "devastated" because The Home

Depot will cancel its GDO program. One World will thus be eliminated from the GDO market, and will lose the good will and business opportunities that its success with the GDO program has generated.

The IPRB's decisions have forced One World to halt importing the redesigned GDOs. Given that it takes five to six weeks for imported products to reach One World's distribution centers, injunctive relief forcing Defendants to release the currently-detained GDOs is necessary to provide One World sufficient time for new imports to arrive. Moreover, if Customs excludes the new imports and One World is forced to file another protest, One World will not have time to obtain judicial review before it suffers the irreparable harm discussed above. Accordingly, both injunctive relief addressing the currently-detained GDOS and declaratory relief addressing future shipments is necessary to prevent the irreparable harm facing One World.

In contrast, issuing injunctive relief will not harm Defendants. Moreover, the public interest in encouraging legitimate redesigns and having non-infringing competitive choices available in in the market strongly favors One World's requested relief.

## II.    STATEMENT OF FACTS

### A.    The Parties

#### 1.    One World

One World is a Delaware corporation with its principal place of business in Anderson, South Carolina. Hr'g Tr. at 140:21-25; Dkt. 004, ¶ 4. One World designs, markets, and sells power tools and outdoor products under the Ryobi® brand, which is exclusively sold at The Home Depot. *Id.* at 141:5-10; 143:4-9. One World's Ryobi®-branded products include the GDOs at issue, as well as their related accessories. *Id.* at 144:7-17.

### 2. Defendants

Defendants the United States of America, the U.S. Department of Homeland Security, U.S. Customs and Border Protection, and Kevin K. McAleenan, in his official capacity as Commissioner of U.S. Customs and Border Protection, are responsible for determining the admissibility of goods sought to be entered into the United States, for determining the exclusion of goods, and for deciding protests opposing those determinations.

### 3. Description of the Products

The products at issue are the Ryobi® Ultra-Quiet Garage Door Opener, Model Nos. GD126 and GD201 (collectively, "Redesigned GDOs"). As discussed below, these products were specifically designed to—and do—avoid infringing any claim of the '319 patent.

On or about May 12, 2018, One World exported Redesigned GDOs from a port in or near Shanghai, China. On June 12, 2018, CBP detained the shipment of Redesigned GDOs at the port of Charleston, South Carolina. CBP's actions were based on the incorrect understanding that the Redesigned GDOs are subject to the LEO in the 1016 Investigation.

### B. The Proceedings

### 1. The International Trade Commission Investigation

### a. Proceedings before the Commission

On July 5, 2016, Chamberlain filed a complaint with the ITC naming Techtronic Industries Co., Ltd., Techtronic Industries North America, Inc., One World Technologies, Inc., OWT Industries, Inc., Ryobi Technologies, Inc.,[1] and ET Technology (Wuxi) Co., Ltd. as respondents (collectively, the "Respondents"). The Complaint alleged that that Ryobi® Ultra-Quiet Garage Door Opener, Model No. GD200 infringed the '319 patent, the only patent at issue here. On

---

[1] Ryobi Technologies, Inc. was terminated from the Investigation on November 7, 2016.

August 9, 2016, the Commission instituted the 1016 Investigation, which was later expanded to include Model Nos. GD200A and GD125 in addition to the GDO200 (collectively, the "Original GDOs").

The ALJ issued an Initial Determination finding a violation of section 337 as to the '319 patent on October 23, 2017. *Certain Access Control Systems and Components Thereof*, Inv. No. 337-TA-1016 ("*Access Control Systems*"), Initial Determination ("ID") (Oct. 23, 2017) (Exhibit B[2]). The ID adopted the following constructions:

| Term / Phrase | ITC Construction |
|---|---|
| "wall console" | "a wall-mounted control unit" |
| "digital data bus" | "a conductor or group of conductors which conveys digital data" |
| "controller" | "any type of control device" |
| "motor drive unit" | "unit where a driven motor resides" |

Exhibit B, ID, at 120-28; *see also Access Control Systems*, Comm'n Op. at 1-2 (May 5, 2018) (Exhibit C).[3] The ALJ also recommended that the Commission issue a LEO prohibiting the importation of One World's Original GDOs, which were found to infringe the asserted claims of the '319 patent. Exhibit B, ID, at 2.

On March 23, 2018, the Commission issued a Notice of its Final Determination, finding a violation of section 337 and adopting the recommended LEO barring importation of certain access control systems and components thereof covered by one or more of claims 1-4, 7-12, 15, and 16 of the '319 patent, and issuing CDOs as to all Respondents except ET Door (collectively, the

---

[2] One World's original Motion (Dkt. 006) included Exhibits A through Q. (*See* Dkt. 006-1 – 006-17.) One World's exhibits to this supplemental brief begin at Exhibit R. Unless otherwise noted, all citations to Exhibits in this document are to the Exhibits attached to One World's original Motion (Dkt. 006) or to this filing directly.

[3] Although One World reserves the right to challenge one or more of the ALJ's claim constructions on appeal, One World applies those constructions for the present motion.

"Remedial Orders").  *Access Control Systems*, Notice of the Comm'n Final Determination (Mar. 23, 2018) (Exhibit O).  The Notice published in the Federal Register on March 29, 2018.  *Fed. Reg.* 13517 (Mar. 29, 2018).  On the same day, the Commission issued its Opinion in the Investigation.  *Access Control Systems*, Comm'n Op. (Mar. 29, 2018) (Exhibit D).

### b.     The Federal Circuit Appeal

On July 23, 2018, certain Respondents in the 1016 Investigation filed a Petition for Review of the Commission's Final Determination at the U.S. Court of Appeals for the Federal Circuit, styled *Techtronic Industries Co., Ltd. v. Int'l Trade Comm'n* (Case No. 18-2191), which was consolidated with Chamberlain's appeal from the same Final Determination, styled *The Chamberlain Group, Inc. v. Int'l Trade Comm'n* (Case No. 18-2002).  Those Respondents are seeking a stay of the Remedial Orders in the consolidated appeal.  No hearing date has been set in the consolidated appeals.

### 2.     The Patent Trial and Appeal Board's *Inter Partes* Review of the Asserted Claims of the '319 Patent

On October 25, 2016, One World and Techtronic Industries North America, Inc. filed a petition for *inter partes* review ("IPR") of the claims of the '319 patent that Chamberlain asserted in the 1016 Investigation.  *One World Techs., Inc. v. The Chamberlain Group, Inc.*, IPR2017-00126, Paper 1 (PTAB Oct. 25, 2016).  The U.S. Patent Office's Patent Trial and Appeal Board ("PTAB") instituted review of all asserted claims on May 4, 2017, and held oral argument on February 1, 2018.  *Id.*, Papers 8 & 36.  The PTAB subsequently decided to consider an additional ground of unpatentability in light of the Supreme Court's decision in *SAS Institute Inc. v. Iancu*, 138 S. Ct. 1348 (2018).  *Id.*, Paper 41.  The PTAB held a second oral argument on August 7, 2018, *id.*, Paper 53, and the statutory deadline for the PTAB to issue a final written decision is November

4, 2018.  Following the final written decision, One World expects that either Chamberlain or One World (or both) will appeal that decision.

### 3. One World Developed Redesigned GDOs and Seek Orders Confirming that these Products May Be Imported Lawfully

#### a. One World Relied On Chamberlain's Admissions To Invest Significant Time And Money In Redesigning

After the July 2017 ITC hearing, One World redesigned the Original GDOs in view of evidence presented to the ALJ, and Chamberlain's numerous judicial admissions about the scope of the '319 patent.  As discussed below, both independent claims of the '319 patent require a "microcontroller [or controller] of said motor drive unit being connected to the microcontroller [or controller] of the wall console by means of a digital data bus."  The ITC found that the wired connection between the head unit and wall console of the Original GDOs met this limitation, and, Chamberlain has repeatedly stated that its claims do not cover a wireless keypad as this limitation *requires* a wired connection between the controller in the keypad and the controller in the head unit.

One World redesigned the Original GDOs by replacing the original wired wall console with one that transmits ***wirelessly*** to a receiver at the head unit.  One World began implementing its redesign in reliance on Chamberlain's judicial admissions in the ITC that a wireless keypad design could not infringe the '319 patent claims.  *See* Hr'g Tr. at 187:4-11.  One World first conceptualized its redesign in October 2017, just a few months after the July 2017 ITC evidentiary hearing.  *Id.* at 186:14-18.  Redesigning the GDOs cost over a million dollars and took approximately six months to complete because the new wireless "keypad had to really be done from scratch."  *Id.* at 153:25-154:16.  Even though the redesign was not optimal from an engineering and marketing perspective because One World had to give up desirable features on

the wireless keypads, including AC power and back lighting, it implemented the redesign in order to avoid infringement. *Id.* at 153:4-24.

Under the claim constructions adopted by the ITC, Chamberlain's admissions, and the plain and ordinary meaning of terms like "connected to" and "by means of," the Redesigned GDOs do not meet the "connected . . . by means of a digital data bus" limitation and therefore do not infringe the '319 patent.

### b. IPRB Ruling, HQ H295697 (July 20, 2018)

On March 30, 2018, after the ITC's Final Determination issued, One World submitted a letter to the IPRB of CBP requesting a ruling that the Redesigned GDOs are not covered by the LEO. The IPRB conducted a hearing on May 25, 2018. *See* Exhibit M.

During the hearing, One World demonstrated that the Redesigned GDOs do not include a wired connection between the controller in the head unit and the controller in the wall unit. It also identified numerous admissions by Chamberlain in various *fora* that the '319 patent does not cover a wireless keypad or wireless transmissions between the controllers, as it is limited to a wired connection between the controllers. *See infra* Section V.A.1.a. Chamberlain, however, flip-flopped, arguing for the first time that the '319 patent claims cover a wireless keypad and wireless communications in what Chamberlain called a "part-wired, part-wireless" configuration. *Id.*

The IPRB issued Ruling HQ H295697 (the "Request Ruling") on July 20, 2018. Exhibit E. The IPRB acknowledged that "[t]he GDOs at issue replace the pair of wires and the wired, wall-mounted keypad of the [previous design] with a wireless, wall-mounted keypad and a wireless receiver." *Id.* at 26. Nevertheless, it concluded that the "microcontroller [or controller] of said motor drive unit being connected to the microcontroller [or controller] of the wall console by means of a digital data bus" limitation simply requires the presence of a conductor—***any*** conductor—at some point between the microcontroller in the wall unit and the microcontroller in

the head unit. The IPRB focused on the "pair of wires" that connected the head unit to a wireless receiver located at the head unit (but not connected to the wall console) as satisfying the disputed limitation:

> Indeed, given that: (i) the head unit of the GDOs at issue remains unchanged from the '319 Accused Products, and (ii) a pair of wires connects the head unit of the GDOs at issue to the wireless receiver in the same manner as a pair of wires connected the head unit to the wired, wall-mounted keypad of the GDOs before the ITC, it follows that the microcontroller (or controller) of the motor drive unit of the GDOs at issue is connected to wireless receiver by means of a digital data bus (i.e., a conductor or group of conductors which conveys digital data).

*Id.* at 27.

The IPRB erroneously relied on Chamberlain's new reading of the '319 patent's scope, while failing to apply judicial estoppel and declining to consider whether Chamberlain's reading renders the asserted claims invalid in light of the prior art already considered in the 1016 Investigation. *See id.* at 32-34.

### c. IPRB Protest Ruling, HQ H300129

On or about June 29, 2018, Defendants excluded a shipment of Redesigned GDOs from importation into the U.S. at the Port of Charleston, South Carolina. *See* Exhibit P. On August 10, 2018, One World filed protest number 160118100231 regarding the Redesigned GDOs wrongly denied entry into the United States. Dkt. 004-9 (Complaint, Exhibit I).

On September 7, 2018, the IPRB issued Ruling HQ H300129 (the "Protest Ruling") erroneously denying One World's protest. Exhibit F. In its Protest Ruling, the IRPB incorrectly found that the Redesigned GDOs infringe the '319 patent based on the same misreading of the claims in the Request Ruling. *Id.* at 34-36. In particular, the IRPB again found that "the pair of wires connecting the head unit to the wireless receiver in the redesigned GDOs is a digital data bus that connects the wireless receiver to the controller in the head unit." *Id.* at 35. The IPRB did

not find—and could not have found—any wired connection that extends between the controller in the head unit and the controller in the wall console of the Redesigned GDOs. The IPRB again failed to apply judicial estoppel to Chamberlain's prior admissions, and declined to consider how its new reading of the '319 patent rendered the asserted claims invalid in light of the prior art of record in the 1016 Investigation. *Id.* at 38.

### d. The ITC Modification Proceedings

On August 2, 2018, Respondents requested institution of a Commission Rule 210.76(a)(1) modification proceeding, and a determination that the Redesigned GDOs are not covered by the LEO because they do not infringe any valid claim of the '319 patent. The Commission instituted modification proceedings on September 4, 2018. Exhibit G. The Commission has ordered the presiding Administrative Law Judge to issue a recommended determination within six months after publication of the Order's notice in the Federal Register. *Id.* at 3. Respondents are seeking a stay of the Remedial Orders in the modification proceeding.

## III. <u>JURISDICTION</u>

One World seeks judicial review of CPB's decision to exclude the Redesigned GDOs and deny One World's protest pursuant to 28 U.S.C. § 1581(a). *See* Dkt. No. 006-6, PI Mot. Exhibit F, Protest Ruling HG H300129.

One World also seeks judicial review of CBP's administrative ruling issued pursuant to 19 C.F.R. § 177, finding that the Redesigned GDOs were subject to the LEOs. *See* Dkt. No 006-5, PI Mot. Exhibit E, Request Ruling HG H295697.

## IV.    APPLICABLE LAW

### A.    Standard of Review

The Court of International Trade may reverse a Customs ruling if its "action, findings, and conclusions . . . [are] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Holford USA v. United States*, 19 Ct. Int'l Trde 55, 1488 (1995). In actions commenced under Sections 1581(a) and 1581(h), the Court "make[s] its determinations upon the basis of the record made before the court." 28 U.S.C. §§ 2640(a)(1) & (4). The Court reviews CBP's decisions *de novo*. *See Universal Elecs., Inc. v. U.S.*, 112 F.3d 488, 493 (Fed. Cir. 1997); *Jazz Photo Corp. v. U.S.*, 353 F. Supp. 2d 1327, 1333 (Ct. Int'l Trade 2004). Thus, "any [] findings of fact are required under § 2640(a)(1) to be made *de novo* by the Court of International Trade, not Customs, and all conclusions of law are, of course, also the *de novo* responsibility of this Court." *CBB Group, Inc. v. U.S.*, 783 F. Supp. 2d 1248, 1254 (Ct. Int'l Trade 2011).

### B.    Declaratory and Injunctive Relief Under Section 1581(a)

Section 1581(a) allows a party to seek juridical review of protest denials. 28 U.S.C. § 1581(a). The Court is empowered to grant both declaratory and injunctive relief in actions commenced pursuant to Section 1581(a). *See* 28 U.S.C. § 2643(c)(1); *see also* USCIT R. 65(a)-(b). A preliminary injunction may issue where:

1.    the movant is likely to ultimately succeed on the merits of its claims;

2.    the movant will be irreparably harmed without injunctive relief;

3.    the balance of hardships tilts in the movant's favor; and

4.    the public interest favors the grant of injunctive relief.

*American Signature, Inc. v. United States*, 598 F.3d 816, 823 (Fed. Cir. 2010) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 19 (2008)). "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show

a likelihood of success on the merits rather than actual success." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 546 (1987). The party seeking a temporary restraining order or preliminary injunction bears the burden of showing that it is likely to succeed on the merits of its claims. *See Winter*, 555 U.S. at 20.

### C. Declaratory Relief Under Section 1581(h)

Section 1581(h) allows party to seek review of a Custom's ruling issued "prior to the importation of the goods involved . . . ." 28 U.S.C. 1581(h). The Court is empowered to issue declaratory relief in civil actions commenced pursuant to Section 1581(h). *See* 28 U.S.C. § 2643(c). "[T]he party commencing the civil action [pursuant to Section 1581(h) must] demonstrate[] to the court that he would be irreparably harmed unless given an opportunity to obtain judicial review prior to such importation." 28 U.S.C. 1581(h). "The irreparable harm contemplated by section 1581(h) is the harm that may be visited upon an importer by requiring the importation of merchandise and requiring the importer to go through the administrative process of protesting its exclusion." *Manufacture De Machines Du Haut-Rhin v. Von Raab*, 569 F. Supp. 877, 881 (CIT 1983). "[T]he standard for proving irreparable harm [in a § 1581(h) case] is essentially identical to that used to determine irreparable injury in cases where injunctive relief is sought." *Otter Products, LLC v. U.S.*, 37 F. Supp. 3d 1306, 1317 (CIT 2014) (brackets in original).

## V. ARGUMENT

### A. The Redesigned GDOs Do Not Infringe the '319 Patent and Are Not Covered by the LEO.

To succeed on the merits, One World must show it is likely that the Redesigned GDOs do not infringe any valid claim of the '319 patent. *See Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009). A patent infringement analysis is a two-step process. First, the scope of the claims must be determined. *Markman v. Westview Instruments, Inc.*, 517 U.S.

370 (1996). Second, the properly construed claims must be compared with the accused device to determine whether all of the claim limitations are present in the accused product. *Id.* If even one limitation is missing there can be no infringement. *Id.* As applied here, claim construction is a question of law that this Court reviews *de novo*. *See CBB Group*, 783 F. Supp. at 1254.

As One World demonstrated at the evidentiary hearing, the IPRB's ruling letter and protest decisions were legally erroneous and should be reversed for at least three reasons:

1) the IPRB failed to apply judicial estoppel and find that Chamberlain is estopped from asserting that the claims cover products like the Redesigned GDOs that use wireless communications;

2) the IPRB failed to apply the proper interpretation of "connected . . . by means of a digital data bus"; and

3) the IPRB erred by construing this claim limitation to cover wireless systems so long as there is a "digital data bus" anywhere in the communication path between the controllers in the head unit and wall console when the claims would be invalid under its construction.

Each of these three issues is dispositive of the merits. If it agrees with One World on any one topic, then Court should reverse the ruling letter and protest decisions.

     **1.**    **Chamberlain Is Judicially Estopped from Asserting The '319 Patent Claims Extend to Wireless Communications Between the Head Unit and Wall Console**

        **a.**    **Chamberlain Has Repeatedly Admitted That '319 Patent Claims Do Not Cover Wireless Communications Between the Head Unit and Wall Console.**

"Because the inquiry into the meaning of claim terms is an objective one, a patentee who notifies the public that claim terms are to be limited beyond their ordinary meaning to one of skill in the art will be bound by that notification, even where it may have been unintended."

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004). A consistent construction of the claims "ensures that claims are not construed one way in order to obtain their allowance and in a different way against accused infringers." *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005). Accordingly, "competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct, such as designing around the claimed invention." *Hockerson-Halberstadt v. Avia Group Intern.*, 222 F.3d 951, 957 (Fed. Cir. 2000).

Chamberlain has repeatedly admitted that a wireless keypad and wireless communications between the head unit and the wall console are outside the scope of the asserted claims. In the ITC, the parties agreed that a "digital data bus" required a "conductor" – *i.e.*, a connection that conducts electricity:



Exhibit R, PDX 1.63 (citing Exhibit S at 15); *see also* Hr'g Tr. at 102:23-103:8 (Mr. Lipoff explaining that a conductor conducts electricity). For this reason, the parties agreed that

"connected . . . by means of a digital data bus" required the two elements to be connected by a *wired* connection. *See* Hr'g Tr. at 79:9-80:9.

To show infringement, Chamberlain argued that only a fully wired connection between the wall-mounted control unit and the head unit would infringe the '319 patent:



Exhibit R, PDX 1.20 (citing Exhibit T, at 117-19). Indeed, One World's original design also included wireless communications between the head unit and the outdoor keypad. *See* Exhibit B at 131 (depicting "Outdoor Keypad" as communicating with "315 MHz RF Receiver"). However, Chamberlain did *not* accuse these wireless communications of infringement.

On the contrary, Chamberlain repeatedly admitted that wireless keypads and wireless communications would *not* infringe. For example, in both its pre- and post-hearing ITC briefs, Chamberlain argued that "[a]ll '319 patent claims relate to ***wired digital communications*** between a garage door opener's wall console and head unit." *See* Exhibit H at 5 and Exhibit I at 4–5 (emphasis added).

Chamberlain had to agree the claims require a wired connection to preserve their validity because Chamberlain's own prior art reference from 1997, U.K. Patent App. No. 2,312,540 (Exhibit N; "Doppelt"), discloses a wireless communications between the same elements recited in the '319 patent claims:



Exhibit R, PDX 1.49 (illustrating Exhibit N, Figure 1 (annotated)).

Accordingly, to distinguish the prior art's wireless communication, Chamberlain argued that wireless communications were "irrelevant" to the patent's claims:



Exhibit R, PDX 1.22 (citing Exhibit H at 67).

Indeed, at the ITC evidentiary hearing, Chamberlain's expert again unequivocally admitted that the claims of the '319 patent do **not** claim a wirelessly connected keypad and are **limited** to a wired connection to the keypad:

**Chamberlain's Expert Admitted That The Claims Are Limited To A Wired Connection**

13    Q    You'll agree with me that the '319 patent does
14 not claim a wirelessly connected wall console; correct?
15    A    That's correct.
16    Q    And, in fact, the '319 patent claims are limited
17 to a wired connection between the microcontroller of the
18 wall console and the microcontroller of the motor drive
19 unit; correct?
20    A    Yes.

Ex. J, Hr'g Tr. (July 13, 2017) at 1079:13-20

PDX 1.37

Exhibit R, PDX 1.37 (citing Exhibit J, Hr'g Tr. (July 13, 2017) at 1079:13–20).

Chamberlain made the same admission in other *fora* when attempting to preserve the '319 patent's validity. After One World filed IPRs with the PTAB challenging the validity of the '319 patent, Chamberlain's expert again attempted to distinguish the prior art by arguing that wireless communication was outside the scope of the patent's claims:

> Q.    So within the confines of the '319 patent, would sending signals, digital signals using radio frequency or other wireless means, be conveying digital signals over a digital data bus?
>
> A.    In my opinion, no.

Exhibit K, Dep. Tr. of Dr. Nathaniel Davis, at 65:3-8 (objection omitted).

At oral argument before the PTAB, Chamberlain again attempted to distinguish the prior art by arguing that the '319 patent claims do not extend to wireless wall consoles that communicate wirelessly with the head unit:

> Judge Horvath: If I were to take that remote controller and mount it on a wall, would that become a wall console?

Mr. Monaldo: That's a good question, Your Honor. That's not an argument that Petitioner has raised in this proceeding, but ***I don't think so***. It's a remote controller that has different functionality. ***It's not attached to anything***.

. . .

Exhibit L, Aug. 7, 2018 PTAB Hr'g Tr. at 28:21–29:16 (emphasis added). When asked whether mounting *Doppelt's* wireless transmitter to a wall would meet the "connected . . . by means of a digital data bus" requirement, Chamberlain's counsel again answered no because there would be no **<u>direct</u>** wired connection to the head unit:



**Chamberlain's Admissions Before the PTAB**

| 10 | JUDGE HORVATH: If I were to mount it on a wall, would it have |
| 11 | the digital data bus? |
| 12 | MR. MONALDO: I don't think so because it's wirelessly |
| 13 | transmitting and there's not necessarily a data bus that's flowing between the |
| 14 | two components. It's a wireless controller that is used to send wireless |
| 15 | signals that are different than when we're talking about the wall console. |
| 16 | That's connected directly through a digital data bus to the head unit. |

Ex. L, IPR2017-00126 Hr'g Tr. at 29:10-16.

PDX 1.40

Exhibit R, PDX 1.40 (citing Exhibit L, Aug. 7, 2018 PTAB Hr'g Tr. at 29:10-16).

As discussed below, Chamberlain's judicial admissions preclude any argument that the '319 patent covers the Redesigned GDOs, yet the IPRB erroneously relied upon such arguments from Chamberlain in ruling against One World.

        **b.**     **Chamberlain Is Estopped from Arguing the Redesigned GDOs Infringe Under A "Part-Wired/Part-Wireless" Theory.**

The Federal Circuit has long held that "a party who successfully argues one position is estopped from later adopting a contrary position in a case involving the same patent." *Organic*

*Seed Growers & Trade Ass'n v. Monsanto Co.*, 718 F.3d 1350, 1358 (Fed. Cir. 2013).

Chamberlain's numerous admissions thus estop it from arguing a different claim interpretation that

would cover wireless transmissions. *See Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1564 (Fed.

Cir. 1996) ("[W]here a party successfully urges a particular position in a legal proceeding, it is

estopped from taking a contrary position in a subsequent proceeding where its interests have

changed.").

Nonetheless, during the Customs proceedings, Chamberlain did just that, arguing the

claims cover a wireless keypad and do **not** require a wired connection between the controllers in

the keypad and head unit:



Exhibit R, PDX 1.29 (citing Exhibit U at 2, 10; Exhibit V at 9). Instead, Chamberlain advanced

for the first time a new (and contradictory) position that the claims cover a wireless keypad in a

"***part-wired/part-wireless connection***"—*i.e.*, a system that has a digital data bus or conductor at

some point in the communication pathway between the controllers. *See* Exhibit M, IPRB Hr'g Tr. at 83:9–84:22 (emphasis added).

The IPRB wrongly adopted and relied upon Chamberlain's newly crafted infringement theory. In the Request Ruling and Protest Ruling, the IPRB gave no weight to Chamberlain's prior admissions because it erroneously applied the standards for disavowal of claim scope and ***prosecution history*** estoppel, rather than that for ***judicial*** estoppel. *See* Exhibit E at 30-32 (citing prosecution history case law); Exhibit F at 36-37 (same). Chamberlain's positions in the other judicial proceedings unquestionably give rise to judicial estoppel.

"The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." 18 Moore's Federal Practice § 134.30, p. 134-62 (3d ed. 2000).

> Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him. This rule, known as judicial estoppel, generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.

*New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quotations and citations omitted). The main factors warranting judicial estoppel are (1) a party's later position is inconsistent with its prior position, (2) the party successfully persuaded a court to accept its prior position, and (3) the party "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 750-51 (citations and quotations omitted). Chamberlain's prior actions fall squarely within the confines of judicial estoppel, and the IPRB's decision to essentially ignore Chamberlain's prior judicial admissions was arbitrary, capricious, an abuse of discretion, and not in accordance with the law.

The doctrine of judicial estoppel has far greater reach than the cannons of claim construction cited by the IPRB. The standard for prosecution disclaimer based on statements to the U.S. Patent and Trademark Office is "exacting," *GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014), and "the alleged disavowing actions or statements made during prosecution [must] be both clear and unmistakable." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325–26 (Fed. Cir. 2003). Although Chamberlain's statements in the IPRs *do* meet the requirements for disclaimer, that was not the issue before IPRB.

In addition to applying the wrong legal standard, the IPRB erroneously agreed with Chamberlain's argument that none of its prior judicial admissions "stat[ed] that the '319 patent does not cover a ***part-wired/part-wireless connection***." Exhibit F at 37 (quoting Chamberlain's Reply) (emphasis in original). The IPRB's decision was incorrect for at least two reasons.

First, Chamberlain's prior statements never distinguished between a "solely wireless" connection and a so-called "part-wired/part-wireless connection." To the contrary, Chamberlain argued, without qualification, that the claims do not cover wireless systems that include wireless keypads. For example, Chamberlain's expert unequivocally testified that the claims do **not** cover a wirelessly connected keypad and were **limited** to a wired connection between the keypad and head unit:

**Chamberlain's Expert Admitted That The Claims Are Limited To A Wired Connection**

```
13        Q       You'll agree with me that the '319 patent does

14   not claim a wirelessly connected wall console; correct?

15        A       That's correct.

16        Q       And, in fact, the '319 patent claims are limited

17   to a wired connection between the microcontroller of the

18   wall console and the microcontroller of the motor drive

19   unit; correct?

20        A       Yes.
```

Ex. J, Hr'g Tr. (July 13, 2017) at 1079:13-20

PDX 1.37

Exhibit R, PDX 1.37 (citing Exhibit J, Hr'g Tr. (July 13, 2017) at 1079:13–20). By allowing Chamberlain to back-track from these prior statements, the IPRB erroneously allowed Chamberlain to "derive an unfair advantage or impose an unfair detriment on the opposing party." *New Hampshire*, 532 U.S. at 750-51.

Moreover, and as detailed below, Chamberlain's so-called "part-wired/part-wireless" distinction is nonsense because ***all wireless systems have a conductor or wire at some point in the wireless communication pathway*** (*e.g.*, an antenna or circuit board trace).

Second, judicial estoppel exists to prevent Chamberlain's gamesmanship, which the IPRB has implicitly endorsed. *Cf. Innova/Pure*, 381 F.3d at 1117 ("a patentee who notifies the public that claim terms are to be limited . . . will be bound by that notification" and may not, like a "nose of wax," twist the meaning of patent claims one way to avoid a finding of unpatentability and in another way so as to avoid infringement). The IPRB should not have allowed Chamberlain to twist the meaning of the claims depending on whether it was addressing infringement or invalidity.

Chamberlain's new read of the asserted claims in the ITC is clearly inconsistent with the position

it advanced for the first time at Customs:



Exhibit R, PDX 1.44 (citing Exhibit H at 5; Exhibit U at 6). In particular, before the ITC,

Chamberlain argued that the prior art's wireless communications between its head unit and wall-

mounted transmitters were "irrelevant" to the patent's claims because the wall-mounted

transmitters were not "wired to the head unit":



Exhibit R, PDX 1.45 (citing Exhibit H at 67). But the Redesigned GDOs operate in a similar manner:



Exhibit R, PDX 1.46 (citing Exhibit H at 67 (Ryobi components added)).

The Federal Circuit has long held that it is "axiomatic" that claims must be interpreted the same way for both invalidity and infringement. *See W.L. Gore Assocs., Inc. v. Garlock, Inc.*, 842 F.2d 1275, 1279 (Fed. Cir. 1988). The IPRB erred by allowing Chamberlain to assert a different interpretation for infringement than it argued for validity and by relying upon those inconsistent interpretations in its decisions.[4]

Accordingly, the IPRB's decisions were arbitrary, capricious, an abuse of discretion, and not in accordance with the law.

> ### 2. Under the Plain Language of the Claims, the Redesigned GDOs Cannot Infringe the '319 Patent.

The claims' plain language also does not cover a wireless keypad. The '319 patent has two independent claims, claims 1 and 9. Representative claim 1 is reproduced below with the disputed language emphasized:

> 1. An improved garage door opener comprising
>
> a motor drive unit for opening and closing a garage door, said motor drive unit having a microcontroller and
>
> a wall console, said wall console having a microcontroller,
>
> ***said microcontroller of said motor drive unit being connected to the microcontroller of the wall console by means of a digital data bus***.

---

[4] Any suggestion that Customs was not estopped from adopting Chamberlain's "part-wired/part-wireless" construction misses the mark. Customs was required to apply the same construction for infringement as Chamberlain applied for validity in the ITC and IPRs. *Gore*, 842 F.2d at 1279; *Amgen*, 324 F.3d at 1330. Further, Chamberlain was estopped from advancing its "part-wired/part-wireless" argument in the first instance, and One World was "entitled to rely on [Chamberlain's] representations when ascertaining the degree of lawful conduct, such as designing around the claimed invention." *Hockerson-Halberstadt*, 222 F.3d at 957. Customs' adoption of these improperly advanced positions was in error.

Exhibit A at claim 1 (emphasis added).  Claim 9 is identical except the term "microcontroller" in claim 1 is replaced with "controller."  *See id.* at claim 9.

The bolded language above requires that the microcontroller of the head unit[5] and the microcontroller of the wall console be "connected . . . by means of a digital data bus."  During the 1016 Investigation, the ALJ construed the term phrase "digital data bus" as a "conductor or group of conductors which conveys digital data."  Exhibit B at 121-22.  This construction allowed for multiple conductors (*i.e.*, a "group of conductors"), but it did not eliminate the requirement that at least one conductor connect the two controllers.  Indeed, the familiar terms "connected to" and "by means of" were not construed during the 1016 Investigation, and were therefore given their plain and ordinary meaning.  *See id.* at 120-28.  Under the ALJ's constructions and the plain meaning of the claim language, one or more electrical conductors must connect the controller in the head unit to the controller in the wall counsel.  Mr. Lipoff provided examples of how a "group of conductors" may be used to "connect" the controllers in the head unit and wall console serially (as illustrated below on left) or in parallel (shown on right):

---

[5] The term "motor drive unit" was construed to be a "unit where a driven motor resides."  Exhibit B at 124-28.  The driven motor in the Redesigned GDOs resides in the head unit.



Exhibit W, PDX 2.14; *see also* Hr'g Tr. at 81:4-82:4.  But in all instances, at least one conductor "connects" the controllers in the keypad and head unit.  Hr'g Tr. at 85:5-14.

In the Original GDOs, the wired keypad was connected to the head unit by a pair of wires (*i.e.*, a group of conductors).  As shown below, these wires extended out from the wall console, up the garage's wall, and to the head unit located on the ceiling:



*See also* Hr'g Tr. at 83:20-23: (Mr. Lipoff explaining that in "the old design . . . there was metallic wires extending from the head unit along the ceiling and down the wall to the wired keypad").

During the ITC proceeding, Chamberlain relied solely on this wired connection as the claimed "digital data bus" connecting the wall console to the head unit:

**Chamberlain's Infringement Position**

6. Element [1E/9E]: "said microcontroller [controller] of said motor drive unit being connected to the microcontroller [controller] of the wall console by means of a digital data bus"

Q117. Do you have an opinion as to whether the GD200 satisfies the limitation requiring "said microcontroller of said motor drive unit being connected to the microcontroller of the wall console by means of a digital data bus?"

A117. Yes, I do. It is my opinion that the GD200 satisfies this claim element.

Q118. Are there any claim constructions at issue in this limitation?

A118. Yes, the parties have agreed that the term "digital data bus" means a conductor capable of conveying digital data. I applied this construction in my analysis and opinions.

Q119. Can you explain why you believe the GD200 satisfies this limitation?

A119. Yes. As I explained in my discussion of the accused Ryobi product operations and architecture, the microcontroller on the Wi-Fi Board is connected via a two-wire serial connection to the microcontroller of the indoor keypad. The exchange of data across these wires is in a digital format.

TTI's IPRB Post-Hearing Br., Ex A, CX-1317 (Dr. Davis Witness Statement) at Q&A 117-119

PDX 1.20

Exhibit R, PDX 1.20 (citing Exhibit T, at 117-19). The ALJ agreed and adopted Chamberlain's position. *See* Ex. B at 134-35; *see also* Hr'g Tr. at 82:15-84:2 (Mr. Lipoff explaining the ALJ's findings). The Ryobi GDOs also contained a wireless outdoor keypad. However, as discussed, to avoid prior art that disclosed wireless communications between wall consoles and head units, Chamberlain did not accuse the wireless outdoor keypad of infringing and instead repeatedly asserted that the claims do not cover a wireless connection between these two elements. *See, e.g.,* Exhibit H at 67 (distinguishing Doppelt's wall-mounted as transmitters as "irrelevant").

Relying on all of Chamberlain's arguments and evidence in the 1016 Investigation and PTAB proceedings—including the testimony of Chamberlain's experts and admissions of its counsel—One Wrold redesigned the accused GDOs to avoid the claims of the '319 patent. *See supra* Section II.B.3.a. It did precisely what the patent system encourages: to rely on the public notice function of the patent system by innovating and designing around existing technology. *See*

*TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 881–82 (Fed. Cir. 2011) (en banc) ("[L]egitimate design-around efforts should always be encouraged as a path to spur further innovation.").

The resulting Redesigned GDOs have a wireless keypad that communicates wirelessly with a receiver at the head unit. Whereas the indoor keypad of the Original GDOs was connected to the head unit by wire, the keypads of the Redesigned GDOs communicate wirelessly with the head unit:



*See also* Hr'g Tr. at 83:23-84:11 (Mr. Lipoff explaining "[t]here are no wires extending between the keypad and the head unit"). Thus, the Redesigned GDOs do not meet the claims' requirement that the wall console's controller and the head unit's controller be "connected . . . by means of a digital data bus." Hr'g Tr. at 84:4-11. Using the same format as the prior illustration above, no conductor connects the controllers in the head unit to the wall console:



Exhibit R, PDX 1.67. This new wireless architecture places the Redesigned GDOs squarely outside of the scope of the claims of the '319 patent. The IPRB's decision to the contrary was arbitrary, capricious, an abuse of discretion, and not in accordance with the law.

3.     **The IPRB's Decision Adopted an Erroneous Construction of the Term "Connected . . . By Means of Digital Data Bus" To Find Infringement**

a.     **Chamberlain's "Part-Wired/Part-Wireless" Theory Contradicts The Claim Language.**

The IPRB acknowledged that "[t]he GDOs at issue replace the pair of wires and the wired, wall-mounted keypad of the [previous design] with a wireless, wall-mounted keypad and a wireless receiver." Exhibit E, Request Ruling, at 26. Nevertheless, the IPRB ignored Chamberlain's prior admissions and adopted a claim construction where all that is required to meet the requirement of "connected . . . by means of a digital data bus" is the presence of a conductor at some point in the communication pathway between the microcontroller in the wall unit and the microcontroller in the head unit. *See id.* at 27. For the Redesigned GDOs, the IPRB found that a

"pair of wires connects the head unit of the GDOs at issue to ***the wireless receiver***," and therefore, there was a digital data bus at some point in the connection. *See id.* (emphasis added). The pair of wires to the "wireless receiver" are shown in red below:



When denying One World's protest, the IPRB again confirmed that it erroneously relied on the connection between the wireless receiver and the head unit as meeting this claim element. *See* Exhibit F, Protest Ruling, at 35 ("[T]he pair of wires connecting the head unit to the wireless receiver in the redesigned GDOs is a digital data bus that connects the wireless receiver to the controller in the head unit."). During the evidentiary hearing, Mr. Lipoff illustrated the IPRB's analysis on the below demonstrative:



Exhibit W, PDX 2.5. Mr. Lipoff explained that the IPRB erroneously focused on the wire between elements (a) and (b)—*i.e.*, between the head unit and the head unit's wireless receiver—and did not determine whether there was a wire connecting the head unit to the wall console (c), as required by the patent and Chamberlain's judicial admissions. Hr'g Tr. at 73:11-75:11.

In short, the '319 patent's claims require the microcontroller in the head unit and the microcontroller in the wall console to be "connected . . . by means of a digital data bus." Exhibit A at claims 1 & 9. As shown in the above figure, ***no*** conductor or wire connects the wireless receiver and the wireless keypad. Hr'g Tr. at 74:8-24. Even if the IPRB were correct that a digital data bus "connects the wireless receiver to the controller in the head unit," the claims require the digital data bus to "connect" the head unit's and the wall console's controllers, ***not*** a receiver to the head unit. Thus, the IPRB's findings were arbitrary and capricious and not in accordance with the law.

### b. Under the IPRB's Construction, the Prior Art Would Render the '319 Patent Invalid.

The IPRB's decision also should be reversed because the '319 patent cannot, as a matter of law, cover the wireless system used by the Redesigned GDOs. To so read the claims would run them straight into Chamberlain's own prior art U.K. Patent Application GB231250 to Doppelt ("Doppelt") and render the '319 patent invalid. *See* Exhibit N.

The Federal Circuit has held that, "[i]f, after applying all other available tools of claim construction, a claim is ambiguous, it should be construed to preserve its validity." *Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*, 824 F.3d 999, 1004 (Fed. Cir. 2016) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1327 (Fed. Cir. 2005) (en banc)). In *Ruckus*, the Federal Circuit relied on this cannon as support for "limit[ing] the scope of the claims to wired communication." *Id.*

In this case, the parties' disputed the proper construction of the claim limitation requiring the controllers in the head unit and wall console to be "connected . . . by means of a digital data bus." One World demonstrated that all of the standard tools of claim construction—*i.e.,* the plain language of the claims, the specification, Chamberlain's judicial admissions, and the IPR prosecution history—counsel against Chamberlain's new (and nonsensical) "part-wired/part-wireless" construction. Even assuming that the IPRB were correct to consider Chamberlain's new construction (it was not), these tools of claim construction, at best, rendered the scope of the claims ambiguous. In these circumstances, the IPRB's refusal to consider whether its adoption of Chamberlain's proposed claim construction would render the claims invalid was arbitrary, capricious, an abuse of discretion, and not in accordance with the law.

Mr. Lipoff testified that, under the IPRB's construction, the '319 patent's claims are invalid over the Doppelt reference. Hr'g Tr. at 88:23-89:5. He explained that Doppelt is a Chamberlain prior art patent that predates the '319 patent:



Exhibit W, PDX 2.19 (illustrating Exhibit N, Doppelt Fig. 1); Hr'g Tr. at 89:6-11.

In the ITC investigation, Chamberlain did not dispute that Doppelt discloses every limitation of claims 1 and 9 except for a "microcontroller [or controller] of said motor drive unit being connected to the microcontroller [or controller] of the wall console by means of a digital data bus." *See* Exhibit B, ID, at 182-83. Under the IPRB's reading of the '319 patent, it cannot be disputed that Doppelt discloses a wireless system that meets this limitation as well.

Mr. Lipoff presented a breakdown of the '319 patent's claims to assist in discussing the claim limitations:



**The '319 Patent: Independent Claims 1 and 9**

[1] **Claims 1/9**: An improved garage door opener comprising

[2] a <u>motor drive unit</u> for opening and closing a garage door

[3] said motor drive unit having a <u>microcontroller [or controller]</u>

[4] a <u>wall console</u>

[5] said wall console having a <u>microcontroller [or controller]</u>

[6] said <u>microcontroller [or controller]</u> of said motor drive unit being <u>connected</u> to the <u>microcontroller [or controller]</u> of the wall console <u>by means of a digital data bus</u>.

RDX 2.21

Exhibit W, PDX 2.21; Hr'g Tr. at 89:15-20.  Discussing each element, he demonstrated that Doppelt discloses each limitation of claims 1 and 9 of the '319 patent.

In particular, Mr. Lipoff explained that Doppelt discloses a "garage door opener," as can be seen in Doppelt's Figure 1, annotated below in blue:

**Doppelt Describes a "Garage Door Opener"**

[1] An improved **garage door** opener comprising:

FIG. I

Ex. N, Fig. 1 (coloring added)

RDX 2.21

Exhibit W, PDX 2.21 (annotating Exhibit N, Doppelt Fig. 1); Hr'g Tr. at 89:21-90:9.

Doppelt also discloses "a motor drive unit for opening and closing a garage door," where "motor drive unit" has been construed as "a unit where a driven motor resides." Doppelt discloses a "[h]ead unit 12" that is "mounted to the ceiling of garage 14," which includes a motor for opening Doppelt's garage door. Exhibit N at 5:8-10. As Mr. Lipoff explained, head unit 12 can be seen in Figure 1, annotated below in blue:



Exhibit W, PDX 2.23 (annotating Exhibit N, Doppelt Fig. 1); Hr'g Tr. at 90:10-22.

Mr. Lipoff also explained that Doppelt discloses "said motor drive unit having a microcontroller [or controller]," because its "head unit has a controller 70" (Exhibit N at 5:29-30) (in blue below) that "includes a microcontroller 84" (*id.* at 5:34-37) (in green below):



Exhibit W, PDX 2.24 (annotating Exhibit N, Doppelt Fig. 2); Hr'g Tr. at 90:23-91:14.

He also demonstrated that Doppelt teaches a "wall console"—which the Commission construed to mean "a wall-mounted control unit." Specifically, Doppelt discloses "[a]n external control pad 34 [that] is positioned on the outside of the garage." Exhibt N at 5:16-18. Mr. Lipoff explained that the control pad is also referenced as a "keypad type door frame mount transmitter 34," *id*. at 7:1–5, as depicted in the annotated version of Figure 1 below.



Ex. N, Fig. 1 (coloring & call-out added)

Exhibit W, PDX 2.25 (annotating Exhibit N, Doppelt Fig. 1); Hr'g Tr. at 91:15-92:7.

Mr. Lipoff demonstrated that Doppelt also teaches "said wall console having a microcontroller," as Doppelt's outdoor control pad 34, also referred to as "[t]ransmitter 34," is "controlled by a programmed microcontroller." Exhibit N at 10:26–27. He showed this in Figure 10, illustrating the boundary of the "transmitter 34" annotated in blue and the microcontroller annotated in green:



Exhibit W, PDX 2.26 (annotating Exhibit N, Doppelt Fig. 10); Hr'g Tr. at 92:8-22.

Finally, Mr. Lipoff demonstrated that Doppelt teaches "said microcontroller of said motor drive unit being connected to the microcontroller of the wall counsole by means of a digital data bus," if the digital data bus can be *wireless* or if the claims cover a so-called "part-wired, part-wireless" configuration. Hr'g Tr. at 92:23-94:9. Doppelt teaches wireless communications in that external keypad 34 "communicate[s] via radio frequency transmission with an antenna 32 of the head unit 12." Exhibit N at 5:18–20. As highlighted in Figure 2 below, Mr. Lipoff explained that antenna 32 is connected to receiver 80 which is in turn connected to microcontroller 84 via line 82, which meets the digital data bus element of the claims.



Exhibit W, PDX 2.27 (annotating Exhibit N, Doppelt Fig. 2); Hr'g Tr. at 92:23-94:9.

Mr. Lipoff also explained that Doppelt's configuration was "part-wired/part-wireless," under the IPRB's interpretation of that term:



Exhibit W, PDX 2.28 (annotating Exhibit N, Doppelt Fig. 2); Hr'g Tr. at 94:10-95:2.

As Mr. Lipoff explained at the evidentiary hearing, this configuration in Doppelt is the same as the Redesigned GDOs:



Ex. N, Fig. 2 (coloring added)

Exhibit W, PDX 2.31; Hr'g Tr. at 96:14-97:5. The Redesigned GDOs' wireless keypad communicates wirelessly with the wireless receiver, just as "external keypad 34" of Doppelt communicates wirelessly with "antenna 32 of the head unit 12." Exhibit N at 5:18-20. The Redesigned GDOs have a wired connection from the wireless receiver to a controller in the head unit, just as receiver 80 is connected via "line 82" to "microcontroller 82." *Id.* at 5:34-37. This is exactly the type of "part-wired/part-wireless" configuration that Chamberlain argues satisfies the claim language. Thus, Doppelt would anticipate the '319 patent's independent claims.

Mr. Lipoff also demonstrated that Doppelt anticipates dependent claims 2-4 and 10-12. *See* Hr'g Tr. at 97:6-100:12; Exhibit W, PDX 2.32 – 2.34.

Defendants cannot lawfully exclude One World's Redesigned GDOs based on a reading of the '319 patent that renders it invalid.

In their opposition and at the evidentiary hearing, Defendants made no attempt to rebut One World's evidence regarding the scope of the prior art.

At bottom, to the extent there is any support in the record for the IPRB's construction, it would render the meaning of the claim, at best, ambiguous. In this situation, the Federal Circuit has stated that a claim should not be interpreted to read on a prior art patent application. *Ruckus*, 824 F.3d at 1004 ("The canons of claim construction provide additional reason to limit the scope of the claims to wired communication. If, after applying all other available tools of claim construction, a claim is ambiguous, it should be construed to preserve its validity."); *Regents of the Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 936–37 (Fed. Cir. 2013) (holding that the proper construction was one that avoided the prior art successfully distinguished by the applicant); *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1335 (Fed. Cir. 2003) (holding that the district court failed to interpret the claims "to preserve their validity . . . [and] thus erred.").

Accordingly, the '319 patent simply cannot be read to cover the sort of wireless system contained in the Redesigned GDOs. The IPRB's decision did just that and as such was arbitrary, capricious, an abuse of discretion, and not in accordance with the law.

B.    **The Court Should Issue Both Injunctive Relief Under Section 1581(a) And Declaratory Relief Under Section 1581(h)**

1.    **One World Will Be Irreparably Harmed Without Both Forms of Relief**

Defendants are wrongly detaining One World's Redesigned GDOs and preventing their entry into the U.S. under the IPRB's erroneous interpretation of the LEO. One World now faces a six month wait until the Commission will be able to addresses these issues during the Modification Proceedings and correct the IPRB's erroneous ruling. Absent an injunction requiring Customs to immediately release the currently-impounded GDOs and a declaration that the

Redesigned GDOs should not be excluded under the LEOs, One World will suffer immediate and irreparable harm because it will be **excluded** from the U.S. GDO market.

Irreparable harm includes "a viable threat of serious harm which cannot be undone." *Zenith Radio Corp. v. U.S.*, 710 F.2d 806, 809 (Fed. Cir. 1983) (internal citations omitted). Substantial loss of business constitutes irreparable harm because "loss of business renders a final judgment ineffective, depriving the movant of meaningful judicial review" and cannot be undone. *Harmoni Int'l Spice, Inc. v. U.S.*, 211 F. Supp. 3d 1298, 1307 (Ct. Int'l Trade 2017) (citing *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975)); *see also Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) (loss of business opportunities and goodwill can be irreparable).

The Redesigned GDOs are One World's **only** garage door openers offered in the marketplace. Exhibit Q at ¶ 8; Hr'g Tr. at 154:17-20. If Defendants continue to wrongfully detain and exclude the Redesigned GDOs, One World will be unable to fulfill orders and The Home Depot will drop its products from the GDO category. Mark Huggins, One World's Senior Vice President of Product Development, testified that One World would thus be excluded from the United States market:

> Q.     Mr. Huggins, if the Home Depot were to drop One World from the garage door opener product category how would that impact One World's entry into the garage door opener market in the United States?
>
> A.     The program would be over. That's our only customer.

Hr'g Tr. at 162:22-163:4.

One World does not have sufficient inventory of the GD126s to fulfill The Home Depot's orders through the end of 2018. Hr'g Tr. at 158:25-159:5. Indeed, it projects it will run out of GD126 inventory by the **end of October**:

> Q.     When does One World project it will run out of inventory for the GD126 in the United States?

A.     Based on current sell-through rates we project that by the end of October we will be out of stock.

*Id.* at 159:5-10.  Importation of the GD126s was thus necessary to maintain inventory beyond October.  *Id.* at 157:8-14.

Mr. Huggins testified that if One World cannot fulfill The Home Depot's orders at the end of October, senior management believes The Home Depot will cancel its GDO program:

[Q].     My question specifically was what does One World project the consequences would be if it can't supply the GD126 to the Home Depot after the end of October?

A.     So myself along with our head of sales along with President, Mike Farrah, all believe that if we have another disruption with the Home Depot that it will be the end of the program.

Hr'g Tr. at 159:19 – 160:6 (objections omitted).   He explained that there have already been past "disruptions" in supplying GDOs to The Home Depot and that the relationship is "rocky, at best." *Id.* at 161:3-16.  In particular, One World was previously forced to buy-back inventory while it implemented other redesigns in response to Chamberlain's lawsuits, which led to "a significant amount of time [when] there [weren't] Ryobi GDOs in the stores."  *Id.* at 161:20-162:3.  Being forced to inform The Home Depot that it cannot supply inventory would be the precise type of disruption that would end One World's GDO program:

Q.     If at the end of October 2018 you have no GD126 to supply to the Home Depot would that be the type of disruption that you believe would end the program at the Home Depot?

A.     Yes. We would not be able to fulfill orders and Home Depot, they're not going to leave the shelves bare. They will begin the clearance process because, you know, we don't have stock and imminent stock to come in to resupply them.

*Id.* at 160:7-15.

One World's projected date for running out of inventory also coincides with The Home Depot's promotion of Black Friday and the Christmas holiday season. Mr. Huggins testified that a disruption during this time frame would be "detrimental":

> Q.      In terms of the [company's] projections regarding the Home Depot's future conduct what role, if at all, does the upcoming year end Christmas holiday play in these calculations?
>
> A.      So to not be able to supply them in the fourth quarter would be even more detrimental because that's the biggest overall selling season and it's very important. The Home Depot is typically very busy getting ready for Black Friday and other promotions that go on during that time and they certainly don't want to deal with any headaches at all much less an out of supply issue.

*Id.* at 162:4-15.   One World believes that the program "would be over" if it were unable to fulfill orders during this all-important timeframe "with no definitive plan to know when we're going to get back in stock." *Id.* at 173:3-8.

Furthermore, Mr. Huggins testified that the damage to One World's goodwill with The Home Depot will extend farther than just the GDO program. In particular, One World has received additional business opportunities in other categories as a result of the GDO program's success, including ceiling fans, plumbing products, pool products, wireless speakers, and ongoing projects with several different merchants. *Id.* at 163:12-165:12; 168:16-172:20. He explained that business opportunities in these adjacent categories are critical to One World's growth, and if One World cannot meet The Home Depot's expectations on the influential and innovative GDO program, One World will likely lose opportunities in these other categories as well. *Id.* at 169:11-171:22. He explained that the consequences of losing the GDO program would be "severely damag[ing]" to One World's strategic growth plans. *Id.* at 172:3-20.

With respect to timing, Mr. Huggins testified that it takes approximately five-to-six weeks for new GDOs to ship from China by sea and to reach One World's distribution facilities in the U.S. *Id.* at 158:18-24.   Given that One World is expected to run out of GD126s by the last week

of October, if the 936 excluded GD126s are not immediately released by Customs, One World will not have enough inventory to last until a new shipment of GDOs can arrive in the U.S. *Id.* at 155:17-23; 158:18-159:10; 173:9-18. Thus, an injunction forcing Customs to release the excluded GD126s is critical to One World's requested relief.

Furthermore, "unless given an opportunity to obtain judicial review prior to" the importation of future shipments of GD126s, One World will be unable to avoid the "detrimental" irreparable harm discussed above. *See* 28 U.S.C. § 1581(h). Mr. Huggins testified that the release of the excluded GD126s would buy One World a few more weeks until it could "get the supply chain moving again and get things back in order." Hr'g Tr. at 173:9-18. However, based on current sell through projections, these additional 936 GD126s will only extend the time period before One World runs out of inventory by two additional weeks. *See id.* at 155:17-23. Thus, if Customs continues to exclude future shipments of GD126s pursuant to the IPRB's erroneous ruling request and protest decisions, One World will not be able to fulfill orders for the GD126s by mid-November and will suffer the same irreparable harm discussed above.

Given this timing, One Word cannot go through the administrative process of: (1) shipping the Redesigned GDOs to the U.S., (2) receiving notification that Customs excluded the GDOs, (3) filing a protest, (4) receiving the protest decision, and (5) filing a temporary restraining order with this Court. *See Manufacture De Machines*, 569 F. Supp. at 881 ("The irreparable harm contemplated by section 1581(h) is the harm that may be visited upon an importer by requiring the importation of merchandise and requiring the importer to go through the administrative process of protesting its exclusion."). Unless the Court issues declaratory relief with respect to future shipments as well, One World will be forced to inform The Home Depot that it cannot fulfill orders before it is able to obtain relief via the typical the administrative process of protesting exclusions.

In short, One World now faces a six month wait until the Commission will be able to address these issues during the Modification Proceedings and correct the IPRB's erroneous rulings. Absent both injunctive relief forcing Customs to release the 936 excluded GD126s and declaratory relief addressing future imports, One World will suffer immediate and irreparable harm in the form of loss of good will, damage to reputation, and loss of business opportunities

Defendants did not present any evidence rebutting One World's showing of irreparable harm. Thus, as a matter of law, One World has demonstrated irreparable harm. *See, e.g., Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1154 (Fed. Cir. 2011) (it was a clear error for the district court to deny injunctive relief where the movant demonstrated a *prima facie* case of irreparable harm, and the non-movant "proffered no evidence to rebut that showing"); *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1063 (Fed. Cir. 2010) (district court did not err in finding that certain "resulting noneconomic loss would be significant and unquantifiable" based on the "undisputed testimony" of the plaintiff-company's president).

Defendants' only argument is that any harm to One World is allegedly "self-inflicted" because the redesign could have been introduced in the ITC.[6] Dkt. No. 022 at 33. However, this argument ignores the timeline of events. Mr. Huggins testified that One World first conceptualized its redesign in October 2017. Hr'g Tr. at 186:14-18. This was well after the ITC's evidentiary hearing was completed in July 2017:

---

[6] Defendants also argue that product modifications were foreseeable in light of the standard warranties contained in The Home Depot's supplier contract. Dkt. No. 022 at 33. This argument misses the mark. Defendants fail to demonstrate that the supplier contract language somehow makes the irreparable harm stemming from the IPRB's erroneous decision to ignore Chamberlain's judicial admissions and enforce a patent under a claim construction that renders it invalid foreseeable.

**Timeline**
- July 13 & 14, 2017 – ITC Hearing on '319 Patent
- Oct. 23, 2017 – Initial Determination
- Mar. 16, 2018 – Notice of Redesign Letter to Chamberlain
- Mar. 23, 2018 – Final Determination
- Mar. 30, 2018 – Ruling Request Letter to IPRB
- May 25, 2018 – IPRB Hearing
- July 20, 2018 – IPRB Ruling on Request Letter
- Aug. 10, 2018 – Protest
- Sep. 07, 2018 – Protest Ruling
- Sep. 13, 2018 – CIT Complaint & TRO/PI

PDX 1.2

One World Closing Slide, PDX 1.2.

Further, One World began implementing its redesign in reliance on Chamberlain's judicial admissions that a wireless keypad design could not infringe the '319 patent claims. *See* Hr'g Tr. at 187:4-11. In fact, believing Chamberlain would abide by its prior representations that a wireless keypad design does not infringe the '319 patent, One World informed Chamberlain of the Redesign on March 16, 2018, shortly after the design was completed—a fact that Chamberlain elected to omit in its Opposition—and before the Commission issued the Final Determination. *See* Exhibit X (letter from J. White to J. Colaianni).

But Chamberlain did not abide. Instead, during the IPRB proceedings, Chamberlain flip-flopped from its prior position that the '319 patent does not cover a wireless keypad—as it had represented to the ITC and One World time and time again—and argued, for the first time, the patent covers a wireless keypad in a so-called "part-wired/part-wireless" configuration. As a result, Customs was the first body to consider the non-infringement and invalidity issues raised

here. One World's good faith attempt to redesign its product and then, when faced with new, inequitable allegations, seek relief in the appropriate fora does not somehow undo the irreparable harm caused to One World absent its requested relief. Indeed, Defendants do not dispute that One World faces complete exclusion from the U.S. market without immediate relief form this Court. *See Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1170-71 (Fed. Cir. 2014) ("[T]he record shows that a loss of market share and customers is a loss that Trebro is not likely to recover.").

## 2. The Balance of Hardships Favors One World's Requested Relief

When evaluating a request for preliminary injunctive relief, courts must balance the potential hardship to each party. *See Winter*, 555 U.S. at 20. One World has demonstrated that it is suffering, and will continue to suffer, immediate and irreparable harm absent injunctive relief. In contrast, there can be no showing of any hardship on the part of Defendants if the requested injunction does issue.

Defendants argue that a preliminary injunction would harm "the Government's administration of the customs laws . . . by short-circuiting the regulatory process for administration and enforcement of the ITC's exclusion orders." (Dkt. No. 22 at 34.) But Defendants fail to explain how this could be the case. In fact, Defendants' burden in enforcing the LEO will be diminished with preliminary injunctive relief, not increased.

As to Defendants' remaining arguments on the balance of hardships, the issue before the Court is not whether the ITC is permitted to "determine the need for and the scope of exclusion orders in the first instance." (Dkt. No. 22 at 34.) Nor is it whether "One World's Redesigned GDOs should be *excepted from the LEO*." *Id.* (emphasis added). The only issue is whether One World's Redesigned GDOs are covered by the LEO in the first instance. The answer is that they

are not. The IPRB, not the Commission, determined the Redesigned GDOs were subject to the LEO, and as demonstrated herein, that decision was clearly erroneous.

Finally, any alleged harm to Chamberlain is irrelevant. (*See* Dkt. No. 20-2 at 14-116.) "In balancing the hardships, harm to Plaintiff must be measured against harm to the government." *Sunpreme, Inc. v. U.S.*, 181 F. Supp. 3d 1322, 1342 (Ct. Int'l Trade 2016) (citing *Ugine-Savoie Imphy v. U.S.*, 121 F. Supp. 2d 684, 688 (Ct. Int'l Trade 2000)).

In fact, any perceived harm is mitigated by the Chamberlain's numerous admissions that the '319 patent does not cover the wireless communication utilized by the Redesigned GDOs. *See* Mot. at 12-15. Chamberlain cannot take one position to attempt to preserve the patent's validity and then take opposite positions when a competitor relies on those admissions. *See Hockerson-Halberstadt v. Avia Group Intern.*, 222 F.3d 951, 957 (Fed. Cir. 2000) ("[C]ompetitors are entitled to rely on those representations when ascertaining the degree of lawful conduct, such as designing around the claimed invention.").

### 3. An Injunction Would Serve The Public Interest

Finally, a court must consider the impact of injunctive relief on the public interest. Typically, the public interest is served by enforcing valid and infringed patents. However, the public is not served by enforcing a patent beyond its metes and bounds. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 150–151 (1989) ("The federal patent system thus embodies a carefully crafted bargain for encouraging the creation and disclosure of new, useful, and nonobvious advances in technology and design in return for the exclusive right to practice the invention for a period of years…. The attractiveness of such a bargain, and its effectiveness in inducing creative effort and disclosure of the results of that effort, depend almost entirely on *a backdrop of free competition in the exploitation of unpatented designs and innovations*.") (emphasis added); *Princo Corp. v. Int'l Trade Com'n*, 616 F.3d 1318, 1327 (Fed. Cir. 2010)

("[T]he patentee may exploit his patent but may not 'use it to acquire a monopoly not embraced in the patent.'") (quoting *Transparent-Wrap Mach. Corp. v. Stokes & Smith Co.*, 329 U.S. 637, 6443 (1947)). Here, the IPRB broadly construed the patent in a manner that would render it invalid. There is no public interest in enforcing patents in a way that would render them invalid.

Patent law encourages companies to design around patents to promote innovation by relying on the patentee's admissions as to the scope of his or her patent rights. *See, e.g., Hockerson-Halberstadt*, 222 F.3d at 957. It is through this process of disclosure and design around that innovation occurs. *See, e.g., State Indus. Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985) ("One of the benefits of a patent system is the so-called 'negative incentive' to 'design around' a competitor's products"). The public is served through greater competition in the market place by spurring innovation through encouraging better quality of products. Accordingly, "legitimate design-around efforts should always be encouraged as a path to spur further innovation." *TiVo*, 646 F.3d at 881–82.

Defendants do not dispute that (1) the public is not served by enforcing a patent beyond its metes and bounds and (2) patent law encourages companies to design around patents to promote innovation by relying on the patentee's admissions as to the scope of his or her patent rights. Although Defendants contend that injunctive relief "will harm the administration of custom laws" given "One World's attempt to bypass the ITC's modification proceeding" (Dkt. No. 22 at 36), the record proves otherwise. One World previously sought administrative remedies with the IPRB and now properly seeks injunctive relief from this court. Although Chamberlain argues in its *amicus* brief that this proceeding is a "wasteful approach to administrative litigation," that argument hardly fits the facts of this case. (Dkt. No. 20-2 at 17.) Regardless, any so-called "waste" of resources is properly attributed to Chamberlain's refusal to accept the consequences of its

admissions and could easily have been avoided if Chamberlain had not presented its baseless "part-wired/part-wireless" infringement allegations and instead recognized that the Redesigned GDOs do not infringe the '319 patent when it was first alerted to the new design in March 2018. *See* Exhibit X. Instead, Chamberlain forced One World to pursue relief from Customs and now this Court to hold Chamberlain to its numerous admissions.

## C.    Defendants' Motion To Stay Should Be Denied

As set forth more fully in One World's prior reply, Defendants' Motion to Stay should be denied because none of the three factors raised by Defendants—stage of the proceedings, streamlining of issues, and harm to plaintiff—favors their request. Dkt. No. 023, Reply Br. at 1-4 (filed Sep. 21, 2018). The Court's decision to consolidate the preliminary injunction hearing and the trial on the merits further militates against Defendants' requested relief.

With respect to the stage of the proceedings, the Court has already received the parties' initial briefing and conducted an evidentiary hearing in which it heard live testimony from One World's Senior V.P. of Product Development, Mark Huggins, and an expert on the underlying technology, Stu Lipoff. The Court is now receiving supplemental briefing, which is the final step before the Court issues its ruling. Time is of the essence in this case and the issues are ripe for adjudication. A stay would be the antithesis of what is appropriate at this stage of the proceedings.

Additionally, staying this proceeding would not streamline any of the issues for trial. This Court has exclusive jurisdiction to review Customs' denial of One World's ruling request and protest. *See* 28 U.S.C. §§ 1581(a) & (h). And as discussed during the evidentiary hearing and in One World's reply, the timing of the various proceedings before the PTAB, Federal Circuit and ITC is uncertain and will not provide One World relief before it suffers irreparable harm. (Dkt. No. 023, Reply Br. at 2-4; Hr'g Tr. at 16:4-17:6.) In particular, the PTAB's decision in One World's IPR is not due until November 4, 2018, and even if One World is successful in that

proceeding, the ITC is unlikely to defer to the PTAB's decision until it is affirmed on appeal. *See Certain Network Devices, Related Software and Components Thereof (II)*, Inv. No. 337-TA-945, Comm'n Op. at 11-12 (Aug. 16, 2017); *Certain Laser-Driven Light Sources, Subsystems Containing Laser-Driven Light Sources, and Products Containing Same,* Inv. No. 337-TA-983, Order No. 8 at 8-9 (Mar. 4, 2016) (refusing respondents' motion to stay in part because "[t]here [was] no final judgment" in the IPR proceeding).

Further, One World's motions to stay enforcement of the LEOs that are currently pending before the Federal Circuit and ITC also provide no grounds for denying One World's requested relief. Even if One World is successful on those motions, any such ruling would not include an order for Customs to release the currently-excluded goods, and One World would be right back before this Court seeking another order compelling Customs to release the goods. This all but guarantees that One World will suffer irreparable harm because if the currently-excluded goods are not immediately released, One World will run out of inventory before new shipments can arrive in the U.S. *See supra* Section V.B.1. Likewise, even if the Federal Circuit and ITC were to deny One World's motions to stay, those decisions would not be binding and would not resolve the disputes presently before this Court. Neither the Federal Circuit nor the ITC have the benefit of the record that has been developed in this case—including Customs' findings, One World's rebuttal papers, Mr. Huggins' testimony on the irreparable harm that One World will suffer absent immediate relief, and Mr. Lipoff's testimony that the patent claims are invalid under Customs' interpretation. The record in this case provides ample basis for this Court to find irreparable harm.

For all these reasons, Defendants' motion should be denied.

## VI.    <u>CONCLUSION</u>

For all of the foregoing reasons, One World respectfully requests that Defendants be enjoined from enforcing the exclusion order against One World's detained, non-infringing products, and the Court issue a declaration that the Redesigned GDOs should not be excluded under the LEOs.

Dated:  October 4, 2018

Respectfully submitted,

By: /s/ *Jason C. White*
Jason C. White
Michael Abernathy
**Morgan, Lewis & Bockius LLP**
77 West Wacker Drive
Chicago, IL 60601
Telephone: (312) 324-1000
Facsimile: (312) 324-1001

Stephen E. Ruscus
**Morgan, Lewis & Bockius LLP**
1111 Pennsylvania Ave, N.W.
Washington, D.C. 20004
Telephone: (202) 739-3000
Facsimile: (202) 739-3001

Of Counsel:
  Eric S. Namrow
  Susan Baker Manning
  **Morgan, Lewis & Bockius LLP**
  1111 Pennsylvania Ave, N.W.
  Washington, D.C. 20004
  Telephone: (202) 739-3000
  Facsimile: (202) 739-3001

  Nicholas A. Restauri
  **Morgan, Lewis & Bockius LLP**
  77 West Wacker Drive
  Chicago, IL 60601
  Telephone: (312) 324-1000
  Facsimile: (312) 324-1001

*Attorneys for Plaintiff One World Technologies Inc.*

**CERTIFICATE OF COMPLIANCE WITH WORD COUNT**

I, Jason C. White, relying upon the word count feature of the word processing program used to prepare this brief, certify that this brief complies with the Court's chambers procedure on word count limits, and contains less than 14,000 words.

Dated:  October 4, 2018                                      /s/   *Jason C. White*
                                                                            Jason C. White

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on October 4, 2018, I caused the foregoing **PLAINTIFF ONE WORLD TECHNOLOGIES, INC.'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND REQUEST FOR DECLARATORY JUDGEMENT** to be electronically filed with the Clerk of the U.S. Court of International Trade by using the CM/ECF system, which will automatically generate and serve notice of this filing to all counsel of record, including counsel for the Defendants listed below:

Guy R. Eddon
U.S. Department of Justice
International Trade Field Office
26 Federal Plaza
Room 346
New York, NY 10278
(212) 264-9232
Fax: (212) 264-1916
Email: *guy.r.eddon@usdoj.gov*

Amy Michelle Rubin
U.S. Department of Justice
International Trade Field Office
26 Federal Plaza
Room 346
New York, NY 10278
(212) 264-9237
Fax: (212) 264-1916
Email: *amy.rubin@usdoj.gov*

Edward Francis Kenny
U.S. Department of Justice
Commercial Litigation Branch - Civil Div.
26 Federal Plaza
Room 346
New York, NY 10278
(212) 264-0480
Fax: (212) 264-1916
Email: *edward.kenny@usdoj.gov*

*/s/ Nina Armah*

NINA ARMAH
Paralegal
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2541